[No. S004494. Crim. No. 23019. July 30, 1992.]

THE PEOPLE, Plaintiff and Respondent, v.
DOUGLAS DANIEL CLARK, Defendant and Appellant.

48

50

COUNSEL

Harvey R. Zall and Fern M. Laethem, State Public Defenders, under appointments by the Supreme Court, Donald L. A. Kerson, Larry Pizarro and Verna Wefald, Deputy State Public Defenders, for Defendant and Appellant.

John K. Van de Kamp and Daniel E. Lungren, Attorneys General, Steve White and George Williamson, Chief Assistant Attorneys General, Carol Wendelin Pollack, Acting Assistant Attorney General, John R. Gorey, Ivy K. Kessel, Susan Lee Frierson and Robert S. Henry, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

ARABIAN, J.—Defendant Douglas Daniel Clark appeals from a judgment of death under the 1978 death penalty law. A jury found him guilty of six counts of first degree murder. (Pen. Code, § 187.)[1] Multiple murder special circumstances and enhancements for personal use of a firearm were found true as to each of the murder charges. (§§ 190.2, subd. (a)(3), 12022.5.) The jury further found defendant guilty of one count of mutilation of human remains, as to one of the murder victims (Health & Saf. Code, § 7052), and of attempted murder and mayhem as to a different victim. (§§ 187/664, 203.) Allegations that defendant had personally used a deadly weapon were found true as to the attempted murder and mayhem counts. (§ 12022, subd. (b).) An enhancement allegation for intentional infliction of great bodily injury was found true as to the attempted murder count. (§ 12022.7.)

The jury set the punishment at death. This appeal is automatic. (§ 1239, subd. (b).) We conclude that the attempted murder and mayhem convictions must be reversed, and all but one of the multiple-murder special-circumstance findings must be set aside. In all other respects, we affirm the judgment.

I. GUILT PHASE FACTS

This case concerns the so-called Sunset Slasher or Sunset Slayer murders, a series of killings of young women which took place in the Los Angeles area between approximately May 31 and July 31, 1980.

---

[1] All further unspecified statutory references are to this code.

Police investigation did not focus on defendant until August 11, 1980, when Carol Mary Bundy, defendant's housemate, confessed to the murder of Jack Murray, her sometime lover. In the course of her confession, Bundy accused defendant of the killings. Defendant in turn theorized that Bundy committed the killings with Jack Murray, and then killed Murray in a plot to frame defendant for the Sunset murders.

The evidence against defendant was largely circumstantial and painstakingly pieced together through extensive police investigation. (Bundy did not testify for the prosecution, but only when called by the defense.) The story is further complicated by a morass of procedural machinations relating to defendant's representation. Accordingly, the facts must be set forth in some detail.

A. THE PROSECUTION CASE

1. *Murders of Gina Marano and Cynthia Chandler*

The first murders the police discovered, and those about which the most detailed evidence existed, were the killings of Cynthia Chandler and Gina Marano.

a) *Discovery of the Bodies*

About 1:30 p.m. on June 12, 1980, police were called to the scene of a freeway ramp near the Forest Lawn cemetery, where a highway worker had found the bodies of two young girls. Cynthia Chandler, a blonde 16-year-old, was found with a pink jumpsuit wrapped around her legs. One leg of the jumpsuit was slit to the crotch. There was blood on the jumpsuit, and a spot of grease or oil. Chandler's half sister, Gina Marano, age 15, was clothed only in a red tube-top pulled down around her waist. No underwear was found on or anywhere near the bodies. In addition, police found no address book or business cards in the vicinity.

b) *Coroner's Examination*

Marano was killed by two gunshots to the head. Both bullets exited the skull. Chandler had been shot in both the head and the chest. The chest wound was a contact wound. Two .25-caliber bullets were recovered after the autopsy.

Marano and Chandler had been dead at least 12 hours at the time their bodies were recovered. They were probably killed sometime on June 11, or

up to about 4 a.m. on June 12. The signs of lividity on Cynthia Chandler's body were consistent with the body having been moved from one location to another after her death. The absence of puddles of blood where the bodies were found, and post mortem scratches and abrasions on Chandler's body, indicated that the victims had been killed elsewhere and the bodies later moved.

Police criminalists testified that microscopic examination of vaginal material from Cynthia Chandler contained spermatozoa. Samples from Chandler's mouth were negative for spermatozoa or semen. No evidence of sexual assault on Gina Marano was found, but neither could sexual activity be ruled out. No bruising would occur as a result of post mortem sexual activity.

### c) *Chandler's and Marano's Movements*

On June 1, 1980, Chandler and Marano attended a party given by Mark Gottesman, an attorney, at his Hollywood home. Many people were there, including a number of Gottesman's clients. Gottesman was unsure whether his business cards were handed out at the party. Mindy Cohen, a guest at the party, saw the two girls. She talked to Gina Marano and gave the girl her telephone number. Marano wrote the number in an address book she carried with her.

On the afternoon of June 10, 1980, Henry Brigges was driving a moving truck. He picked up two female hitchhikers. One of the girls, with blonde hair, gave her name as Cindy. The other girl had dark hair. Brigges gave the blonde girl his business card, bearing both his own telephone number and the number of his brother and sister-in-law, George and Laurie Brigges. He dropped the girls off at the entrance to a freeway onramp.

Angelo Marano, the father of Gina Marano and the stepfather of Cynthia Chandler, last saw them alive in early June 1980. Gina always carried her address book containing business cards and other information; it was very important to her.

### d) *The Telephone Calls*

### (1) *Laurie Brigges*

Laurie Brigges testified that between 1 p.m. and 3 p.m. on June 16, 1980, she received a telephone call at home from a man asking for her brother-in-law, Henry Brigges. The man identified himself as a police officer in the Hollywood division who was investigating the murder of two girls whose

bodies were dumped near the freeway on June 12. The man said that one of the girls had her brother-in-law's business card. The "policeman" assured Laurie Brigges that her brother-in-law was not suspected in the killings, and that it was not necessary for Henry Brigges to contact the police. Laurie Brigges believed the man gave his name as Detective Clark. She thought the call was unusual because as the conversation proceeded, the caller became more casual and less police-like. For instance, the caller commented that the two girls had been "doing what they shouldn't"——that they were prostitutes.

Over defendant's objection, Laurie Brigges testified that she had identified defendant's voice for police from a tape recording they played for her. She also identified his voice in court as that of the caller.

### (2) Mindy Cohen

Around 11:30 a.m., June 22, 1980, Mindy Cohen received a telephone call from a man identifying himself as a detective with the Los Angeles Police Department. The man stated he was inquiring into the murders of Chandler and Marano. He said that Gina had been shot in the head, and Cindy in the heart. When Cohen inquired how the police got her phone number, the man said it was found with the bodies.

Approximately one month later, on July 24, 1980, Cohen was awakened by a second telephone call at 7:11 a.m. Cohen immediately recognized the man's voice as the same one she had heard on June 22. The caller asked "if this was Mindy"; Cohen answered yes. He asked if she remembered that he had called previously about the murders of Gina and Cindy, and said, "Well, I killed them and now I want you." The man told Cohen he had shot Gina in the head and had to shoot Cindy in the heart. He said they were prostitutes and that he had paid Cindy $30 to "suck him off." He said, "I shot them and then I made love to them and it felt so good. It felt so good." He said, "Now I want you, Mindy," and "You're next." Cohen noticed that the caller's breathing changed in the course of the conversation. That, coupled with the hesitation in his voice, led Cohen to believe that he was reaching a sexual climax. Cohen became scared and hung up the phone. She asked her father to call the police.

Cohen, like Brigges, identified defendant's voice from a tape recording. Cohen also told the police that the caller had used a two-syllable name. She was not sure of the name but thought she might remember it if she heard it. The officer suggested the name "Doug Clark." Cohen said that was the

name. She was so positive about the name "Doug Clark" that the detective did not suggest any others. Cohen testified at trial that "Doug Clark" was the name the caller gave.

### (3) Telephone Records

The prosecutor introduced telephone company records for the telephone of Bretta Jo (Joey) Lamphier, one of defendant's girlfriends with whom he sometimes lived. The records for June 16, 1980, reflected three significant telephone calls: a call at 2:13 p.m., from Lamphier's residence to her place of employment; a call at 2:36 p.m. to the number assigned to Laurie Brigges; and a call at 2:40 p.m. to the office of Mark Gottesman. Lamphier testified that she did not make the calls. She was at work at that time. Rather, she testified, defendant telephoned her at work on that afternoon. Defendant told her he was at her apartment, and that he would be calling some movers to arrange to move some of his property from Lamphier's residence into a new apartment on Verdugo Street that defendant intended to share with Carol Bundy.

The July 24, 1980, telephone call to Mindy Cohen was made at 7:11 a.m. from the telephone at the Verdugo Street apartment defendant shared with Carol Bundy. Records showed that defendant clocked in at work at 7:28 a.m. that same morning. It took defendant two to five minutes to get from the apartment on Verdugo Street to his place of work a few blocks away on Verdugo Street.

### 2. Murders of Karen Jones and Exxie Wilson

Between 2:00 and 2:30 a.m. on June 23, 1980, Officer Guzzetta was patrolling on Sunset Boulevard when he met a prostitute named Karen Jones, whom he warned not to loiter in that area. A resident of the area heard a scream outside his home between 2:25 and 2:40 a.m. At 3:15 a.m., Karen Jones's body was discovered lying by the curb in a pool of blood around her face and hair. The cause of death was a gunshot wound to the head. A .25-caliber jacketed bullet was retrieved from the skull. The gun had been held approximately six to twelve inches from the head when the shot was fired. The coroner estimated that Jones died sometime between 12 midnight and 2:00 a.m. on June 23. The coroner's examination could not determine whether Jones had engaged in sexual activity shortly before her death.

At 7:15 a.m. that same morning, a decapitated body, later identified as that of Exxie Wilson, was discovered in the parking lot of a restaurant. A red dress with a sash was found in a dumpster next to the body. The sash was cut

into pieces. No other articles of clothing were found at the scene. Four days later, around 1 a.m., June 27, 1980, a wooden box was discovered in an alley. The severed blonde head of Exxie Wilson was inside the box, wrapped in a pair of blue jeans and a pink T-shirt with the inscription "Daddy's Girl." (These items of clothing were ultimately identified as belonging to another victim, Marnette Comer.) The head had been frozen, and appeared to have been scrubbed or scoured.

The coroner determined that Wilson, like Jones, had died sometime between midnight and 2 a.m. on June 23, 1980. The head had probably been cut off after death, although the victim might have been dying or unconscious. Approximately 15 to 20 cuts were required to sever it. The cause of death was a gunshot wound to the back of the head. A .25-caliber jacketed bullet was recovered from the head. Three vaginal samples from Wilson's body all contained spermatozoa.

3. *Murder of Marnette Comer*

On June 30, 1980, the nude body of Marnette Comer, a blonde prostitute, was found in a ravine off Foothill Boulevard, not far from the freeway. Freeway lights were visible from the site in the ravine where the body was found. The ravine itself was dark at night. Comer had been dead for some time—from 20-90 days according to the coroner's estimate—and the skin had become dried and mummified. The autopsy showed that Comer had suffered three gunshot wounds to the chest area. Two .25-caliber bullets were recovered from the body.

Sabra Comer, the sister of Marnette Comer, last saw the victim on May 21, 1980. At that time, Marnette was wearing a pink T-shirt with the words "Daddy's Girl" printed on it, like the one found with Exxie Wilson's head.

4. *Murder of Jane Doe 18*

On August 26, 1980 (after defendant's arrest), another body was discovered near the Sierra Highway in Antelope Valley. A worker inspecting some nearby water towers came upon some human bones, scattered in a 10-foot radius about an oily spot that smelled of decomposing flesh. A clump of blonde hair was found in the vicinity of the site where the remains were found. The victim, an unidentified young female who had died about one to two months earlier, was designated merely "Jane Doe 18." The cause of death was a gunshot wound to the back of the head. The coroner removed a .25-caliber jacketed bullet from the temporal area of the skull.

5. *Attempted Murder and Mayhem of Charlene A.*

Charlene A. testified that around 10 p.m., April 27, 1980, she was on Sunset Boulevard. A man she identified at trial as defendant approached

driving a blue station wagon, and solicited an act of oral copulation. After she entered the car, defendant suddenly began stabbing her repeatedly in the back, neck, arms, chest and stomach. In the ensuing struggle, Charlene grabbed the knife by the blade. The blade severed tendons in her hand. At one point, she said, "Mister, that's blood. You're hurtin' me." He laughed and said, "I know." She was finally able to open the car door and escape. Charlene later identified defendant's photograph from a lineup, and identified him in court.

### 6. Defendant's Arrest and Interrogation

On August 11, 1980, Carol Bundy called police to confess to the murder of Jack Murray, her lover. In the course of that confession, she said that she had discovered sometime in June that her roommate, defendant, was engaged in the Sunset murders. She said she helped defendant dispose of Exxie Wilson's head. As she found out more about the murders and became more deeply involved, Bundy confided in Murray. Then, because she was afraid that Murray would tell the police, she shot him in the head, decapitated him, and cut his body with a knife. Defendant helped Bundy dispose of Murray's head.

Defendant was initially taken into custody for his possible involvement in the Murray murder. He was also questioned about the Sunset killings. The interview is relevant to these crimes in several respects.

### a) Defendant's Sexual Activities and Attitudes

Detective Orozco asked about defendant's activities in the Hollywood area. Defendant admitted he went to the Hollywood area "pretty much" on a regular basis, primarily to "troll" for prostitutes and to go to clubs. Sometimes defendant would go by himself, but other times he would go with Bundy. He picked up "hookers" on Sunset Boulevard and several other locations. One night, he and Bundy "cruised" Anaheim after reading news stories of the Sunset killings because they wanted to see other areas where prostitutes hang out. Bundy also sometimes went with defendant and paid hookers for "threesomes."

Defendant said that his mother knew "I've been a little weird for a long time. She caught me dressed in her and my sister's underwear when I was nine years old." Defendant told police that he had "started into damn near everything" when he was in the ninth grade in Switzerland, "[a]nd since then I've never been able to look at sex just straight on. It had to be kinky or at least good communication. [¶] . . . [¶] And so with hookers, if the girl was

a human being first and a hooker second, instead of vice versa, then . . . it was great. It—it was a challenge." Defendant said that simply picking up hookers was too easy, so he started going to dancer bars because it was an "ego trip" to be the one man of all those at the bar who walked out with the dancer. In addition, defendant said, "It also was the kind of woman I wanted—tough enough to stand up there and say 'You can look; don't touch.' "

Defendant told police he had known "about 100 whores" since he had been living in Los Angeles, and that it was important to be able to have a conversation with a prostitute; defendant would "shine on" a hooker who just says how much and gets down to it. He denied any interest in necrophilia.

b) *Knowledge of the Charged Offenses*

Detectives showed defendant photographs of the five victims then known. Defendant recognized Cynthia Chandler's photograph as that of a part-time prostitute he had met at the Malibu pier. Defendant thought her name was "Cynthy" or "Cindy" and stated that he had her phone number in his wallet. The two had "partied" about a half dozen times. He was upset when he read about her death in the newspaper and "[i]t scared the fuck out of me because she had my phone number." Defendant said he exchanged phone numbers with all the girls he liked.

Defendant otherwise denied knowing about the deaths of the five girls. He had heard of the name Exxie in the paper, but "must have missed" reading about a head in a wooden box connected to the crimes. Defendant told police he read the newspaper "religiously" every day and specifically had been interested in stories about the Sunset killings because they involved prostitutes.

c) *Defendant's Access to Weapons and Cars*

Police asked defendant whether he was familiar with two .25-caliber Raven automatic pistols registered to Carol Bundy. Defendant stated that he had handled both guns and test-fired them into a telephone book. He told police he believed Bundy had gotten rid of or sold them. When police officers said that they would like to have the guns, defendant responded, "I bet you would. I—I can understand that." Defendant told police he had "no idea" where they were, although he knew "goddamn well" he did not have them and they were "not in my area." Defendant admitted that he customarily carried a .25-caliber automatic in a clip-on holster in his boot, even though he knew it was unlawful to do so.

When police indicated they had a piece of physical evidence linked to the crimes, defendant surmised that Detective Stallcup might have a bullet in his pocket. Defendant immediately stated that police might have recovered bullets "from the car" because defendant remembered shooting the gun into a telephone book.

Defendant additionally admitted owning a folding knife with a silver handle which he might have left at work. He also had a buck knife which he had given to his brother. He said he had gotten rid of his buck knife, and stated he had had two or three knives.

Police asked defendant if he owned a car. Defendant said he did not; he drove Carol Bundy's Datsun sometimes, but defendant had a motorcycle. In addition, he had driven Bundy's blue Buick station wagon off and on until she recently sold it.

 d) *Defendant's Demeanor*

Although defendant was generally cooperative during questioning, he stated that he was not fully candid with the officers because "there are some things I don't want you to know and I'm not going to tell you, O.K?" Detective Stallcup also testified that defendant was the coolest murder suspect he had ever interviewed. Defendant's behavior changed only when he was interrogated about molesting a 12-year-old girl, Shannon O. Defendant became embarrassed when the police indicated they had a photograph album showing defendant engaged in sexual activities with her.

7. *Postarrest Investigation*

 a) *Telephone List Seized From Defendant's Wallet*

Defendant's wallet was seized when he was detained at the police station for questioning. The wallet contained a piece of paper with these words on one side:

"Mindy C. [telephone number]

"B. Hills not working

"Friend of Cindi's

"pretty."

The opposite side contained the notation:

"Cindy [telephone number] Rm bottom left

"Blonde hooker 30"

"Cathy too."

The telephone number given for "Mindy C." was Mindy Cohen's actual telephone number. The telephone number listed for "Cindy" was for the Palm Motel on Sunset Boulevard, in an area frequented by prostitutes.

b) *Search of Defendant's Apartment*

At the conclusion of the interrogation, defendant, Detective Orozco, and other officers went to defendant's Verdugo Street apartment. Defendant pointed out his bedroom and a filing cabinet which he stated belonged to him. Inside the filing cabinet, Detective Orozco found a newspaper opened to an article describing the recovery of the box containing Exxie Wilson's head, and numerous pornographic books and magazines, some depicting necrophilic activities.

c) *Defendant's Rental Garage*

During the interview, defendant admitted he had rented a small storage garage in Burbank in January 1980. Defendant told police he had given up the garage in May 1980, although other evidence at trial established that he had rented it through June 1980 and abandoned it sometime in July. Police found several dark stains on the garage floor which appeared to be blood. One was a smear approximately two and one-half feet wide and eight feet long, as if something bloody had been dragged across the floor. Presumptive, though not conclusive, testing of the stains proved positive for blood. One of the stains was a partial print of the sole of a boot. The bootprint itself also showed a positive reaction to a presumptive test for blood.

Police later seized a pair of black boots defendant was wearing. The sole of the boots matched the bloody bootprint. This was the same boot in which defendant had admitted carrying a .25-caliber automatic.

8. *Other Evidence*

a) *The Guns*

On April 25, 1980, Bundy applied to purchase two .25-caliber Raven automatic pistols at a pawnbroker in Van Nuys. The guns were nearly identical; one had a bright chrome finish and the other had a slightly duller nickel finish. Bundy received the guns on May 16, 1980.

Eleanor (Cissy) Buster first met defendant in May 1980. He moved in with her shortly after Memorial Day. Buster testified that defendant habitually carried two small Raven automatics. He usually carried one in his boot and the other in his jacket. Defendant told Buster he had obtained the guns at a pawnshop on Van Nuys Boulevard. Defendant never went out without taking his guns with him.

Frances Huys was defendant's high school sweetheart. They lost contact in 1968. Then, in 1980, defendant invited her to visit him in Los Angeles over the Memorial Day weekend. Defendant took Huys to an apartment he said he had formerly shared with Carol Bundy (the Lemona Street apartment). There he obtained a gun and ammunition. Defendant told Huys that he had persuaded Bundy to buy a gun for him by falsely telling her that he had a federal conviction and could not purchase it himself. Huys testified that defendant's gun was shiny and silver, like the chrome Raven.

Carlos Ramos was a steam boiler operator at the plant where defendant worked. Defendant, a licensed steam engineer, was training Ramos to operate the boiler. Ramos had seen defendant cleaning guns at work—two smaller guns and a large gun like a .44. On August 15, 1980, another employee told Ramos that police were going to search the plant for guns. Before the police arrived, Ramos found two Raven pistols inside a cosmetic bag hidden in a remote area near the top of the boiler room. Detective Stallcup took custody of the guns the same day.

The plant watchman testified that, on the night of August 9 to 10, 1980, defendant came to the plant after hours. Defendant said he was not feeling well and wanted to get something out of the building. Defendant signed the visitors' log at 2:06 a.m. on August 10, entered the plant, and returned and signed out at 2:15 a.m. The watchman did not see defendant carrying any guns, but defendant was carrying or wearing a jacket which could have concealed small guns like the Raven automatics. A round trip from the watchman's station to the place where the guns were found would take approximately five minutes.

Comparative ballistics tests established that all the bullets recovered from all of the victims in this case were fired by the nickel Raven, one of the guns found hidden at defendant's place of employment.

b) *The Cars*

During the relevant time, Bundy owned a blue Buick station wagon until she sold it on July 17, 1980. Bundy also purchased a small Datsun automobile. Defendant had regular access to both cars, even when not living with

Bundy; he frequently drove the Buick. For example, Cissy Buster testified that defendant had the Buick station wagon virtually continuously from the day he moved into her house (June 3) to the day he left (June 22). Defendant used the station wagon to pick up Frances Huys at the airport in May 1980, and was driving it when he met another witness, Elaine Forrestall, around June 7. Joey Lamphier testified that she often saw defendant driving a small blue car, like a Datsun or Toyota.

After the arrest of Bundy and defendant, law enforcement officers searched both vehicles. In the Buick station wagon, officers recovered .25-caliber slugs and casings which were traced to both the nickel Raven and the chrome Raven. A bullet from the nickel Raven was embedded in the passenger door of the Datsun. Evidence of blood was found inside each vehicle.

c) *Blood Type Evidence*

The police seized a large painting of a ski scene from the Verdugo Street apartment defendant shared with Bundy. Other evidence established that the painting had been kept for a time in defendant's rental garage. Several spots of blood were found on the back of the painting. Analysis of the blood spots identified a number of different blood type and enzyme characteristics which matched blood from the body of Gina Marano. A blood typing expert testified that only one out of two hundred people would share all of these characteristics.

A criminologist testified that a blood sample from the Buick station wagon shared seven identifiable characteristics which matched the blood of Karen Jones. Only one person in one hundred twenty-five would share all seven characteristics. Some blood samples in the Buick also matched four blood type characteristics of Exxie Wilson. One out of five persons would share those four characteristics.

d) *Defendant's Activities on the Date of the Chandler/Marano Murders*

Defendant was living with Cissy Buster on June 11-12, the date of the Chandler/Marano killings. Buster testified that defendant telephoned her on June 11, 1980 and told her he would be late for dinner. His work records showed that he worked from 5:10 a.m. to 12:32 p.m. that day. Defendant returned home around 8:30 p.m. and went out again at 10:30 p.m. in the Buick station wagon. Defendant told Buster he wanted to take pictures of a car that was involved in a hit-and-run accident; he borrowed her Polaroid

camera. Defendant returned home again around 2 a.m. He later showed Buster pictures of a small car in an underground garage. He pointed to what appeared to be a red liquid on the fender of the car and said the liquid was blood. Buster identified a photograph of Bundy's Datsun as similar to the car defendant showed her in the Polaroid snapshots.

### e) *Defendant's Postarrest Writings*

While defendant was in custody in the county jail, he sent numerous letters and other documents to Joey Lamphier. The documents were seized pursuant to a search warrant executed at Lamphier's residence. Among the documents was defendant's personal summary of "case notes." Defendant detailed case activity and his own actions in parallel columns. One entry acknowledged his acquaintance with Chandler, showing he had had his "4th date w/Cindy" on June 8.

In other letters, defendant importuned Lamphier to "remember" (quotations in defendant's original) the facts as he wanted her to, suggesting that if she failed to do so she would be responsible for his death. In particular, defendant wrote about a specific instance in which he wanted Lamphier to say that he had had the chrome Raven rather than the nickel Raven. Defendant admitted being at Lamphier's house on June 16 and making the telephone calls from her residence reflected in the telephone records for that afternoon (i.e., the calls to Lamphier, to Laurie Brigges, and to the office of Mark Gottesman). Defendant also acknowledged he had given his buck knife to Lamphier and told her to get rid of it. He chastised her for not following his instructions, asserting that the knife was not connected to the crimes, but that it would look bad if the jury knew he had owned knives.

Defendant urged Lamphier to become his investigative eyes and legs, exhorting her to "photograph scenes" from the murder locations and to "see the freeway lights from where #70 [Comer] lay in a ravine for 30 days."

An excerpt from another document indicated defendant's concern, if he represented himself, that he might have to allow his attorney, Maxwell Keith, to cross-examine two key witnesses, because "if *I* do the direct- or cross-exam on them it will be VERY harmful to our case." (Defendant's emphasis.) The prosecution theorized that this note referred to Mindy Cohen and Laurie Brigges, the two witnesses who heard defendant's voice on the telephone and who would be able to identify him if they heard his voice in court.

Other writings indicated that at a court-ordered examination of physical evidence, defendant deliberately handled certain items to place his fingerprints on them so that police would be unable to prove any preexisting

fingerprints; that defendant had altered his appearance by losing weight; and that he had sent case exhibits to a prisoner in the State of Washington for her titillation and amusement. A writing by Joey Lamphier acknowledged that she had destroyed some of defendant's letters at his request.

### f) *Defendant's Sexual Proclivities*

In addition to defendant's statements to the police about his sexual interests and practices, additional evidence was introduced at trial.

Defendant was a regular patron of a bar where Donielle Patton worked. Defendant often talked to Patton about his sex life. He complained that his sex life had become boring and he was looking for new ways of obtaining gratification. Defendant said he was "into S & M" (sadomasochism) and physical abuse. Defendant also talked about picking up "hookers" and going to "swing parties." Defendant told Patton he liked to pick up hookers on Sunset Boulevard, that it made him feel superior since they were so far beneath him. Patton saw defendant at the bar with various women, including Carol Bundy, Cissy Buster, and, based upon a photograph she was shown, Cynthia Chandler. Patton also testified about one incident when defendant came into the bar very excited. He told Patton that he had found a new way of reaching a sexual "high": he would engage a prostitute in sex and slit her throat. Defendant found the jerking motion of her body and her vaginal spasms as she died to be sexually exciting. Patton did not initially believe defendant because she could not believe that anyone would actually do such a thing and then boast about it.

Shannon O., who was 14 at the time of trial in 1982, testified that she would often ride with defendant in the Datsun or the Buick automobile. Defendant would point out prostitutes standing on the street. Shannon once heard defendant say he would like to pick up a "rowdy prostitute" and shoot her if she pulled a knife on him. On another occasion, with both Shannon and Carol Bundy present in the car, defendant paid a prostitute $25 to orally copulate him.

In addition, three of defendant's girlfriends testified that he collected and wore women's underwear.

## B. THE DEFENSE CASE

In his opening statement, defendant stated his intent to prove that Carol Bundy, a vocational nurse, and her former lover, Jack Murray, were the real killers. Bundy was granted immunity by the district attorney before she

testified for the defense. Bundy did not implicate Murray, however, but testified that defendant had committed the instant crimes.

1. *Carol Bundy's Testimony*

a) *Background*

In late 1979, Bundy was living at the Valerio Gardens apartments. Jack Murray was the manager. In December, Bundy met defendant at a country-western nightclub where Murray sometimes sang. Defendant was looking for someone to move in with. By January or February 1980, Bundy had moved to an apartment on Lemona Street in Van Nuys (the Lemona apartment) and defendant had moved in with her. Over the next few months, defendant moved in and out of the Lemona apartment several times, living with various other women for short periods of time.

Bundy and defendant agreed to share a new apartment on Verdugo Street in Burbank (the Verdugo apartment) in late June 1980. Defendant moved into the Verdugo apartment about one week before Bundy. Bundy testified she was still living at the Lemona apartment on June 23, 1980, and did not move to the Verdugo apartment until after that date. Bundy and defendant often fantasized together about sexual matters, including necrophiliac activities.

Bundy purchased two Raven .25-caliber automatic pistols at a pawnshop in Van Nuys in April 1980. The day before Bundy purchased the guns, defendant had gone to the pawnshop, selected the guns he wanted, and then sent Bundy to purchase them. Defendant told Bundy that he was an ex-felon, having committed an armed robbery in Indiana, and that it was illegal for him to purchase the guns himself. Defendant kept the nickel Raven pistol, while the chrome Raven was Bundy's gun. Defendant had access to both guns, however, and sometimes carried both.

Bundy recalled that Frances Huys and defendant came to the Lemona apartment immediately before the Memorial Day weekend in May 1980. Defendant borrowed Bundy's chrome Raven pistol and left the nickel Raven in Bundy's closet. Defendant told Bundy he borrowed the chrome gun because, if he were stopped by police, he did not want to have a "dirty gun" in his possession and the chrome gun had not been previously fired.

During the night of August 9 to 10, 1980, the night Jack Murray's body was discovered, Bundy asked defendant to get rid of the guns. Defendant left the Verdugo apartment and returned approximately 15 minutes later. Defendant did not tell Bundy what he had done with the Raven pistols, although he

had previously confided to her that he occasionally hid them in the boiler room at work.

b) *The Crimes*

(1) *Marano/Chandler Murders*

Bundy first learned about the murders when defendant telephoned her at work on June 12 or 13, 1980, and directed her to watch the television news. The news broadcast depicted the recovery of the bodies of two teenage girls, Chandler and Marano.

Defendant later told Bundy he had picked up the two girls on the afternoon of June 11. He was only interested in Chandler, the blonde, but Marano would not leave, so he invited both girls into the Buick. He paid Chandler $30 to orally copulate him. Defendant told Marano he did not want her to watch. When Marano turned her head, defendant shot her. Chandler pulled away, and defendant also shot her in the head. The girls did not die right away, so defendant again shot Marano in the head and Chandler in the heart.

After shooting the girls, defendant drove to his rental garage, where he dragged their bodies inside and "played" with them sexually from approximately 4 to 8 p.m. on a bed he kept in the garage. Defendant said he engaged in anal intercourse with Marano, vaginal intercourse with Chandler, and had ejaculated twice in Chandler's throat. Defendant left the garage, returning after dark to pick up the bodies and dump them alongside the freeway. Defendant gave Bundy two bullets which he said had gone through Gina Marano's head.

A few days later, defendant took Bundy for a ride in the Datsun to show her where he had dropped off the bodies of Chandler and Marano. During the drive, defendant had the nickel Raven pistol on the seat beside him. Defendant threatened Bundy not to tell police about the murders.

Sometime after this incident, defendant told her that he had called a girl named Mindy Cohen, whose telephone number he had found among the personal belongings of the two teenage girls. Defendant told Bundy he "got off" on making that telephone call. Defendant called Mindy Cohen a second time and threatened her. Cohen became upset and hung up the telephone, which caused defendant to panic. He called Bundy at work and demanded to know where the two Raven pistols were. He was concerned that he might have told Cohen too much.

### (2) *Marnette Comer*

Defendant told Bundy that on May 31, 1980, he had killed another girl, whom he called "Foothill" (Marnette Comer) because he had dumped her body near Foothill Boulevard. He told Bundy he had picked up Comer on Sunset Boulevard while driving Bundy's newly purchased Datsun. He said that he had shot Comer four times. When Comer realized she was being fired upon, she became angry, called defendant names, and kicked at him. Comer's foot missed defendant and instead broke the handle of the gearshift of the Datsun. After defendant shot Comer, he "gutted her," slitting her belly.

### (3) *Jones/Wilson Murders*

Around 4:30 or 5:00 a.m., June 23, 1980, defendant came to the Lemona apartment, where Bundy was still living, woke Bundy up, and told her that he had killed two prostitutes.[2] Defendant first saw them together on Ventura Boulevard in Studio City. Defendant was sexually interested in only one of them, Exxie Wilson. Eventually, defendant got Wilson to enter the Buick alone. He drove to a restaurant parking lot and shot her in the back of the head as she orally copulated him. Defendant cut off her head with a buck knife. Defendant then went back to look for Karen Jones, the second prostitute, because he was afraid she might identify him. Defendant found her, shot her and left her fully clothed body on the street. Jones was not sexually molested.

A few days later at the Verdugo apartment, Bundy saw Exxie Wilson's frozen head on the kitchen counter near the sink. Defendant swung the head by the hair and asked Bundy to put makeup on it. Then defendant became worried that the makeup would show fingerprints, so Bundy washed the head. Bundy later purchased a wooden box, in which defendant placed Wilson's head, wrapped in the pink "Daddy's Girl" T-shirt, and a pair of blue jeans. They dropped the box in an alley not far from the parking lot where Wilson's body had been.

---

[2]Telephone records also indicated a call was made from the Verdugo apartment to the Lemona apartment at 3:08 a.m. on June 23, very shortly after the Wilson/Jones killings. It lasted seven minutes. As between Bundy and defendant, each of whom accused the other, the logical inference is that the caller, i.e., whoever occupied the Verdugo apartment on June 23, was the murderer. Bundy testified she was living at the Lemona apartment. She did not specifically remember receiving a call at that time from defendant, though she did remember that he came to the Lemona apartment. Defendant, on the other hand, insisted he was staying in the Lemona apartment on June 23, and received the call. He testified that, when he answered the phone, there was no one on the line, but he deduced from telephone records that Bundy must have been the caller. According to defendant's account, however, he would have listened to dead silence for seven minutes.

### (4) *Jane Doe 18*

Sometime in late July or early August 1980, defendant told Bundy he had picked up a prostitute, whom he called "Water Tower" (Jane Doe 18) in Hollywood, and killed her in the Datsun. He shot the victim in the back of the head while she was orally copulating him. Defendant drove to a remote area near some water towers, dragged the body from the car, and laid it against the hood of the car. He engaged in sexual intercourse with the dead body.

### (5) *Charlene A. Assault*

Bundy also described an incident in late April 1980, when defendant came to the Lemona apartment late at night, covered with blood. Defendant told Bundy he had picked up a woman in a bar and had taken her to the Buick station wagon where she orally copulated him. Suddenly, a man named Nick, a rival member of a professional murder organization, came out of the bar, opened the door of the Buick, and attacked defendant with a knife. Defendant grabbed his knife which he kept in the visor of the Buick and began stabbing at the man. He stabbed the woman numerous times instead. She cut her right hand severely when attempting to grab the knife. The woman eventually jumped out of the station wagon and ran away. Defendant told Bundy he killed Nick.

### c) *Move to Verdugo Apartment/Defendant's Garage*

On June 12, 1980, Bundy applied to rent the Verdugo apartment, with defendant as a co-occupant. Defendant moved into the Verdugo apartment before Bundy. The telephone, "a top priority" to defendant, had already been connected. Bundy helped defendant move his belongings, including the large ski painting with the blood spots, from the rental garage in Burbank to the Verdugo apartment. As defendant hung the ski painting on the wall, he laughed and told Bundy the bloodstains in the back belonged to Gina Marano.

Bundy and defendant then cleaned out the rental garage. Bundy swept out the garage while defendant scrubbed stains from the concrete floor. This was the only occasion that Bundy was ever inside that garage.

### 2. *Defendant's Testimony*

Defendant denied killing Gina Marano and Cynthia Chandler on June 11, 1980. He admitted he telephoned Mindy Cohen at 7:11 a.m. on July 24,

1980, and identified himself as "Doug," but claimed that Chandler had given him that phone number and that he believed he was calling Chandler. Defendant testified that he asked for "Cindy" and that the conversation was confused between the names Cindy and Mindy. He stated that Cohen became hysterical and hostile and threatened to call the police. Defendant denied threatening Cohen or telling her that he had killed the two girls near the Forest Lawn exit.

Defendant also admitted making the telephone calls from Joey Lamphier's residence on June 16, 1980. He denied, however, that he told Laurie Brigges he was a detective investigating the Chandler/Marano homicides. He claimed he only talked about hiring a mover to help him move to the Verdugo apartment. He claimed Bundy had supplied him with telephone numbers of movers to call.

Defendant denied committing any of the other murders or assaulting Charlene A. He claimed, though without any supporting evidence, that Jack Murray committed the murders.

### 3. Defendant's Postarrest Writings

Defendant was impeached by letters and documents he wrote after his arrest.

In letters to Carol Bundy while they were incarcerated, defendant attempted to persuade her to present false evidence at defendant's trial. Chiefly, defendant urged Bundy to testify that Murray, not defendant, was the killer.[3] Some of defendant's writings indicated firsthand knowledge of the crimes (e.g., defendant knew that Marnette Comer wore "sexy bikini 6's" underwear although he claimed never to have seen or met her; he knew freeway lights were visible from the ravine where her body lay).

Defendant also corresponded with Veronica Lyn Compton, a prisoner in the State of Washington, in which he referred to his plan to have Bundy "lay it [the murders] on dear, dead Jack [Murray]," and his threats to retaliate if she did not. Defendant also wrote that he needed a "foxy blonde" attorney to "offset the 'blonde whore' motive." Defendant sent coroner's photographs and other case materials to Compton for her amusement. Much of his writing consisted of sexually oriented matter, including references to necrophilia.

---

[3] Defendant also boasted that he had "gone 'Pro per' at least 3 times" and had the "case so fraught with controversial Judge's rulings it will be an appeals court NIGHTMARE, should it ever get so far." (Emphasis by defendant.)

## II. Guilt Phase Issues

### A. Defendant's Representation

Defendant makes a number of interrelated contentions with regard to his representation.

#### 1. *The Facts*

In case No. A361671, defendant was originally charged with the six counts of murder, three counts of sexual misconduct against minor Shannon O., and one count of being an accessory to the murder of Jack Murray. The preliminary hearing on those charges began on October 20, 1980. Defendant was then represented by Karl Henry, an attorney apparently appointed to represent him. Defendant was held to answer on all charges.

Defendant was arraigned in superior court on November 13, 1980, on the same counts, with the addition of the count of mutilation of human remains (Health and Saf. Code, § 7052). Because the public defender declared a conflict, the court appointed Paul Geragos to represent defendant. Defendant immediately moved to act as assistant counsel and to have "pro per" (in propria persona) privileges in the jail. Among other reasons for requesting cocounsel status, defendant stated that he had been dissatisfied with Henry's representation in the municipal court. The trial court (Judge Keene) denied the motion without prejudice. On December 9, 1980, defendant's renewed motion for cocounsel status before Judge Ringer, the judge assigned to hear pretrial motions, was heard and again denied.

On June 12, 1981, Geragos was relieved on the ground of a conflict of interest, and Maxwell Keith was appointed to represent defendant. Defendant requested law library privileges for the purpose of filing a civil suit against his former attorney, Karl Henry. The court denied the request.

On July 6, 1981, Judge Ringer granted defendant's request for "pro se" privileges, excluding law library access. Defendant described the "pro se" privileges as "the same things as pro per, but I don't need the law library." In November 1981, Keith moved for an ex parte order that defendant be granted law library privileges in order to assist with the preparation of the defense. Judge Ringer ultimately granted the motion on April 19, 1982. Defendant was accorded law library privileges two hours per day, seven days a week. In addition, sometime before April 19, 1982, a different judge appointed a second attorney, Penelope Watson, to assist in the defense.

On April 2, 1982, case No. A377385 was filed, charging defendant with the attempted murder and mayhem of Charlene A. The public defender

declared it could not represent defendant because of a conflict of interest. Defendant objected to the appointment of either Keith or Watson because of their responsibility in dealing with the multiple murder charges in case No. A361671. At defendant's request, David Wesley was appointed to represent him on the new charges. Preliminary hearing on the Charlene A. charges was set for April 14, 1982. At that time, Wesley requested a continuance to pursue discovery and preparation of an affirmative defense. The motion for continuance was denied, and the preliminary hearing was held, despite Wesley's declaration that the defense was not ready and would therefore stand mute. Defendant was held to answer on the charges.

On June 9, 1982, the two cases were consolidated for trial. Wesley's separate appointment was therefore terminated and defendant was represented on all the charges by Keith and Watson.[4]

On July 8, 1982, several pretrial motions remained to be decided. The court set July 26, 1982 as a firm trial date, stating that "What I mean by a trial date is [that] we conclude all the remaining motions that are to be handled prior to the selection of the jury. [¶] As long as those motions are all made, heard and ruled upon, we get a panel. . . ." Both parties, including defendant, agreed to this procedure.

The hearing on pretrial motions was continued to July 26, 1982. The court granted in part and denied in part Keith's motion for discovery. The court asked defendant if he waived time for trial so that hearing on the remaining motions could be continued. Defendant, apparently angry with Keith over the partial denial of discovery, refused to waive time and purported to dismiss Keith, declaring "I'm thoroughly capable of handling this case." Because several defense motions remained to be heard, and the court presumed defendant did not want to abandon the motions, the court found good cause for the continuance despite defendant's refusal to waive time.

Judge Ringer thereupon set a new trial date for August 10, 1982. On August 10, hearing on the remaining defense motions began, but was not concluded. The court continued the hearing to August 12. Keith was unavailable on that date. The hearing resumed on August 13, 1982. The court heard and denied some of the motions. At that point, defendant declared that he had a conflict with one counsel (presumably Keith) and wished to bring a motion under *Faretta v. California* (1975) 422 U.S. 806 [45 L.Ed.2d 562, 95

---

[4]Defendant was ultimately tried only on the six murder counts, the count of mutilation of human remains, and the Charlene A. attempted murder and mayhem counts. The charges involving Shannon O. were severed, and the prosecutor withdrew the charge of accessory to the murder of Jack Murray.

S.Ct. 2525] to represent himself, coupled with a motion under Penal Code section 987.9 to have additional counsel (Watson) appointed to assist him. Judge Ringer advised defendant that he could bring his motion in the master calendar court. Defendant agreed. The court could not conclude proceedings on all the remaining motions, and the matter was continued.

On August 19, Judge Ringer disposed of the remaining pretrial motions, and immediately transferred the case to another department for assignment to a trial judge. Defendant informed the court that he had given his *Faretta* motion papers to Keith, pursuant to the court's instruction that defendant should file papers only through his attorney, but that Keith refused to file the papers. Judge Ringer told defendant he could make his *Faretta* motion orally before the master calendar court.

The next day, August 20, 1982, the parties and counsel appeared before Judge Leetham in the master calendar court, who assigned the case for trial to Judge Torres. Defendant told Judge Leetham that he was "not represented at these proceedings," and that Keith "is not my attorney . . . . Mr. Keith is not representing me." Defendant also stated that he had filed a *Faretta* motion and a motion for appointment of cocounsel. Judge Leetham transferred the matter to Judge Torres's courtroom.

Judge Torres considered defendant's *Faretta* motion. Defendant explained that he had attempted to declare a conflict of interest with Keith and that he had transmitted written *Faretta* motion papers to Keith. Defendant stated he had also included an application under section 987.9 to have Watson appointed to assist him in his self-representation, but Keith had failed to file the written papers. Defendant announced that he therefore considered himself in propria persona with Watson as his cocounsel, unless she did not wish to serve in that capacity. In support of his desire to represent himself, defendant referred to additional motions "that are not being prepared that should be," and stated that "There are delays that will be necessary because of discovery."

· Keith attempted, "while I am still counsel," to have defendant enter a plea of not guilty by reason of insanity. Defendant responded: "Therein lies the conflict, Your Honor. I am not guilty by any regard, way, shape or form. . . . [¶] There is no rapport, communication or any legal way that we can do business together."

The prosecutor objected to defendant's motion for self-representation. He pointed out that since Watson did not wish to remain as cocounsel if defendant represented himself, he would in effect be discharging two experienced counsel who were familiar with the case, even though defendant

conceded that "Miss Watson is fully qualified. She's a very competent attorney. I have utmost faith in her." He stated that he was "satisfied with her representation of me." The prosecutor argued that if defendant subsequently demanded appointment of other counsel, the need to acquaint additional counsel with the case would cause unjustifiable delay.

Judge Torres denied the *Faretta* motion as untimely, noting that "[t]hat matter has been transferred here for trial today" and that the case was extremely complicated, involving over a hundred witnesses in an estimated six-month trial. Keith again raised the question of the plea of not guilty by reason of insanity. Defendant refused to enter such a plea.

One final motion to suppress had been reserved, and defense counsel stated that they wished to pursue three additional unfiled motions. Over prosecution objection, the matter was continued to August 25, 1982, to hear the new motions. The motions were disposed of on that date, and jury selection commenced September 7, 1982. In the middle of jury selection, on September 20, 1982, defendant stated that he was "unrepresented in this courtroom," and complained that Keith was unprepared for trial. After this outburst, and additional remarks generally denigrating Keith, defendant was removed from the courtroom. Defendant returned to the courtroom the next day, September 21, 1982.

On September 27, 1982, the court interrupted jury selection to conduct a hearing regarding the identification testimony of Charlene A., the attempted murder/mayhem victim. At the end of the afternoon session, defense counsel informed the court that defendant desired an ex parte hearing to show that counsel was unprepared and that he needed new counsel. The trial court denied the request. On September 30, 1982, Watson told the court she wished to file a letter defendant had written explaining his reasons for the request of September 27. The court refused to receive the letter.

On October 5, the day opening statements were scheduled to begin, defendant told the court he wished to renew his *Faretta* motion and to represent himself with Watson as cocounsel. He stated that he was not ready for trial and "the defense as a whole right now is not ready" because the district attorney had named a number of witnesses that the defense had never heard of. Defendant thus did not believe any competent attorney (including himself acting as his own attorney) would declare ready for trial under those circumstances. The court advised defendant that if he was ready to proceed forthwith without any attorneys, the motion would be granted. Defendant instead complained that he "was not up to date with the progress of the case." Because defendant apparently did not want to proceed immediately, the court denied the motion.

On October 12, 1982, the fourth day of jury trial, Watson told the court that defendant wished to relieve both counsel and to proceed in propria persona. Defendant claimed that he so moved because of the incompetency of counsel. Defendant stated that he was ready to proceed forthwith, but that he would move immediately for appointment of a second counsel under section 987.9. The court informed defendant that, if he wished to represent himself, he should be prepared to go forward with no other attorneys. The court thereupon denied defendant's motion for self-represenation. Defendant then moved to dismiss Keith for incompetency and to proceed represented by Watson alone, alleging Keith was "totally unprepared." The court effectively denied the motion by bringing out the jury.

The next day, defendant renewed his motion to represent himself. The court again stated that defendant's motion for self-representation would be considered, but that, if granted, defendant would be representing himself without the assistance of any counsel. Defendant asked if the court was requiring him to waive his right to file a motion under section 987.9 for the assistance of counsel. The court stated that defendant could file the motion, but that it would be denied. The court also pointed out that investigators (William Stenberg and Susan Sarkis) had already been provided under section 987.9 to assist in preparation of the defense. Defendant stated that he "absolutely" wanted to represent himself, and indeed that "I've wanted to be pro per since approximately November 25th, 1980 [*sic*, apparently November 13, the date he was arraigned in superior court and Geragos was appointed]."

. The court advised defendant of his constitutional rights as well as the rights, responsibilities and risks attendant on self-representation. It found that defendant knowingly and intelligently waived his right to counsel and stated that defendant would be allowed to represent himself if he wished. Defendant stated that was his desire; he also said that he did not want to be his own attorney but was "forced" to because "It's my life and to proceed with Mr. Keith as my attorney . . . is suicide." Defendant called Keith "a buffoon attorney," and said that he was not prepared and that he came to court "half inebriated" in the afternoons. When the district attorney started to defend Keith, the court stated that the claims were "so outrageous they don't warrant an answer from the court." It then granted the motion for self-representation. It ordered Keith and Watson to remain in court as "standby counsel." Keith requested a hearing to determine defendant's competence to waive counsel. The court denied the request.

At the close of the day on October 14, 1982, defendant requested a "combination legal runner-clerk." The court promised to approve any qualified person whose name was submitted by investigator Stenberg. The next

trial day, October 18, 1982, defendant moved for a one-day continuance, alleging he had been unable to prepare properly because he was only allowed to transport two boxes of materials to and from the jail. The court ordered that the sheriff transport both defendant and all necessary materials to and from the jail.

On October 19, 1982, defendant advised the court that he had seen Wesley in the courtroom and asked whether he would be allowed to consult a legal adviser if he had funds available and hired one. The court stated that, if an attorney represented to the court that he was retained as defendant's legal adviser, defendant would certainly be allowed to consult with him. Defendant also advised the court that he would have a discovery list prepared by the next morning. The court, however, told defendant that discovery of any items related to the case against Carol Bundy (i.e., the murder of Jack Murray) would not be granted. Defendant complained that Carol Bundy's statements had provided the probable cause for his arrest and that witnesses to Bundy's statements were therefore relevant. The court told defendant to prepare a written motion, but defendant argued that he did not have time to prepare written motions.

Defendant stated that he "resigned" his in propria persona status, "as of now . . . because the court refuses to allow me to prepare this case, refuses to allow me evidence and discovery, refuses to present my trial tactics rather than Mr. Keith's half-wit trial tactics." When the court inquired whether defendant was giving up his self-representation, however, defendant stated he "emphatically" wanted his in propria persona status, but that he desired the court to make orders for discovery, and for transportation of defendant and his materials to and from the jail. Defendant berated and accused the court of intentionally "blockading" his preparation of the case. The court repeated its order that the sheriff was "to do everything possible to get the defendant back to the County Jail each and every evening, to the best of their ability."

On November 1, 1982, defendant filed an ex parte motion for appointment of a law student clerk. The court denied the motion. The court told defendant he would have to try the case himself, and that he would "not be getting a big large staff to handle this." If at any time defendant felt he could not represent himself, the in propria persona status could be terminated and the standby attorneys would be reappointed.

After this and other rulings of the court, during his cross-examination of a prosecution witness, defendant declared that the defense "stands mute throughout the rest of the trial." Out of the presence of the jury, the court

found that defendant had renounced his right to represent himself, and ordered the standby counsel, attorneys Keith and Watson, reinstated. The attorneys were given until the afternoon session to prepare to continue the cross-examination.

At the commencement of the afternoon session on November 1, defendant informed the court that he did not wish to be "anywhere near" Keith if he was conducting the case. At the recommencement of the cross-examination, defendant stated in front of the jury that Keith did not represent him and that he desired Keith to say and do nothing on his behalf in the case. When the trial court admonished him not to say anything, defendant told the jury to "be aware" that "Mr. Keith is not my attorney and does not represent me." Keith conducted the defense cross-examination for the balance of the afternoon.

On the morning of November 2, 1982, Watson represented to the court that defendant had reconsidered his posture of standing mute during trial and requested that his in propria persona status be reinstated. The court granted the request, with Keith and Watson again on standby. The court admonished the jury not to concern itself with whether defendant was representing himself or not.

At the close of the People's case on December 2, 1982, defendant moved to dismiss all the counts on the grounds that the trial court improperly removed his in propria persona privileges when he chose to stand mute during the trial, and that the court prejudiced the jury against defendant's conduct by restoring the self-representation with an alleged admonition to the jury that defendant had "apologized." The court denied the motion. It stated that "a defendant cannot stand up at a point in trial and say that he wants to stand mute, so I chose to have your attorney take over the case." The court also admonished defendant that "the minute you misbehave, you are going to find your attorney sitting right next to you."

Defendant made his opening statement on December 2, 1982, stating his intent to demonstrate that Bundy and Jack Murray had committed the murders. On December 6, 1982, defendant and the court discussed the production of certain documents or items of demonstrative evidence for presentation in defendant's case. The court admonished defendant he would have to show relevance before the items would be admitted or, in some cases, ordered produced. Defendant requested production of numerous items of evidence from Murray's van, where Bundy shot and then decapitated Murray. The court ruled that evidence in the Murray case was irrelevant. Defendant threatened to ask for continuances until the requested items were

supplied, accused the court of requiring him to "pre-try my entire defense in front of the district attorney," and asserted "you're way off on a tangent somewhere."

The court warned defendant to conduct himself properly, or his in propria persona privileges would be taken away, and told him that he would have to behave whether he liked the court's rulings or not. Defendant told the court to "stop that crap," and accused it of lying, of having made up its mind about the case because of having heard a preliminary motion in the Bundy case, and of other improprieties. Despite these and other abusive remarks, defendant did proceed to examine defense witnesses.

At the close of the morning session on December 6, 1982, the court took up in chambers defendant's request for funds to transport certain out-of-state witnesses to the trial. The motions were largely denied on the ground defendant failed to show that the witnesses would offer any relevant information. Following that ex parte proceeding, the court admonished defendant on the record that conduct of the defense case was different from cross-examination of prosecution witnesses, and that it was likely that many of the prosecutor's objections to defendant's questions would be sustained. The court warned defendant that it would not argue such rulings with defendant, and that the court's "patience is running out with you." Defendant accused the court of bias. The court warned defendant that he could lose his in propria persona status if he disrupted the courtroom. Defendant stated: "You keep threatening. [¶] You keep threatening that—are you trying to intimidate me? Well, you goddamn can't do that. [¶] You have threatened me, you have brow beaten me, will you just back off and do your job?" The court thereupon revoked defendant's in propria persona privileges.

The matter was continued until December 8, 1982, to allow Keith and Watson time to prepare for presentation of the defense case. On December 8, Keith moved to restore defendant's in propria persona status, indicating that defendant wished to apologize for his demeanor on December 6. The court accepted the apology but denied the motion to restore defendant's in propria persona status, stating, "He's abused the dignity of this court and the privilege. [¶] It's denied, and it is not going to be restored." Keith and Watson represented defendant for the balance of the trial.

2. *Analysis*

Defendant contends the court erred on many occasions during these events. We note at the outset that "[a]ny dispassionate reading of this record reflects that this defendant was playing games with the court on this issue."

(*People* v. *Lopez* (1981) 116 Cal.App.3d 882, 889 [172 Cal.Rptr. 374].) Indeed, defendant once implied in a letter to Bundy that he attempted to manufacture reversible error. (See fn. 3, *ante.*) As explained below, he has not succeeded.[5]

### a) *Motions for Cocounsel Status*

■ Defendant contends that Judges Keene and Ringer improperly refused to grant his 1980 motions to act as cocounsel with Geragos, and that they failed to exercise any discretion in ruling on the motions.

■ It is settled that a criminal defendant does not have a right both to be represented by counsel and to participate in the presentation of his own case. Indeed, such an arrangement is generally undesirable. (*People* v. *Frierson* (1991) 53 Cal.3d 730, 741 [280 Cal.Rptr. 440, 808 P.2d 1197]; *People* v. *Bloom* (1989) 48 Cal.3d 1194, 1218 [259 Cal.Rptr. 669, 774 P.2d 698]; *People* v. *Hamilton* (1989) 48 Cal.3d 1142, 1162 [259 Cal.Rptr. 701, 774 P.2d 730].) Although the court may authorize it upon a "substantial" showing that it will promote justice and judicial efficiency in the particular case (*Frierson*, at p. 741; *Hamilton*, at p. 1162), no such showing was made here.

■ Moreover, it is plain from the courts' remarks that they understood and consciously exercised their discretion. Judge Keene, who had just appointed Geragos, knew that defendant had not yet attempted to work with his attorney. He expressly stated that the ruling was without prejudice. Judge Ringer considered defendant's stated reasons for desiring appointment as cocounsel. Defendant's primary concern was that his counsel would need assistance in handling the case. The court advised counsel that a second attorney or a law clerk would be appointed upon an appropriate request. Defendant's further concern that he wished to understand the proceedings against him and to assist in the preparation of the defense was adequately accommodated by his ability to consult with his appointed attorney. Counsel did not express a need for defendant's assistance in researching the law; rather, he planned to request the assistance of an associate attorney or law clerk. There was therefore no abuse of discretion in denying defendant access to the law library. (See *People* v. *Warren* (1988) 45 Cal.3d 471, 480 [247 Cal.Rptr. 172, 754 P.2d 218].)

---

[5]Defendant has continued his campaign against his various attorneys on this appeal. He has filed various motions and other documents demanding that his appellate attorneys be removed and new ones appointed. As the motions lacked merit, we have denied them and other in propria persona motions in separate orders.

### b) *Faretta and Marsden Contentions*

#### (1) *July 26, 1982, Request*

█ Defendant claims that, on July 26, 1982, he made a knowing and voluntary request for self-representation under *Faretta v. California, supra,* 422 U.S. 806, which Judge Ringer improperly denied.

The right to self-representation, although constitutionally based, "must be initiated by a timely and *unequivocal* assertion by the defendant. (See *Faretta v. California, supra,* 422 U.S. at p. 835 [45 L.Ed.2d at pp. 581-582]; *People v. Windham,* 19 Cal.3d 121, 127-128 [137 Cal.Rptr. 8, 560 P.2d 1187].)" (*People v. Salazar* (1977) 74 Cal.App.3d 875, 888-889 [141 Cal.Rptr. 753], original italics.)

Contrary to defendant's contention, on July 26, 1982, he did not unequivocally assert his right to self-representation. At most, defendant was annoyed at Keith's failure to completely win a defense discovery motion. Although he purported to "dismiss" Keith, and stated "I'm thoroughly capable of handling this case," he never expressed the desire to discharge *both* his appointed attorneys and to proceed pro se. (See *People v. Lopez, supra,* 116 Cal.App.3d at p. 889.) Additionally, the trial court properly pointed out that several defense suppression motions were still pending and unheard. Defendant did not contradict the court's stated presumption that defendant did not wish to abandon those motions. Defendant's contention that his *"Faretta"* motion was improperly denied is thus without merit.[6]

#### (2) *August 1982 Faretta Motions*

█ Defendant next contends that several times he attempted to make a *Faretta* motion during the pretrial proceedings in August 1982, and that all three judges to whom he addressed his motions erroneously denied them.

█ "Although a defendant has a federal constitutional right to represent himself (*Faretta v. California* (1975) 422 U.S. 806), in order to invoke an unconditional right he must assert it ' "within a reasonable time prior to the commencement of trial." ' (*People v. Burton* [(1989) 48 Cal.3d 843, 852 (258 Cal.Rptr. 184, 771 P.2d 1270)], quoting *People v. Windham* (1977) 19 Cal.3d 121, 128 [137 Cal.Rptr. 8, 560 P.2d 1187].) A motion made after this period is addressed to the sound discretion of the trial court. (*Ibid.*) The court should consider such factors as the ' "quality of counsel's representation of

---

[6]We therefore need not consider his further contention that the denial was improper because the prosecutor stated that he himself needed extra time to prepare for trial.

the defendant, the defendant's prior proclivity to substitute counsel, the reasons for the request, the length and stage of the proceedings, and the disruption or delay which might reasonably be expected to follow the granting of such a motion." ' (*Burton, supra,* at p. 853, quoting *Windham, supra,* at p. 128.)" (*People* v. *Frierson, supra,* 53 Cal.3d at p. 742.)

Defendant contends that his *Faretta* motion was first made on August 13, 1982, and that as of that date the motion was timely. On that date, Judge Ringer directed defendant to bring his motion in the master calendar court, as it affected the conduct of trial rather than the pretrial proceedings. The court was arguably wrong in this assessment, as defendant indicated to Judge Torres on August 20 that he believed additional pretrial motions should have been, but had not been, prepared. Defendant's motions were continued, apparently for the convenience of the court, so defendant should not be charged with the delay between August 13 and August 20, 1982. (See *People* v. *Ruiz* (1983) 142 Cal.App.3d 780, 789 [191 Cal.Rptr. 249].) Accordingly, we must determine whether the *Faretta* motion was timely as of August 13, 1982.

Defendant relies on *People* v. *Wilks* (1978) 21 Cal.3d 460 [146 Cal.Rptr. 364, 578 P.2d 1369], for the proposition that the trial court was without discretion to deny his *Faretta* motion, because he made it before the actual commencement of trial. In *Wilks,* however, the court granted a motion for self-representation made over a month before trial was scheduled to begin. (*Id.* at pp. 464-465.) We did not establish a hard and fast rule that any motion made before trial—no matter how soon before—was timely. (*Id.* at pp. 467-468.)

In *People* v. *Windham* (1977) 19 Cal.3d 121, 128 [137 Cal.Rptr. 8, 560 P.2d 1187], we did not fix any particular time at which a motion for self-representation is considered untimely, other than that it must be a reasonable time before trial. (See *People* v. *Ruiz, supra,* 142 Cal.App.3d 780, 790-791; *People* v. *Hernandez* (1985) 163 Cal.App.3d 645, 652, fn. 7 [209 Cal.Rptr. 809].) Nor, despite invitations to do so, have we adopted a rigid rule that any *Faretta* motion made before the actual commencement of trial is deemed timely. (See *People* v. *Burton* (1989) 48 Cal.3d 843, 853-854 [258 Cal.Rptr. 184, 771 P.2d 1270].)

All the parties and counsel agreed on July 8, 1982, that the pretrial motions would be concluded on July 26, 1982, and the case immediately assigned for trial. The court continued the matter to August 10, and the case was thereafter continued on a day-to-day basis in the expectation that the motions would be concluded and jury selection set to begin at any time.

Thus, August 13, 1982—the date defendant first raised his *Faretta* motion—was in effect the eve of trial. That being the case, the court had discretion to deny the motion. (*People* v. *Frierson, supra,* 53 Cal.3d at p. 742.)

A review of the factors stated in *People* v. *Windham, supra,* 19 Cal.3d at p. 128, quoted above, convinces us that the court acted within its discretion in denying the belated request. Although Judge Torres, who ultimately ruled on the motion, was not familiar with the case, he noted on the record the voluminous files, including many motions filed and appearances made by Keith on defendant's behalf. Even a cursory examination of the file supports a reasonable determination that the quality of counsel's representation was adequate. Moreover, even defendant did not claim that Watson's representation was incompetent. In fact, he acknowledged that "Miss Watson is fully qualified. She's a very competent attorney. I have utmost faith in her." He further indicated he was "satisfied with her representation of me."

The second factor, the defendant's proclivity to substitute counsel, was well apparent by August 13, 1982, and supports denial of the motion.[7] Defendant had already been represented by several attorneys. He had disparaged the performance of his attorneys Henry and Geragos, and indicated that he had attempted to discharge Henry in the municipal court proceedings. He had threatened to sue both Henry and Geragos.

The third factor, the reasons for the request, also supports the court's ruling. Defendant did not provide a reasonable basis for dissatisfaction with counsel's performance. Although disagreement between defendant and his counsel over conduct of the proceedings and trial tactics was evident, and defendant claimed there was a "conflict of interest" with Keith, the main articulated source of disagreement—whether defendant should enter a plea of not guilty by reason of insanity—was resolved according to defendant's wishes. The alleged lack of rapport between defendant and Keith did not require a grant of self-representation. "[T]he Sixth Amendment does not guarantee a ' "meaningful relationship" between an accused and his counsel.' (*Morris* v. *Slappy* (1983) 461 U.S. 1, 14 [75 L.Ed.2d 610, 621, 103 S.Ct. 1610].)" (*People* v. *Jeffers* (1987) 188 Cal.App.3d 840, 851 [233 Cal.Rptr. 692].)

---

[7]Defendant had demonstrated his mercurial temperament early in the proceedings. He twice threatened to challenge Judge Ringer for cause because of dissatisfaction with the court's orders with respect to defendant's housing and privileges at the county jail and to protest the sequence in which the pretrial motions were to be considered. In addition, defendant was voluntarily absent from a hearing on December 21, 1981, to set a date for further hearing on the pretrial motions. When Judge Ringer indicated he would remit certain motions to *in limine* proceedings at trial, he asked Keith, "Will there be any flak from Mr. Clark if it is done as an in limine motion during trial? Will he try to discharge you, discharge me, discharge Mr. Jorgensen, discharge the universe?"

The length and stage of the proceedings also militated against granting a motion for self-representation. The pretrial proceedings, nearly concluded at the time defendant raised his motion, had taken almost two years. The prosecutor estimated a six-month trial, and had already twice issued subpoenas to seventy witnesses before two previous trial dates which had been continued at defense request. (See *People* v. *Ruiz, supra*, 142 Cal.App.3d 780, 786, 792.)

Finally, the disruption or delay of the proceedings which would result if the motion were granted also supports its denial. Defendant contends that, as of August 13, 1982, he made no indication that a continuance would be necessary on account of his self-representation, nor did he unequivocally indicate thereafter that any continuance would be necessary. The record belies defendant's claim. The only reason defendant did not indicate on August 13, 1982, that a continuance would be necessary is that the court did not then entertain the motion. When the motion was heard, Keith's failure to file additional pretrial motions or other pretrial proceedings to enforce compliance with discovery orders figured prominently in defendant's expressed reasons for wanting to represent himself. The import of these complaints was that defendant wished to conduct further pretrial proceedings and that the defense could not be ready for trial without full compliance with discovery orders. The court could reasonably have found that the motion for self-representation would have entailed an undetermined amount of delay.

In sum, consideration of the *Windham* factors demonstrates that defendant's legitimate interests did not overbalance the disruption to the proceedings, delay, and potential for abuse which would be engendered by granting the motion. (*People* v. *Hall* (1978) 87 Cal.App.3d 125, 132 [150 Cal.Rptr. 628].) We find no abuse of discretion in the trial court's denial of the untimely motion for self-representation. (*People* v. *Frierson, supra*, 53 Cal.3d at p. 742.)

### (3) *Marsden Motions*

Defendant contends the trial court committed error under *People* v. *Marsden* (1970) 2 Cal.3d 118 [84 Cal.Rptr. 156, 465 P.2d 44] on three occasions. The contention lacks merit.

### (i) *September 20, 1982*

On September 20, 1982, during jury voir dire, defendant told the court that, if the court was going to conduct business on his trial only four days of the week, he would prefer to have Wednesday off rather than Friday. He

complained that Keith was making appearances in other courts on Fridays. "How can he do this when he's written a letter to the DA saying he hasn't even heard of almost 30 witnesses that are on the witness list[?] [¶] He is not prepared for trial now, he has no intention or preparing for trial. He's not interested. [¶] Okay. I'm through."

The court responded that both defendant's attorneys were "doing a very good job," and explained to defendant that the court had other matters assigned on Fridays and that defendant should not expect his attorneys to give up their entire practice simply because they were appointed to represent him. Rather, for the duration of defendant's trial they would have to attend to their other clients only on Fridays.

Later that day, defendant criticized Keith's conduct of voir dire. When the prosecutor objected to defendant's addressing the court, defendant responded "Shut up, you asshole," and was removed from the courtroom.

Defendant was brought out a short time later and stated, "I'm going to object to everything that Mr. Keith does in this courtroom. He's not representing me. . . . [¶] This isn't my case. . . . [¶] . . . I'm not represented in this courtroom. I've told you that. . . . [¶] If you will get that buffoon out of this court, leave Miss Watson here, we'll go on. [¶] As long as that buffoon is here, I'm not going to. . . . [¶] Miss Watson is doing a fine job. She can handle the case. Just get the buffoon out of the courtroom and we will proceed."

Defendant added to his list of complaints about Keith that Keith "look[ed] like he rolled out of the Main Street Mission with his hair sticking out everywhere," and "like he slept in his suit most of the time," and that defendant "ha[d]n't seen that clown except in this courtroom for over two weeks."

Defendant further accused the court of "railroading" him with a "dump truck" attorney, threw things in the courtroom, and was generally abusive, telling the court to "put up with my profanity. [¶] I'll cease the profanity when I'm in pro per." After further discussion in a similar vein, Clark said, "As long as that counsel is in the courtroom, I'm not here. I'm not represented." The court then removed him from the courtroom.

■ Defendant now asserts that his complaints of September 20 constituted a *Marsden* motion. In *Marsden, supra,* 2 Cal.3d 118, we held that when a defendant seeks to discharge counsel and substitute another attorney on the ground of inadequate representation, the court must allow the defendant to

explain the basis for the motion and to relate specific instances of the attorney's deficient performance. Defendant contends that he made allegations at the September 20 hearing which, if true, were sufficient to show that he was not receiving effective assistance of counsel.

Defendant's diatribes about Keith did not, however, constitute a *Marsden* motion. Defendant pointedly acknowledged that Watson was "doing a fine job" and that she was capable of handling the case. He never asked for appointment of substitute counsel, but only to discharge Keith. (Cf. *People* v. *Crandell* (1988) 46 Cal.3d 833, 854, 855 [251 Cal.Rptr. 227, 760 P.2d 423] [Defendant alleged inadequate representation as a ground for wishing to represent himself pursuant to *Faretta*. Not having requested appointment of a substitute counsel, *Marsden* procedures were not required.].) Watson also represented defendant and had his full confidence. Under the circumstances, no additional inquiry by the court was needed.

Moreover, defendant was allowed to fully state his grievances. They did not provide a basis for a meritorious *Marsden* motion. The claim that Keith was unprepared for trial was apparently based on a letter Keith wrote to the deputy district attorney, complaining that the defense had not heard of a number of persons listed on the prosecution's witness list. Defendant's accusation merely seized on and took out of context the rhetoric of Keith's letter. The alleged existence of such a letter does not establish that Keith was unable to be prepared for trial. Neither Keith nor Watson ever indicated a lack of familiarity with any witness which necessitated a continuance or other delay.

Defendant's complaints about Keith's conduct of voir dire address matters which are within the scope of the attorney's authority to control the conduct of the proceedings, and do not establish a basis for substitution of counsel. (*People* v. *McKenzie* (1983) 34 Cal.3d 616, 631 [194 Cal.Rptr. 462, 668 P.2d 769]; *People* v. *Williams* (1970) 2 Cal.3d 894, 905 [88 Cal.Rptr. 208, 471 P.2d 1008].) Similarly, the allegation that, during jury selection, defense counsel had not personally consulted with defendant at the jail does not establish incompetent representation. (See *People* v. *Crandell, supra,* 46 Cal.3d 833, 859.)

(ii) *September 27 and September 30, 1982*

On September 27, Watson approached the bench and informed the court that defendant desired an ex parte hearing so that he could show that "counsel was unprepared" and that he needed new counsel. The trial court denied the request for a hearing. On September 30, 1982, Watson told the

court she wished to file a letter defendant had written explaining his reasons for the request of September 27. The court refused to accept the letter, stating that "[i]t goes through the attorneys, and your request is denied." ■ Defendant now contends that the trial court committed *Marsden* error in refusing to grant the hearing or to receive defendant's letter.

■ Generally, a trial court's refusal to listen to a defendant's reasons for requesting a substitution of counsel does not comport with the standards set forth in *Marsden*. We there emphasized the need to permit the defendant to enumerate specific instances of inadequate representation, in order to permit a proper exercise of discretion (*People v. Marsden, supra*, 2 Cal.3d 118, 124-125), as well as to afford appellate review (see *People v. Cruz* (1978) 83 Cal.App.3d 308, 318 [147 Cal.Rptr. 740]).

However, "the right to the discharge or substitution of court-appointed counsel is not absolute, and is a matter of judicial discretion unless there is a sufficient showing that the defendant's right to the assistance of counsel would be substantially impaired if his request was denied." (*People v. Carr* (1972) 8 Cal.3d 287, 299 [104 Cal.Rptr. 705, 502 P.2d 513].) ■ Defendant failed to demonstrate that his right to assistance of counsel would be impaired if his motion to replace Keith was denied.

Defendant had been allowed to air his complaints about Keith on September 20, including his accusation that Keith was unprepared for trial. His renewal, one week later, of a similar accusation did not compel the court to conduct an additional hearing under *Marsden, supra*, 2 Cal.3d 118. Indeed, on October 5, 1982, defendant again moved to represent himself with Watson as cocounsel, on the asserted ground that the defense was "not ready . . . base[d] . . . on the fact that there's an abundance of prosecution witnesses that have been named . . . ; we have never heard of them." The record demonstrates, therefore, that defendant's repeated allegations that Keith was "unprepared" derived from the same letter that defendant complained about on September 20. Defendant admitted on October 5, however, that he was "totally unaware of what has occurred in the case in the last 60 days, I do not know what discovery has been granted, [and] I do not know if Mr. Keith's gotten the names and addresses of the witnesses to send investigators around . . . ." This shows that defendant had no specific information that Keith was not prepared for trial. Significantly, Watson, who also represented defendant and was thus in a better position to judge the validity of defendant's complaints than the court ever could be, never suggested there was merit in them despite the court's suggestion that it would consider the matter if brought through her. Under such circumstances, the trial court was not required to afford a hearing each time defendant made the same accusations.

### (4) *Waiver of Counsel*

Defendant, having previously argued that the trial court erroneously denied his *Faretta* request to represent himself, now contends that, when he ultimately *was* granted self-representation, the motion should have been denied. He contends that he did not make a voluntary, knowing and intelligent waiver of counsel before he assumed his defense on October 13, 1982. As explained below, the contention is without merit.

#### (i) *Marsden*

Defendant's first line of attack is that he waived counsel only because the trial court erroneously failed to afford him substitute counsel under *People* v. *Marsden, supra,* 2 Cal.3d 113. We have already rejected defendant's claims of *Marsden* error as to the proceedings of September 20 and September 27, 1982.

On October 5, defendant informed the court he still wished to represent himself, that he wanted Watson appointed as cocounsel, and that he would need a two-week continuance to prepare for trial. The court informed defendant he would be permitted to represent himself if he could go forward immediately without appointment of additional counsel. Because defendant did not want to proceed forthwith, the motion was denied.

On October 12, defendant moved to dismiss both his attorneys "[f]or the reason of incompetency and inadequacy of counsel," and stated he was ready to represent himself "forthwith," but that his next step would be to move for appointment of second counsel. When the court reiterated that it would allow defendant to represent himself if he were ready to go forward without the appointment of an attorney, defendant abandoned his claim that both counsel were incompetent; although he moved to dismiss Keith "for incompetency," he also stated that he would "proceed with Miss Watson alone," and once again alleged Keith was "totally unprepared."

The gist of defendant's motions on October 5 and October 12 was that he wished to represent himself, not to substitute counsel. ■ "A request for self-representation does not trigger a duty to conduct a *Marsden* inquiry (*supra,* 2 Cal.3d 118) or to suggest substitution of counsel as an alternative." (*People* v. *Crandell, supra,* 46 Cal.3d 833, 854-855.) The court did not commit *Marsden* error in failing to conduct a hearing on those dates into the reasons for defendant's dissatisfaction with counsel.

#### (ii) *Defendant's Mental Competence to Waive Counsel*

■ Defendant contends that when the court eventually *did* grant his motion to represent himself, that ruling, too, was error. He contends the court

was required to hear psychological testimony regarding his capacity to waive his right to counsel.

In an in camera session on October 13, 1982, outside defendant's presence, Keith requested a "hearing concerning [defendant's] capability to act in pro per," and offered to present the testimony of two psychological experts to show "that he shouldn't be permitted to go pro per because of his mental and character disabilities." Keith told the court, "I don't know how intelligent his waiver will be because, in my opinion, he's crazy, as crazy as anybody I've ever seen or ever will see." The court deferred ruling on the motion for expert testimony until it heard from defendant himself. It stated, "My problem is: I know what the requirement of Faretta is."

In open court, defendant renewed his motion for self-representation. After some discussion, the court advised defendant at length of his constitutional rights, and of the rights, duties and risks attendant on self-representation. Defendant stated that he understood each of the items explained by the court, and reiterated that he desired to represent himself. Keith again moved that the court permit presentation of expert testimony for the purpose of determining whether defendant was capable of making an intelligent waiver. The court denied the motion, expressly finding that defendant had made a knowing and intelligent waiver of counsel.

Defendant now argues that the court was required to hold a hearing to determine defendant's capacity to knowingly and intelligently waive his right to counsel. He cites *People* v. *Burnett* (1987) 188 Cal.App.3d 1314 [234 Cal.Rptr. 67] for the rule that "whenever a trial court has doubt as to the competence of a defendant to exercise the right of self-representation the court must undertake an exceedingly careful inquiry into the subject, ordinarily by ordering a psychiatric evaluation." (*Id.* at p. 1319; see also, *People* v. *Teron* (1979) 23 Cal.3d 103, 114 [151 Cal.Rptr. 633, 588 P.2d 773], disapproved on other grounds in *People* v. *Chadd* (1981) 28 Cal.3d 739, 750, fn. 7 [170 Cal.Rptr. 798, 621 P.2d 837]; *People* v. *Lopez* (1977) 71 Cal.App.3d 568, 573 [138 Cal.Rptr. 36].)

Defendant's reliance on *People* v. *Burnett, supra,* 188 Cal.App.3d 1314, is misplaced. There, the defendant was found not guilty of criminal charges by reason of insanity and was committed to Atascadero State Hospital. He waived counsel at a hearing to determine whether he was restored to sanity. The trial court did not conduct any inquiry into the defendant's capacity to make a knowing and intelligent waiver despite the defendant's history of mental illness, his bizarre delusional statements during his appearances in court, and the representations of counsel that defendant desired, e.g., to call

various public figures during the trial to show that " '[s]omebody implanted something in his brain, transmitting messages and making him do things, et cetera." (*Id.* at p. 1321.)

The Court of Appeal held that "Where, as in the present case, the person whose competence is in question is confined in a mental facility pursuant to judicial decree and the state maintains that such confinement should continue or be extended because that person continues to suffer a mental disability (see Pen. Code, §§ 1026.2 and 1026.5), mental competence to waive counsel is in doubt as a matter of law and such a person cannot be found competent to represent himself or herself without judicial consideration of psychiatric evidence bearing upon the question." (*Burnett, supra,* 188 Cal.App.3d at p. 1322.)

Here, by contrast, defendant gave no indication of mental impairment which prevented a valid waiver of counsel. The relevant inquiry is narrow. ▮▮▮ The trial court is not concerned with the wisdom of defendant's decision to represent himself, or with how well he can do so. The sole relevant question is whether the defendant has the mental capacity to knowingly waive counsel while realizing the probable risks and consequences of self-representation. (*People* v. *Gallego* (1990) 52 Cal.3d 115, 162 [276 Cal.Rptr. 679, 802 P.2d 169]; *People* v. *Teron, supra,* 23 Cal.3d at p. 113.) The court has discretion to determine the defendant's competence to waive counsel; its ruling will not be disturbed on appeal absent an abuse of that discretion. (*People* v. *Teron, supra,* 23 Cal.3d at p. 114.) There was no abuse of discretion here.

▮▮▮ The case had been assigned to Judge Torres close to two months before the waiver. The court thus had had ample opportunity to observe defendant personally, and to draw its own conclusions. It thoroughly discussed defendant's rights and obligations with him personally to make sure he knew what he was getting himself into. The record of the hearing in which defendant waived counsel does not suggest in the slightest that defendant's waiver was not knowing. On the contrary, the record demonstrates convincingly that he knew exactly what he was doing. Under these circumstances, the trial court's refusal to hold a further hearing was within its discretion.

Defendant argues that Keith's statement to the court that he was "crazy" and his own repeated disruptive behavior should have raised a doubt in the court's mind about defendant's competency. Although Keith's comments generally, and this statement specifically, were relevant factors for the court to consider, they did not eliminate the court's discretion in light of its own

observations and the record as a whole. Keith's comments were not specifically directed to the narrow question—defendant's ability to waive counsel—but rather were more directed to the wisdom of defendant's decision and his ability to effectively represent himself. The same is true of the proffered expert testimony. Keith never made a specific offer of proof regarding what the witnesses would or could testify about defendant's competence to waive counsel. Defendant's disruptive behavior, although undoubtedly a justification for revoking the right of self-representation, similarly did not necessarily show incompetence to waive counsel in the first instance. One can knowingly invoke the right to represent oneself and then abuse that right.

Moreover, the record here, as in *People* v. *Teron, supra,* 23 Cal.3d 103, demonstrates that defendant was intelligent, literate and articulate. Judge Ringer granted defendant law library privileges upon a showing that he could materially assist in the preparation of the defense. Judge Ringer also described defendant as "a person of exceptionally high order of intelligence." Keith himself praised defendant's intelligence and abilities on the record. Defendant also displayed substantial legal acumen for a nonlawyer. The record up to the time of the *Faretta* motion shows that defendant generally called motions by their proper legal names, referred to appropriate authorities, and clearly and consistently articulated a tenable theory of defense. Neither Keith's rejected attempt to persuade defendant to plead not guilty by reason of insanity nor his statement that defendant was "crazy" was sufficient to raise a doubt about defendant's capacity to make a voluntary, knowing and intelligent choice with regard to his representation. Under all the circumstances, there was no abuse of discretion.

Defendant also points to the evidence at the penalty phase provided by the same two psychiatric experts whom the court declined to hear earlier. However, as indicated, there was no reason to entertain such testimony absent some evidence of defendant's incompetence.

Furthermore, even assuming Keith's representation should have raised a doubt in the court's mind about defendant's mental status, our review of the experts' penalty phase evidence (allegedly the testimony that would have been offered at any competency evaluation) does not show that defendant was incompetent to waive counsel. Dr. Maloney found defendant to be of above average intelligence. Dr. Keyes testified he was sane. Although they said that defendant's personality disorders included self-destructive conduct, obnoxiousness and narcissistic self-focus, he was not out of touch with reality. This testimony raises no doubt about defendant's mental ability to understand what he was undertaking. Defendant's contention is without merit.

### (iii) *Failure to Exercise Discretion*

 Defendant next contends that the trial court erroneously believed it lacked discretion to deny defendant's midtrial *Faretta* motion as untimely, and that the failure to exercise its discretion constitutes reversible error. We conclude that defendant may not be heard to argue on appeal that his own motion should not have been granted.

Defendant is correct that the court has discretion to deny a midtrial motion for self-representation. (*People* v. *Windham, supra,* 19 Cal.3d 121; see *ante,* at p. 98.) However, "[t]he *Windham* factors primarily facilitate efficient administration of justice, not protection of defendant's rights." (*People* v. *Hill* (1983) 148 Cal.App.3d 744, 760 [196 Cal.Rptr. 382].) Because the court granted defendant's motion for self-representation at his own insistence, he may not now complain of any error in the court's failure to weigh the *Windham* factors. (*People* v. *Brownlee* (1977) 74 Cal.App.3d 921, 934 [141 Cal.Rptr. 685]; see also *People* v. *Bloom, supra,* 48 Cal.3d at pp. 1219-1220.)

 Defendant further appears to claim that the court may not grant a midtrial *Faretta* request in a capital case because, at that point, the state's interest in a reliable death verdict "will always outweigh" the defendant's right of self-representation. We disagree. In *People* v. *Bloom, supra,* 48 Cal.3d 1194, the trial court granted the defendant's midtrial motion to represent himself at the penalty phase. We held that, although the defendant had announced his purpose to present no evidence at the penalty phase and to seek a death verdict, that announcement did not compel denial of the self-representation motion. (*Id.* at pp. 1222-1223.)

We also rejected the defendant's claim that permitting him to represent himself with the stated intention of obtaining a death verdict rendered the verdict unreliable in a constitutional sense. Even under those circumstances, "the required reliability is attained when the prosecution has discharged its burden of proof at the guilt and penalty phases pursuant to the rules of evidence and within the guidelines of a constitutional death penalty statute, the death verdict has been returned under proper instructions and procedures, and the trier of penalty has duly considered the relevant mitigating evidence, if any, which the defendant has chosen to present. A judgment of death entered in conformity with these rigorous standards does not violate the Eighth Amendment reliability requirements." (*Bloom, supra,* 48 Cal 3d. at p. 1228.)

Thus, a fortiori, the granting of defendant's motion for self-representation here, where defendant and his counsel vigorously contested both the guilt

and the penalty proceedings, did not violate United States Constitution Eighth Amendment reliability standards. (See also *People* v. *Deere* (1991) 53 Cal.3d 705, 717 [280 Cal.Rptr. 424, 808 P.2d 1181]; *People* v. *Lang* (1989) 49 Cal.3d 991, 1030-1031 [264 Cal.Rptr. 386, 782 P.2d 627].)

### (iv) *"Conditioning" Grant of Faretta Rights*

■ Defendant next contends that the trial court improperly conditioned its grant of his *Faretta* motion on waiver of any necessary continuance or assistance of advisory counsel. The cases on which he relies are not apposite.

In *People* v. *Bigelow* (1984) 37 Cal.3d 731 [209 Cal.Rptr. 328, 691 P.2d 994, 64 A.L.R.4th 723], after the trial court denied repeated motions to substitute new counsel, on the opening day of trial it did permit the defendant to represent himself, making clear that no continuances would be granted. We did not discuss whether the court's failure to grant a continuance would constitute reversible error, but we noted that the defendant effectively had no time to prepare for trial. We stated, "if the trial court did not intend to deny the motion for self-representation as untimely under *People* v. *Windham* (1977) 19 Cal.3d 121 [137 Cal.Rptr. 8, 560 P.2d 1187], it should have considered granting a continuance." (*Id.* at p. 741, fn. 3.) In *People* v. *Maddox* (1967) 67 Cal.2d 647 [63 Cal.Rptr. 371, 433 P.2d 163], a pre-*Faretta* and -*Windham* case, we held that a defendant who was granted the right to represent himself was entitled to a reasonable time to prepare for trial if necessary. (See also *People* v. *Moss* (1967) 253 Cal.App.2d 248 [61 Cal.Rptr. 107].)

These cases are distinguishable. Although a necessary continuance must be granted if a motion for self-representation is granted, it is also established that a midtrial *Faretta* motion may be denied on the ground that delay or a continuance would be required. (*People* v. *Fulton* (1979) 92 Cal.App.3d 972, 976 [155 Cal.Rptr. 327]; *People* v. *Hernandez, supra,* 163 Cal.App.3d 645, 651, fn. 4.) Unlike the trial court in *Bigelow, supra,* 37 Cal.3d 731, this trial court made clear its intent to deny the *Faretta* motion as untimely if a continuance would be necessary. It had in fact denied other *Faretta* motions on this basis. The *Faretta* motion was ultimately granted only when defendant expressly represented he was able to proceed without a continuance.

In addition, in contrast to the cited cases, defendant here had been afforded research facilities for many months, so that he had a full opportunity to prepare independently for trial even while he was represented by counsel. (See *People* v. *Hill, supra,* 148 Cal.App.3d 744, 757-758 [court that grants self-representation must allow reasonable continuance for preparation,

but arguably not when the defendant knew 73 days before trial that he would represent himself, he was allowed 10 days for trial preparation, and he had actively participated in his defense before self-representation]; *People* v. *Jackson* (1978) 88 Cal.App.3d 490, 502 [151 Cal.Rptr. 688].)

c) *Advisory Counsel*

 Defendant argues that the trial court erroneously refused to exercise its discretion on his request for advisory counsel and that, if the court did exercise discretion, it abused it. (See *People* v. *Bigelow, supra*, 37 Cal.3d 731, 743.) *Bigelow* found error in this regard. It did not, however, create a blanket rule requiring advisory counsel in a capital case. On the contrary, we have specifically held that cocounsel status, advisory counsel and other forms of "hybrid" representation are not constitutionally guaranteed. (*People* v. *Bloom, supra*, 48 Cal.3d 1194, 1218.) Thus, as with other matters requiring the exercise of discretion, "as long as there exists a reasonable or even fairly debatable justification, under the law, for the action taken, such action will not be here set aside . . . . [Citations.]" (*People* v. *Crandell, supra*, 46 Cal.3d 833, 863, internal quotation marks omitted.)

· The record here, unlike in *Bigelow, supra*, 37 Cal.3d 731, does not demonstrate that denial of defendant's request for advisory counsel was an abuse of discretion. The defendant in *Bigelow* was a Canadian, unfamiliar with California law, and had only a ninth grade education. Defendant, by contrast, had graduated from Culver Military Academy, a preparatory school for entry into the service academies. In the military, defendant was assigned to radio intelligence, doing "top security work." Subsequently, defendant earned a license as a stationary engineer. Defendant demonstrated he was an intelligent, articulate, literate individual.

Additionally, while ". . . the defendant in *Bigelow* was charged with four special circumstances under the 1978 death penalty initiative, two of which had never been judicially construed and were arguably inapplicable to the defendant's act, . . . in the present case the defendant was charged only with the multiple-murder special circumstances, which presented no significant construction problems on the facts of this case." (*People* v. *Crandell, supra*, 46 Cal.3d 833, 864.)

The record here also indicates that defendant demonstrated considerable skill and intelligence as an advocate for himself throughout the proceedings. He consistently called motions by their proper names and cited appropriate authorities. Prior to representing himself, he was permitted on occasion to participate in the proceedings. He questioned witnesses skillfully and was

capable of logical reasoning in his arguments to the court. Both the court and counsel acknowledged defendant's superior intellectual capacity and, indeed, defendant was granted law library access based on his demonstrated legal abilities.

Furthermore, as suggested in *Crandell*, other circumstances may justify denial of a motion for advisory counsel. If, for example, the record supports an inference that the motion is manipulative (e.g., to obtain the appointment of private counsel when no grounds have been demonstrated to relieve appointed counsel), then it may be denied. (*People* v. *Crandell, supra,* 46 Cal.3d 833, 863.) The record of this case supports such an inference.

 When a defendant represents himself, he retains primary control over the conduct of the case, and the role of advisory counsel is consequently limited. (See *People* v. *Hamilton, supra,* 48 Cal.3d 1142, 1164, fn 14; *People* v. *Bloom, supra,* 48 Cal.3d 1194, 1218-1219.) Although the court ultimately granted defendant's motion for self-representation, in deference to his manifest desire to control the proceedings, it was not also required to place an attorney under the personal direction of someone with defendant's history of manipulative, obstructive and abusive conduct.

d) *Appointment of Law Clerk*

 Defendant also contends the trial court erroneously denied his request for assistance of a law clerk.

In support of his motion, defendant presented three declarations. First, defendant himself averred that the case was too complicated for one person to handle alone (pointing out that Keith had been provided with the assistance of a second counsel), that he needed "a person with good legal research training skills, and ability to assist me in the preparation of my defense," and that law student Darryl Piggee possessed such skills. Second, Darryl Piggee stated that he was a law clerk employed in the office of Steven Solomon, an attorney; that Piggee would be able to devote 40 or more hours per week to assist defendant; that he could provide defendant with access to superior law library materials; and that he would confer with the attorneys in Solomon's office as needed to help prepare the defense. Third, Caryl Warner, an attorney in Solomon's office, stated that Warner had been an attorney for 50 years, that he had handled many murder trials, and that he would personally oversee Piggee's work on defendant's behalf.

The trial court denied the motion, on the grounds (1) that law clerks must work under the supervision of a lawyer, and defendant was not a lawyer, (2)

that the law clerk's proper place was with his law firm, and (3) that, while attorneys may need more assistance because they have other cases to which they must devote time, a defendant representing himself has only his own case to prepare.

The request was properly denied. Defendant's motion showed that the requested services were "merely convenient" rather than "reasonably necessary." (*Corenevsky* v. *Superior Court* (1984) 36 Cal.3d 307, 323 [204 Cal.Rptr. 165, 682 P.2d 360]; cf. *Keenan* v. *Superior Court* (1982) 31 Cal.3d 424 [180 Cal.Rptr. 489, 640 P.2d 108].)[8]

e) *Revocation of Self-representation*

(1) *Threat to Stand Mute*

On Thursday, October 28, 1992, defendant commenced his cross-examination of the prosecution's expert pathologist. After defendant questioned the witness at length for the rest of the day, the court continued the trial until Monday, November 1. A brief hearing was held out of the presence of the jury regarding a discovery matter that defendant raised. Defendant also raised certain matters regarding the witness's "testimony and my scope of cross-examination."

When trial recommenced on November 1, defendant made a number of motions out of the presence of the jury. Some involved the manner in which he would be allowed to question witnesses and to handle exhibits. The court made several rulings against defendant. Defendant also moved to recuse the district attorney. During the course of defendant's rambling discourse on the

[8]On October 14, 1982, defendant also requested a "combination legal runner-clerk." The court told defendant that any qualified person whose name was submitted by investigator Stenberg would be approved. The minutes of the court reflect that "Defendant is allowed to have a legal runner; Investigator Stenberg is ordered to locate such a runner and notify the court of said runner's name." Defendant moved the court "to grant this motion forthwith. [¶] I believe we discussed it earlier and there was some agreement that the court would, to some degree, allow assistance of this nature.

"THE COURT: There's no such agreement.
"THE DEFENDANT: There was—
"THE COURT: No such agreement.
"THE DEFENDANT: Didn't we discuss where you said Mr. Stenberg may approve someone?
"THE COURT: Never, never in this court."

Although the court did not specifically agree to the appointment of a law clerk, the promised "legal runner" was never appointed and the court may have inadvertently misled defendant in this regard. Nevertheless, defendant has not shown that he was entitled to have a law clerk appointed. (Cf. *People* v. *Lopez, supra,* 71 Cal.App.3d 568, 573 [a defendant choosing to represent himself should be advised that "he will have no staff of investigators at his beck and call."].)

latter motion, the court twice warned him not to abuse his "pro per status" or it would be revoked. After allowing defendant to discuss at length his unfocused motion to recuse, the court finally denied it as "frivolous." Defendant tried to continue arguing the issue. The court stated it had already ruled and that defendant was not to speak further on that point. It asked if defendant was ready to proceed. Defendant responded, "I'm ready to proceed with this motion [the one the court had just ruled upon]. [¶] You have not heard this motion."

The court ordered the jury brought into the courtroom, and told defendant he could continue cross-examination of the witness. Defendant immediately stated, "Your Honor, the defense stands mute throughout the rest of the trial." The trial court excused the jury, found defendant's actions to be a renunciation of his in propria persona status, and ordered Keith and Watson to resume conduct of the defense. Trial was recessed until the afternoon. That afternoon, Keith and Watson represented defendant.

The following day, Watson advised the court that defendant had reconsidered his position and was now willing to continue cross-examining the prosecution witnesses. Although it stated a belief that defendant was trying to place the court in a "dilemma" and was merely "playing games with the court," the court agreed to give defendant another chance to represent himself. It reinstated defendant's in propria persona status, warning him that any further misbehavior or delaying tactics would result in revocation of that status.

Defendant contends that his self-representation was improperly revoked because he had a right to conduct his defense by standing mute. He correctly points out that we have upheld cases in which the trial court allowed a self-represented defendant not to actively participate in the defense. (*People* v. *Teron, supra,* 23 Cal.3d 103; see also *People* v. *Bloom, supra,* 48 Cal.3d 1194; cf. *People* v. *McKenzie, supra,* 34 Cal.3d 616.) These cases do not, however, compel the reverse conclusion that the trial court here was *required* to permit defendant to stand mute under the circumstances of this case. While a defendant may sincerely and properly choose not to participate, as in *Teron* and *Bloom,* that was not the situation here.

Throughout the trial, defendant had frequently and vehemently made clear that he desired to prove that others had committed the crimes. He had been vigorously defending himself, and indeed had clearly been planning to continue his detailed cross-examination of the pathologist as late as the court's ruling on the recusal motion. Then he apparently became disgruntled with the court's rulings. In front of the jury, he suddenly stated an intent to

stand mute. This statement was clearly not motivated by the sincere desire to withhold a defense; it was instead an attempt to either inject error into the case, or to pressure the court into reconsidering its earlier rulings, or, most likely, both. It was merely one of a series of attempts to manipulate or coerce the trial court.

The court was not required to tolerate this conduct. ▮ As *Faretta* itself made clear, a constitutional right of self-representation "is not a license to abuse the dignity of the courtroom." (*Faretta* v. *California, supra,* 422 U.S. 806, 835, fn. 46 [45 L.Ed.2d at p. 581].) Thus, "the trial judge may terminate self-representation by a defendant who deliberately engages in serious and obstructionist misconduct." (*Id.* at p. 834, fn. 46 [45 L.Ed.2d at p. 581].)

▮ Defendant argues that his statement of intent to stand mute was not sufficiently disruptive to warrant termination of his self-representation. Viewing the statement in context, we disagree. Standing mute alone may not be disruptive, but we do not view that one statement in isolation. It was part of a series of actions by defendant clearly intended to manipulate the trial. As the court stated in *People* v. *Davis* (1987) 189 Cal.App.3d 1177, 1187 [234 Cal.Rptr. 859], "Trial courts are not required to engage in game playing with cunning defendants who would present Hobson's choices." *Faretta* v. *California, supra,* 422 U.S. 806, held generally that a defendant may represent himself. It did not establish a game in which defendant can engage in a series of machinations, with one misstep by the court resulting in reversal of an otherwise fair trial.

In *McKaskle* v. *Wiggins* (1984) 465 U.S. 168 [79 L.Ed.2d 122, 104 S.Ct. 944], the high court held that under some circumstances, standby counsel of a defendant representing himself may play a role at trial even over the defendant's objection. That holding is not directly at issue here, but some of the court's analysis is instructive. It stated, "The right to appear *pro se* exists to affirm the dignity and autonomy of the accused and to allow the presentation of what may, at least occasionally, be the accused's best possible defense." (*Id.* at pp. 176-177 [79 L.Ed.2d at p. 132].) Refusing to bow to defendant's obviously insincere ploy did not challenge his dignity or autonomy. The court's ruling, which merely caused defendant to continue to defend himself, certainly did not prevent presentation of the accused's best possible defense. The *McKaskle* court also pointed out that the "trial judge may be required to make numerous rulings reconciling the participation of standby counsel with a *pro se* defendant's objection to that participation; nothing in the nature of the *Faretta* right suggests that the usual deference to 'judgment calls' on these issues by the trial judge should not obtain here as elsewhere." (*Id.* at p. 178, fn. 8 [79 L.Ed.2d at p. 133].)

The court's judgment call here is similarly entitled to deference. The trial court justifiably viewed defendant's statement, or threat, that he would "stand mute" not as a conscious decision to simply force the prosecution to its proof, but as part of a deliberate course of conduct designed to cause as much disruption as possible. It properly revoked defendant's in propria persona status until defendant chose to continue defending himself.[9]

The dissenting opinion of Justice Kennard argues that the court erred in not allowing defendant to represent himself in his own way, i.e., by standing mute. Other than *Faretta* itself, however, it does not cite a single case that actually finds a violation of a defendant's right to self-representation. Moreover, although that dissent cites cases finding no error in allowing a defendant to stand mute, it cites none compelling a court to acquiesce in a defendant's request to stand mute under circumstances even remotely similar to those of this case. A finding of *no* error in one situation is not tantamount to the finding of error in another. As illustrated by the two dissents herein— one finding error in allowing defendant to represent himself, and the other finding error in *not* allowing defendant to represent himself—*Faretta* v. *California, supra,* 422 U.S. 806, is not always easy to apply. We have an obligation to interpret *Faretta* in a reasonable fashion to vindicate the legitimate rights of defendants while at the same time avoiding turning the trial into a charade in which a defendant can continually manipulate the proceedings in the hope of eventually injecting reversible error into the case no matter how the court rules. Defendant's actions presented the court with a "judgment call" under combat conditions upon which we may, and must, give deference to the trial court. (See *McKaskle* v. *Wiggins, supra,* 465 U.S. at p. 178, fn. 8 [79 L.Ed.2d at p. 133].)

### (2) *Final Termination of Self-representation*

Defendant's self-representation was restored on November 2, 1982. On December 6, 1982, however, following a series of abusive and threatening remarks by defendant directed at the court, the court revoked defendant's in

---

[9]In *People* v. *Manson* (1976) 61 Cal.App.3d 102, 197-203 [132 Cal.Rptr. 265], at the close of trial, counsel was appointed to represent one of the defendants when her attorney failed to appear and never returned to the courtroom. The defendant's convictions were reversed on the ground that her new attorney could not effectively represent her at the closing arguments, having come into the case "cold," and without having been present at trial or having heard or observed the witnesses testify. Here, there was no such impediment. Both standby counsel had been appointed to represent defendant. They were thoroughly familiar with the case, had prepared the case for trial, and had been present during the entire trial and observed the demeanor of the witnesses. They were therefore qualified to take over presentation of the defense.

propria persona status and reappointed standby attorneys.[10] They represented defendant during the remainder of the trial.

 Defendant contends the trial court erred. He argues that his self-representation could be terminated only for deliberate engagement in serious and obstructionist misconduct (see *Illinois* v. *Allen* (1970) 397 U.S. 337 [25 L.Ed.2d 353, 90 S.Ct. 1057]; *Faretta* v. *California, supra*, 422 U.S. 806, 834-835, fn. 46 [45 L.Ed.2d at p. 581]), and that conduct insufficient to support a finding of contempt of court is insufficient to justify terminating self-representation. (See, e.g., *United States* v. *Seale* (7th Cir. 1972) 461 F.2d 345, 369-370); *In re Little* (1972) 404 U.S. 553 [30 L.Ed.2d 708, 92 S.Ct. 659].)

We need not decide exactly what standard applies, for defendant's conduct, summarized previously, justified the court's exercise of discretion even under his suggested standard. The court was justified in concluding that defendant intentionally sought to disrupt and delay his trial. (See also *People* v. *Davis, supra*, 189 Cal.App.3d at p. 1200 [although a defendant may have the right to represent himself, " '[h]e should not be permitted to disparage . . . counsel and the court, and to disrupt the orderly presentation of the trial.' "]).

### f) *Ineffective Assistance of Counsel*

 Defendant claims that there was a fundamental breakdown in the attorney-client relationship which deprived him of the effective assistance of counsel. He cites to the proceedings on August 27, 1982, in which Keith attempted to have defendant enter a plea of not guilty by reason of insanity, although Keith conceded that he had not consulted defendant about such a plea beforehand. No fundamental breakdown in the attorney-client relationship was demonstrated, however. The trial court properly ruled that such a plea could not be entered without defendant's consent and no such plea was therefore made. Defendant's wishes in this regard were fully honored. (See *People* v. *Gauze* (1975) 15 Cal.3d 709, 717-718 [125 Cal.Rptr. 773, 542 P.2d 1365].)

 Defendant asserts that he thereafter repeatedly alerted the trial court to a breakdown in the attorney-client relationship, citing the numerous

---

[10]Defendant told the court "Your prejudices are running away with you" and accused the court of "jumping to conclusions" and predetermining the case. When the court warned defendant about his behavior, defendant told it to "stop that crap," and accused the court of bias, of lying, and of having its mind made up "from day one." Defendant stated, "This railroad train of yours is going to have to come to a screeching halt." When the court once again warned defendant to behave or his in propria persona privileges would be revoked, defendant responded, "are you trying to intimidate me? Well, you goddamn can't do that. [¶] . . . [W]ill you just back off and do your job?"

*Faretta* and *Marsden* motions. He also complains that, after defendant's in propria persona status was revoked, trial counsel seized all of defendant's papers and notes. In addition, when defendant elected to testify (against counsel's advice), defendant complained that Keith had not met with him and had not permitted him to have his notes with which to prepare his testimony. He argues that these deprivations evidence a lack of communication between defendant and trial counsel, and asserts that the "assistance of counsel is worthless if counsel does not communicate with the defendant."

The claims lack merit. We have already rejected defendant's claims under *People* v. *Marsden, supra,* 2 Cal.3d 118. Defendant's claims that counsel was "unprepared" were never substantiated. Defendant's own writings suggest that the claims of unpreparedness were an attempt to inject error into the record. Moreover, although defendant claimed that counsel neglected to interview "hundreds" of witnesses, he failed to identify any such witness or to demonstrate any relevant testimony these unidentified witnesses might offer. Indeed, there is no reason to believe that defendant would have been satisfied with the services of any attorney appointed to represent him.

In this case, any conflict between defendant and his attorney was manufactured by defendant himself. He refused to accept that there were any matters within the province of counsel to decide. He desired to control all trial decisions and to make his attorneys subservient to his whims. He has not shown the impairment of the right to effective assistance of counsel or that any lack of communication was the fault of anyone but himself. As noted before, there is no guarantee of a meaningful relationship between an accused and his counsel. (*Morris* v. *Slappy* (1983) 461 U.S. 1, 14 [75 L.Ed.2d 610, 621, 103 S.Ct. 1610].)

## B. ADMISSIBILITY OF DEFENDANT'S ADMISSIONS

Defendant challenges the admissibility of his statements to the police on several grounds.

Before trial began, a full evidentiary hearing was held in front of Judge Ringer on defendant's pretrial motion to suppress the statements on *Miranda* (*Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974]) and related grounds. Judge Ringer denied the motion to suppress, finding there was no coercion and full compliance with the requirements of *Miranda*. At trial, defendant renewed his objection. The trial court reviewed Judge Ringer's ruling, and refused to reconsider the *Miranda* and related issues. Defendant agreed that Judge Ringer had ruled on most of his objections, but he wanted to raise one point not specifically objected to

in front of Judge Ringer. The court refused to reconsider any of the *Miranda* points.

Defendant first contends that the trial court erroneously refused to rehear his renewed motion to suppress. We disagree. Although a ruling on a pretrial motion is not always binding on the trial court (see *People* v. *Superior Court* (*Zolnay*) (1975) 15 Cal.3d 729, 734 [125 Cal.Rptr. 798, 542 P.2d 1390]), a defendant is not entitled to two separate evidentiary hearings before two superior court judges on the issue. We need not decide whether the trial court had the *authority* to allow defendant a second hearing and to disagree with Judge Ringer's decision; it was certainly not *required* to do so. Such a requirement would completely defeat the purpose behind pretrial *in limine* hearings on the admissibility of evidence.

In *People* v. *Morris* (1991) 53 Cal.3d 152 [279 Cal.Rptr. 720, 807 P.2d 949], we considered the circumstances in which an evidentiary objection litigated in an *in limine* hearing but not reiterated at trial is preserved for appeal. We pointed out that "Motions *in limine* are a commonly used tool of trial advocacy and management in both criminal and civil cases." (*Id.* at p. 188.) One of the purposes of motions *in limine* is to "permit more careful consideration of evidentiary issues than would take place in the heat of battle during trial." (*Ibid.*) This purpose would be defeated if the *in limine* ruling were rendered meaningless by a rule that a defendant has a right to a new hearing on the same issue during trial. Such a rule does not exist. Defendant had a full evidentiary hearing on the admissibility of his statement before Judge Ringer. He was not entitled to a second such hearing during trial.

Defendant argued at trial that he wanted to make one new argument not made before Judge Ringer—the claim that he asserted his right to an attorney during the interview and further questioning at that point should have stopped. The court refused to hear that argument. We need not decide whether that refusal was error for, as discussed below, the argument lacks merit. Defendant did not seek to present additional evidence not presented to Judge Ringer, so we can effectively consider the merits.

According to the facts adduced at the pretrial hearing, defendant had been taken into custody around 11:30 a.m. to noon on August 11, 1980. He was transported to the Van Nuys station where he was placed in a holding cell pending the arrival of robbery/homicide detectives from the downtown Parker Center station. Defendant was taken from the holding cell at 6 p.m. and transported downtown to the Parker Center station. His interview began around 7:15 p.m. It was tape-recorded.

Detective Stallcup began by advising defendant that he was under arrest for murder. He advised him of his *Miranda* rights. Defendant stated that he

understood these rights. He waived his right to remain silent. When asked whether he waived his right to have an attorney, defendant responded, "I'd like to know how long it will take to get an attorney. [¶] I would like to talk to you in the interim period. . . .[¶] But I would like to try to get one—you know, get that process started." The detective said that a "district attorney" could be there in "about 45 minutes," and he could "start the ball rolling at that time." Defendant responded, "he's with the prosecution on this isn't he?" The detective answered, "Right. But he has—they deal hand in hand."

Another detective asked if defendant wanted an attorney "right now?" Defendant said he did not, that he was "willing to start," but that he was "sure during the process, I'm going to want one." He added, "So there's one fairly quickly available for me." The detectives assured defendant that at any time he could say he wanted an attorney and they would stop the questioning "right there." They said the interview would "stop at that point." Defendant said he understood, and that he did not "want to stop the interview at this point. I would like to have him summoned as soon as possible. But I'm willing to go ahead without him in the interim." For clarification, one of the detectives asked again if defendant wanted "an attorney here right now?"

The parties disagree as to what defendant responded at this point. The Attorney General contends the tape is unintelligible. Defendant claims the tape reveals he said, "I do if you can get it."[11] There the dispute ends. The parties agree that defendant then said, "—right away. But I—in the essence of time factor I would rather—if it's going to take a long time to get him here I'd rather get the ball rolling. You see what I mean? Now, I want to get this cleared up." The detective stated that "if you want an attorney and you want to call one right now, you can call one right now. We want to get that straightened out right here." Defendant responded that he could not afford an attorney, "So it will have to either be public defender or even city attorney or district attorney, whichever you said. [¶] . . . That'd be sufficient, just so I have someone here that lets me know."

The detective reiterated that if defendant wanted an attorney "right now, we're going to stop this questioning right now. It's going to cease right now." Defendant responded, "I'll waive it at this point." When the detective said, "And when you want an attorney here, you tell me you want an attorney," defendant responded, "Yes, okay." The interview then continued.

 Defendant contends that defendant invoked his right to an attorney, and that the interrogation should have ceased at that point. However, defendant never expressed a desire not to talk until he had an attorney. The

---

[11]We need not resolve the dispute, for we find no error under either version.

detectives repeatedly made clear to him that if he wanted an attorney now, they would stop right then, and that he could stop the interview at any time by merely saying he wanted an attorney. Although he expressed the desire to have the process of getting an attorney started, he never showed the slightest reluctance to talk in the meantime. A desire to have an attorney in the future, coupled with an unambiguous willingness to talk in the meantime, is not an invocation of the right to counsel requiring cessation of the interview. (*People* v. *Turnage* (1975) 45 Cal.App.3d 201, 211 and fn. 5 [119 Cal.Rptr. 237] [defendant wanted "an attorney but not necessarily at this particular second"].)

 Defendant also contends that any waiver was not knowing and voluntary because he was misled about his right to an attorney and the time it would take to get him one. We disagree. Our review of the entire record convinces us that defendant clearly knew that he could stop the interview at any time by simply requesting an attorney, and that if he wanted one, an attorney could and would be provided. Contrary to his argument, he was not told that the district attorney would actually represent him; rather he was told the district attorney would arrive in about 45 minutes and could "start the ball rolling." Since the interview took place in the evening, it was reasonable for the detectives to tell defendant it would take a while to get an attorney as long as they also informed him—as they did repeatedly—that he did not have to talk in the meantime.

Defendant next contends that his waiver of counsel was rendered involuntary by improper delay in bringing him before a magistrate. Defendant states that he was held for several hours before he was interrogated, and was not brought before a magistrate in that time. Section 825, as pertinent here, requires that a defendant be arraigned "without unnecessary delay, and, in any event, within two days after his or her arrest . . . ." In *County of Riverside* v. *McLaughlin* (1991) __ U.S. __ [114 L.Ed.2d 49, 111 S.Ct. 1661], the United States Supreme Court held that a reasonable delay of up to 48 hours in obtaining a probable cause hearing is permissible.

Here, defendant was interrogated within several hours after he was taken into custody. "Examples of unreasonable delay are delays for the purpose of gathering additional evidence to justify the arrest, a delay motivated by ill will against the arrested individual, or delay for delay's sake." (*County of Riverside* v. *McLaughlin, supra,* __ U.S. at p. __ [114 L.Ed.2d at p. 63, 111 S.Ct. at p. 1670].) The high court cautioned, however, that "Courts cannot ignore the often unavoidable delays in transporting arrested persons from one facility to another, handling late-night bookings where no magistrate is readily available, obtaining the presence of an arresting officer who may be

busy processing other suspects or securing the premises of an arrest, and other practical realities." (*Ibid.*) These factors easily justify the delay of this case, which was but a fraction of the limit established by section 825 and *County of Riverside* v. *McLaughlin, supra*, \_\_ U.S. \_\_ [114 L.Ed.2d 49, 111 S.Ct. 1661].

 Next, defendant contends that he invoked his right to an attorney in the middle of the interrogation, but that the detectives ignored his request in violation of his *Miranda* rights. The contention lacks merit. At one point during the interrogation, the police began to question defendant about a killing unrelated to this case. Defendant said, "I know about that. And I'm not going to . . . talk any further about it without an attorney and that— . . . . That's a whole different ball game." Defendant then changed the subject and continued to talk to the detectives. Detective Orozco did ask defendant further questions about the unrelated killing. Defendant answered some questions but refused to answer others. None of the questions and answers about that killing resulted in any charges against defendant; they were not relevant to this case.

Defendant did not refuse to talk at all without an attorney. Rather, he indicated he would not talk about one limited subject—unrelated to the offenses here charged—without an attorney present. He made no assertion of his right to an attorney such that the interrogation should have ceased entirely. "A defendant may indicate an unwillingness to discuss certain subjects without manifesting a desire to terminate 'an interrogation already in progress.' (See, e.g., *People* v. *Watkins* (1970) 6 Cal.App.3d 119, 124 [85 Cal.Rptr. 621].)" (*People* v. *Silva* (1988) 45 Cal.3d 604, 629-630 [247 Cal.Rptr. 573, 754 P.2d 1070].) Although it may not have been appropriate for the police to ask any further questions about the unrelated murder, defendant said nothing incriminating about it, and it had nothing to do with this case. It did not prevent further questions on subjects about which defendant *was* willing to talk—the only subjects relevant here. At most, defendant "sought to alter the course of the questioning. But he did not attempt to stop it altogether." (*People* v. *Ashmus* (1991) 54 Cal.3d 932, 970 [2 Cal.Rptr.2d 112, 820 P.2d 214].)

This was not a case in which the officers simply changed the subject of questioning from one offense to another to avoid giving effect to a defendant's invocation of his right to counsel. (See *People* v. *Pettingill* (1978) 21 Cal.3d 231, 245 [145 Cal.Rptr. 861, 578 P.2d 108].) Defendant did not invoke the right as to all subjects, only as to one.

Defendant finally contends that his consent to search his apartment was obtained as the result of the foregoing violations, and the evidence seized

was therefore inadmissible. There was, however, no violation relevant to this case or to defendant's consent to the search. "Because the tree was not poisonous, its fruit was not tainted." (*People* v. *Mickey* (1991) 54 Cal.3d 612, 652 [286 Cal.Rptr. 801, 818 P.2d 84].)

## C. INADMISSIBLE CHARACTER EVIDENCE

Defendant's next series of contentions concern the introduction of allegedly impermissible character evidence of violence and deviant sexual practices. He argues that the evidence was irrelevant or unduly prejudicial, and should have been excluded under Evidence Code section 1101 as improper evidence of propensity toward or prior instances of bad conduct. Defendant further claims the court erred in failing to give a limiting instruction. We consider these claims in turn.

### 1. The Killing of "Cathy"

Defendant contends a document in his handwriting, apparently describing his participation in the killing of a prostitute named "Cathy," was improperly admitted or was improperly permitted to remain in evidence.[12] The jury first learned of this murder when the *defense* played the entire tape of Carol Bundy's August 11, 1980, interview with police in which she described the killing. According to Bundy, she and defendant picked up a young blonde prostitute, who called herself "Cathy." Bundy first watched while Cathy orally copulated defendant. Then, upon defendant's signal, Bundy gave him her chrome Raven pistol. Defendant shot Cathy in the head. Defendant and Bundy took the body, stripped it, and left it in an isolated area near Saugus.

Testifying in his own behalf, defendant claimed that, with one unrelated exception, he had never invited a prostitute into the car with Bundy present. The prosecutor sought to impeach this statement with the writing in question. Defendant's "case materials" contained a cryptic description of the same incident, but described Bundy as the actual killer. Defense counsel objected on the ground there was no corpus delicti of the killing of Cathy, and on relevancy and Evidence Code section 352 grounds.

The trial court ruled that the document was admissible, and permitted the prosecutor to question defendant about it. The court gave a limiting instruction that the jury could not consider the evidence to prove defendant's character or disposition to commit crimes, but only to prove issues such as

[12]"Cathy" was Jane Doe 28. Defendant was not charged at the guilt phase with this killing, although the prosecution presented evidence of it at the penalty phase.

modus operandi, intent, identity, corroboration of a prosecution witness, motive, knowledge or the existence of a conspiracy. At the close of the defense case, the trial court reversed itself, and excluded the document from evidence on the ground there was no corpus delicti of the offense. Defendant contends that, despite this ruling, the document was inadvertently permitted to go to the jury.

Even assuming the document inadvertently remained in evidence, defendant's claim that it violated Evidence Code section 1101 is without merit. ██ We first reject the Attorney General's contention that the issue is not properly before us. Although defendant did not specifically mention Evidence Code section 1101, the trial court was sufficiently alerted to the issue by the objections actually made. Indeed, it gave the jury a limiting instruction consistent with Evidence Code section 1101, subdivision (b). The issue is thus reviewable. (*People* v. *Williams* (1988) 44 Cal.3d 883, 906-907 [245 Cal.Rptr. 336, 751 P.2d 395].)

██ Turning to the merits, the document was properly admitted in the first place. It is not clear that the corpus delicti rule applies to other crimes evidence offered solely to prove facts such as motive, opportunity, intent, or identity, or for impeachment. (See *People* v. *Denis* (1990) 224 Cal.App.3d 563, 568-570 [273 Cal.Rptr. 724].) We need not decide the point, for the corpus delicti was established in this case independently of defendant's extrajudicial writing. Bundy testified from her personal knowledge of the offense. Although she was an accomplice, her testimony was sufficient to establish the corpus delicti. (*People* v. *Williams, supra,* 44 Cal.3d at p. 911.) The document was properly introduced to impeach defendant's claim that he had never invited a prostitute into the car with Carol Bundy present, and his claim that Bundy was lying about Cathy's murder. Evidence Code section 1101, subdivision (c), provides that "Nothing in this section affects the admissibility of evidence offered to support or attack the credibility of a witness."

Defendant's claim that the evidence should nevertheless have been excluded under Evidence Code section 352 also lacks merit. Defendant himself elicited Bundy's testimony on this and the other murders. In addition, the document had significant probative value. Defendant's handwritten version agreed in important respects with Bundy's testimony. The court acted within its discretion in originally admitting the evidence.

2. *Evidence That Defendant Wore Women's Underwear*

Over objection, various witnesses testified that defendant collected various items of clothing from and wore the underwear of his old "girlfriends,"

that is, prostitutes, dancers, and women he had picked up in bars. Defendant's preoccupation with the clothing appeared to involve a component of sexual gratification, either as "mementos" of his sexual exploits, or directly, as reflected in his cutting the crotch of some of the women's panties and wearing them with his penis hanging out.

Defendant contends the evidence was inadmissible. We disagree. This evidence was relevant to the issue of identity. The circumstances of the killings suggested the killer collected and kept trophies of his kills in the form of some items of their clothing. For example, Marnette Comer's jeans and T-shirt were used by the killer to wrap the severed head of Exxie Wilson. And, except for the Karen Jones murder, no underwear was recovered from the site of any of the killings. The treatment of the victims' clothing appeared to involve sexual gratification derived from the clothing itself. Under the circumstances, the court had discretion to admit the evidence.

### 3. Interrogation Statement

Defendant objected to an admission during his police interview that since his school days he had been unable "to look at sex straight on" or that "it had to be kinky." Defendant's driving need for "kinky" sex corroborated evidence of his interest in prostitutes and necrophilia, features that he shared with the murderer. The evidence was therefore relevant to the issue of identity, and thus properly admitted.

### 4. Hiring of Dancer

Defendant also objected to testimony elicited from Frances Huys that defendant had hired a dancer to perform for him and Huys, and to engage in three-way sex with them. This evidence was relevant to show defendant's fondness for hiring prostitutes, which was relevant on the questions of identity and motive.

### 5. Testimony of Donielle Patton

Over relevance objections, Donielle Patton testified that defendant liked to pick up prostitutes, that he had offered her money to help him pick up sexual partners, and that he stated to her that he had found a new "sexual high" in slitting prostitutes' throats while engaged in sex, so he could feel their vaginas tighten as they died.

Defendant did not object to this testimony on the ground of Evidence Code sections 352 and 1101. In the absence of a timely and specific

objection on the ground sought to be urged on appeal, the trial court's rulings on admissibility of evidence will not be reviewed. (Evid. Code, § 353; *People* v. *Green* (1980) 27 Cal.3d 1, 22, fn. 8 [164 Cal.Rptr. 1, 609 P.2d 468].) Accordingly, these contentions are not preserved for appeal.

Defendant argues that, at least with respect to evidence of other crimes, the Evidence Code section 1101 issue was preserved by his objections on relevancy grounds. In *People* v. *Williams, supra,* 44 Cal.3d 883, 907, we held that, "When . . . the People have already made it clear that the evidence will show the commission of an uncharged crime, and the defendant objects on grounds that the People have not shown that the evidence is relevant to any issue in the case, the objection is sufficient to alert the court that admissibility must be determined under the criteria of Evidence Code sections 1101, subdivision (b), and 353, and *People* v. *Thompson, supra,* 27 Cal.3d 303, 314-318."

*Williams* does not aid defendant. We there reemphasized the basic rules that a timely and specific objection to admissibility of evidence is required, and that "A general objection on grounds of relevancy is not adequate to preserve an issue with respect to admission of other-crimes evidence for appeal." (*People* v. *Williams, supra,* 44 Cal.3d 883, 906.) The objection "must be made in such a way as to alert the trial court to the nature of the anticipated evidence and the basis on which exclusion is sought, and to afford the People an opportunity to establish its admissibility." (*Ibid.*)

In *Williams,* the prosecutor had advised the jury in the opening statement that he intended to show that the defendants had stolen some guns and tools (including the murder weapon) from a man for whom they had been working. Defense counsel objected on the ground of relevance *to any issue in the trial.* The objection was therefore "sufficiently specific to encompass a *Thompson* objection, i.e., that the People were offering evidence of uncharged criminal conduct by the defendant, that defendant had not put in issue any element of the offense or issue necessary to the People's case-in-chief to which that crime was relevant, and that any relevance the evidence might have if admissible was outweighed by its inherently prejudicial nature." (*People* v. *Williams, supra,* 44 Cal.3d at p. 906.)

Here, Donielle Patton's testimony did not clearly involve uncharged crimes. Patton testified that, at the time, she believed defendant was describing a fantasy, and not a real event. The prosecutor never argued that defendant actually committed a murder in the manner that defendant described to Patton. The testimony was not introduced for that purpose, but to show defendant's sexual interests and motivations. The testimony was not,

therefore, other-crimes evidence. Under the circumstances, a specific objection on the ground of Evidence Code section 1101, subdivision (b), was required.[13]

▇ In any event, the testimony was admissible under Evidence Code section 1101, subdivision (b), as evidence of motive. Evidence of motive was relevant to the disputed issue of identity.

The murder victims were all prostitutes and, with the exception of Karen Jones, all were found nude, suggesting a sexual motivation. (See *People v. Jennings* (1991) 53 Cal.3d 334, 367 [279 Cal.Rptr. 780, 807 P.2d 1009]; *People v. Robbins* (1988) 45 Cal.3d 867, 886 [248 Cal.Rptr. 172, 755 P.2d 355].) The killer apparently engaged in deviant sexual practices, telling Mindy Cohen he had post mortem sex with Marano and Chandler, and threatening to kill Cohen and then "make love" to her in the same way. Other evidence supported the theory that post mortem sex had taken place in some of the murders. For example, semen was found in the mouth of the severed head of Exxie Wilson, and sperm was found in Chandler's vagina. The killer achieved additional sexual gratification from describing his necrophilic acts to Cohen over the telephone. Evidence of defendant's sexual interest in and gratification from necrophilic activities and fantasies constituted a highly distinctive mark of commonality with the killer (especially when coupled with the other common marks such as access to the relevant vehicles, guns, and locations).

Admission of the evidence was also within the discretion the trial court has under Evidence Code section 352. (*People v. Siripongs* (1988) 45 Cal.3d 548, 574 [247 Cal.Rptr. 729, 754 P.2d 1306].) The testimony was highly probative. The description of slitting the throats of prostitutes was presented as a statement of defendant's interests. There was no claim it described an actual killing. There was no abuse of discretion.

### 6. *Other Evidentiary Items*

Defendant did not raise a specific objection on the ground of Evidence Code section 1101 to any of the remaining 12 items of evidence of which he here complains. Accordingly, his objection on that ground is waived. He argues, however, again in reliance on *People v. Williams, supra,* 44 Cal.3d 883, 906-907, that his relevancy objections to certain items of evidence were

---

[13]Earlier in Patton's testimony, defendant did specifically object to "character trait" evidence regarding his sexual activities, as opposed to evidence of other crimes. That issue is cognizable on appeal, but that evidence was properly admitted. Evidence of defendant's sexual activities, interests and fantasies was relevant to the issue of motive.

sufficient to apprise the court that he was objecting on the ground of impermissible other-crimes evidence under Evidence Code section 1101. For the reasons stated above in connection with the testimony of Donielle Patton, we disagree. In any event, the evidence was properly admitted.

 In a letter to Joey Lamphier, defendant admitted that he had been involved in tax fraud, insurance fraud, arson and other "shady shit" in his life, and may have identified other criminal acts. These references were, however, entirely incidental to the other matters for which the letter was admitted (e.g., to impeach Lamphier's denials that defendant attempted to influence her testimony, direct evidence of defendant's efforts to suborn perjury, and defendant's admissions of his making telephone calls on June 16, 1980).

Defendant did make an adequate Evidence Code section 352 objection to admission of his letter to Lamphier. The letter was, however, probative on issues of his admissions with respect to his movements and with respect to the telephone calls, as well as of his attempts to get Lamphier to lie in his behalf. The admissions of other past criminal activity (tax evasion, etc.) were insignificant in comparison and not prejudicial.

 Evidence of the circumstances of an offer by defendant to "take care of" witness Elaine Forrestall's ex-boyfriend was probative to show that defendant had one of the Raven guns at that time. The probative value was not substantial, but we cannot conclude that its admission was unduly prejudicial. The evidence was not offered as evidence of another crime and was again only incidental to other purposes for which the evidence was admitted.

 Shannon O. testified that, while she and Carol Bundy were riding in the car with defendant, he picked up a blonde prostitute and paid her $25 to orally copulate him while Bundy and Shannon watched. Defendant objected only on relevancy grounds, and therefore has waived other objections. The evidence was relevant. While technically it involved a criminal act of engaging in prostitution or possibly endangerment of a minor, it was not offered specifically to "prove" such a criminal act. The event had significant points in common with the behavior of the murderer (e.g., picking up a blonde prostitute for a sexual encounter in the murder vehicle).

Because defendant did not properly preserve an objection on the ground of impermissible character trait to any of the remaining items of evidence to which he now objects, those contentions will not be reviewed here.

Defendant also maintains that the prejudicial value of other items outweighed any probative value. We disagree. As to some of these items,

defendant did not object on that basis, thus waiving the claim. In addition, had a proper objection been made, the court would have had discretion under Evidence Code section 352 to admit the evidence.

 Two knives were admitted over a relevancy, but not an Evidence Code section 352, objection. Neither knife was directly or conclusively connected to the offenses (e.g., Charlene A. testified her attacker used a knife with a yellow handle; neither of the knives introduced had a yellow handle). However, defendant owned both of the knives. He was seen to carry similar knives in the cars, and in particular kept a buck-type knife in a slit in the visor of the Buick station wagon. Exxie Wilson was killed in the Buick. Her head was severed with 20 cuts by an instrument like a buck knife. Defendant told Joey Lamphier to destroy one of the knives. The knives were circumstantially relevant.

 Many pornographic works were seized from defendant's apartment. Only a few pages were admitted at trial, including one page depicting a decapitated head orally copulating a severed penis. Defendant objected on grounds of relevance and Evidence Code section 352. The picture depicting the decapitation/oral copulation was probative of defendant's interest in that matter. Defendant also complained that the picture was improperly removed from its context. However, if it had been placed "in context," the entire pornographic book from which it came would have been admitted into evidence. The trial court undoubtedly—and reasonably—concluded that the inclusion of the entire remainder of the pornographic book would be prejudicial beyond its probative value. The court acted to avoid undue prejudice to defendant.

 Defendant objected, on relevancy grounds only, to introduction of a photograph album seized from the cell of Veronica Compton. The photographs in the album depicted case photographs (e.g., of the headless corpse of Exxie Wilson and her severed head) as well as pictures of defendant holding up various items of physical evidence including the victims' underwear and the box in which Exxie Wilson's head was found (the photos were apparently taken during a defense viewing of physical evidence at the police property room). The photographs corroborated one of defendant's writings in which he described apparent efforts by him to plant false evidence, i.e., by deliberately placing his fingerprints on items of physical evidence so the prosecutor could not prove any preexisting prints on the evidence.

 Defendant objected on relevancy and Evidence Code section 352 grounds to introduction of a form he had filled out to place an advertisement for sexual partners in a sexually oriented newspaper. The form was circumstantial evidence of defendant's access to Carol Bundy's Datsun automobile

(the ad was found in the trunk of the Datsun), which had not yet been proven at the time the evidence was offered. Although its probative value was slight, we cannot say the court abused its discretion in admitting it.

■ We have reviewed each of the many other items of evidence defendant claims was improperly admitted. As to many, there was no objection, and the issue therefore has been waived. As to the others, we find no abuse of discretion in their admission given the nature of the charged crimes. In addition, in light of the substantial evidence of guilt, and the large amount of other evidence of defendant's aberrant sexual conduct and interests, any error in the admission of any of this evidence was harmless.

The evidence of defendant's commission of the crimes was strong. Indeed, it was sufficiently strong that the prosecution did not even call Bundy as a witness (she testified solely during the defense case). Defendant was closely connected to the gun that fired *all* of the fatal shots; the gun was found hidden at the plant where defendant worked. Defendant had briefly entered the plant in the middle of the night shortly before the guns were discovered. The incriminating telephone calls were made by someone (not the police) who had access to Gina Marano's address book. Telephone company records showed that defendant made the Brigges, Cohen and Gottesman calls; defendant himself admitted on the stand that he made those calls. Defendant had access to the relevant cars. He was unable to account for his movements at relevant times (e.g., the evidence suggesting he, not Bundy, occupied the Verdugo apartment on the night of June 22). He attempted to destroy evidence or to persuade others to alter their testimony. There was substantial blood evidence (painting and bootprint) relating to his rental garage. Defendant admitted that he knew Cynthia Chandler. A telephone list bearing the name "Cindy" and Mindy Cohen's name and telephone number was found in defendant's wallet. It is not reasonably probable that a more favorable result would have occurred in the absence of the evidence to which defendant now objects, whether the evidence be considered singly or as a whole. (*People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].)

## 7. Limiting Instruction

■ Defendant concedes that a limiting instruction was given with respect to the document involving defendant's participation in the murder of "Cathy." He complains, however, that no limiting instruction was given with respect to the other challenged evidence. No such instruction was requested. Defendant argues that the trial court had a sua sponte duty to do so. There is, however, no such duty. (*People* v. *Collie* (1981) 30 Cal.3d 43, 64 [177 Cal.Rptr. 458, 634 P.2d 534, 23 A.L.R.4th 776].) *Collie* recognizes a possible

exception in "an occasional extraordinary case." (*Ibid.*) This is not such an extraordinary case. In addition, contrary to defendant's argument, the rules applicable to noncapital cases are equally applicable in capital cases. (See *People* v. *Williams, supra,* 44 Cal.3d 883, 906; *People* v. *Dyer* (1988) 45 Cal.3d 26, 81 [246 Cal.Rptr. 209, 753 P.2d 1]; *People* v. *Ghent* (1987) 43 Cal.3d 739, 766 [239 Cal.Rptr. 82, 739 P.2d 1250].) The court was under no sua sponte duty to give a limiting instruction.

## D. RIGHT TO PRESENT A DEFENSE

Defendant next contends he was denied due process because the trial court refused to allow him to present evidence supporting his third party culpability defense, and because the trial court improperly refused him discovery of relevant defense evidence. His proposed defense was that Bundy and Jack Murray committed the charged murders, and Bundy then murdered Murray and framed defendant.

The applicable law was summarized in *People* v. *Hall* (1986) 41 Cal.3d 826, 833 [226 Cal.Rptr. 112, 718 P.2d 99]: "To be admissible, the third-party evidence need . . . only be capable of raising a reasonable doubt of defendant's guilt. At the same time, we do not require that any evidence, however remote, must be admitted to show a third party's possible culpability. . . . [E]vidence of mere motive or opportunity to commit the crime in another person, without more, will not suffice to raise a reasonable doubt about a defendant's guilt: there must be direct or circumstantial evidence linking the third person to the actual perpetration of the crime."

Under this test, there was no error.

### 1. *Evidence of the Murray Killing*

Defendant was originally charged as an accessory after the fact to the murder of Murray, because he had aided Bundy in disposing of Murray's decapitated head. (§ 32.) That count was dismissed before trial, over defense counsel's objection. Attorney Keith asserted that the Murray offense "will tend to show there is more than a distinct possibility that someone else other than Clark committed these homicides."

During trial, the court stated in the presence of the jury that it was irrelevant that one of Bundy's guns had been used to kill Murray, and cut off defendant's cross-examination on that subject. It did not permit defense counsel to question Bundy about details of the Murray murder, and ruled that

exhibits relating to that crime would be inadmissible.[14] The court ordered defense counsel not to mention the Murray murder in the closing argument. In addition, the court instructed the jury that there was no corpus delicti of the Murray offense, and that admissions in regard to that offense could not be considered.

■■■ Defendant argues the evidence of the Murray murder was admissible for several reasons. First, since it was a decapitation murder, it was "other crimes" evidence which might tend to establish that the killer of Jack Murray, i.e., Bundy, was also the killer of Exxie Wilson. Second, evidence that Jack Murray's head had been transported in the Datsun automobile would have undermined the inference that blood in the Datsun may have belonged to Marnette Comer. Third, the fact that Murray was killed with the chrome Raven was relevant to show that the fact defendant possessed and hid the guns in his workplace did not necessarily mean that he used the nickel Raven. Since one of the hidden guns was the chrome Raven, which had been used by someone else to commit a separate murder, he argues that his possession and secretion of the nickel Raven does not necessarily tie him to the killings of this case. Finally, evidence that Bundy killed Murray alone would dispel any possibility that the jury might think defendant had been involved.

We find no error. The excluded evidence was not sufficient to raise a reasonable doubt as to defendant's guilt under the standard of *People* v. *Hall*, *supra*, 41 Cal.3d 826. First, the trial court could reasonably have found that it did not qualify as "other crimes" evidence to show that Bundy had killed Exxie Wilson. While the fact of decapitation was an unusual point of similarity between the two murders, there were many significant points of dissimilarity. Exxie Wilson was, like the other victims, a blonde female prostitute. She was invited into Bundy's Buick by a stranger for a sexual encounter. She was killed with the *nickel* Raven, defendant's gun. Her decapitated body was left in a public place. Her severed head was also dropped in a public location a few days later. There was evidence of semen in her mouth and vagina. Her killer was probably a man.

Murray, a male, was killed in his own vehicle by someone he knew. The motive was not sexual gratification, but to prevent the reporting of crime. He was killed with the *chrome* Raven. The body was left inside his vehicle, not dumped, and the head was disposed of and never found. Murray's killer was a woman. The Murray murder does not reasonably tend to show that the same person—Bundy—also killed Exxie Wilson.

---

[14]In Bundy's tape-recorded statement to police, she told police that she was solely responsible for the Murray murder and that defendant was not involved. The statement was introduced at trial at defense request.

Second, the physical facts of Marnette Comer's murder supported the account that it took place in the Datsun. Comer had been shot three times. Two bullets fired from the nickel Raven were recovered from the body. A third bullet, also from the nickel Raven, was found embedded in the passenger door of the Datsun, exactly as Bundy had described. The fact, assuming it true and that the jury had learned of it, that Murray's head was later transported in the Datsun does not negate the conclusion that Comer was killed in the Datsun.

Third, the jury *did* learn that someone else killed Murray with the chrome Raven. It heard Bundy say on the tape that she (and she alone) had killed Murray with her chrome gun. There was no contrary evidence. Defendant was fully able to argue the inference that it was therefore possible that he was also not the user of the nickel Raven.

## 2. *Production of Evidence*

 Defendant argues he was improperly denied discovery of certain items of evidence from the Murray investigation. Specifically, he asked for and was denied the following: (1) Four bloodstained pillows, one with a bullet hole, found in Murray's van; (2) hair and dry tissue found in the van (defendant alleged it was Marnette Comer's); (3) blonde hair found on the ceiling of the van (also supposedly Marnette Comer's); (4) blood samples from the window frame of the van (Defendant wanted to test the blood to see if it matched the blood of victims in this case. The court denied this request provisionally, but stated it would allow discovery if defendant could produce a witness who would testify to its relevance.); (5) a shell casing from the chrome Raven; (6) items of jewelry Bundy had given to another person. The prosecutor represented that the jewelry was related to the killing of Jane Doe 28 ("Cathy"), which was not charged at the guilt phase. Defendant stated he wanted to show the jewelry to other persons to see if it could be identified as belonging to any of the other victims in this case.[15]

 Defendant must show a " ' "plausible justification" ' " for the requested discovery. (*Hill* v. *Superior Court* (1974) 10 Cal.3d 812, 817 [112 Cal.Rptr. 257, 518 P.2d 1353, 95 A.L.R.3d 820].) "A showing . . . that the defendant cannot readily obtain the information through his own efforts will ordinarily entitle him to pretrial knowledge of any unprivileged evidence, or information that might lead to the discovery of evidence, *if it appears reasonable that such knowledge will assist him in preparing his defense* . . . . (Traynor, *Ground Lost and Found in Criminal Discovery*

---

[15]Defendant also alleged that the police may have possessed other items which might have shed light on his defense. The record does not support the allegation.

(1964) 39 N.Y.U.L.Rev. 228, 244 . . . ." (*Ibid.*, internal quotation marks omitted, italics added in *Hill.*) In addition, on appeal, defendant must show prejudice from the erroneous denial of discovery. (*People v. Memro* (1985) 38 Cal.3d 658, 684 [214 Cal.Rptr. 832, 700 P.2d 446].) We reject defendant's invitation to reconsider this "settled" rule. (*Ibid.*)

 Defendant has shown neither a plausible justification nor prejudice. As noted, the jury heard the uncontradicted admission from Bundy herself that she alone killed Murray with the chrome Raven. The shell casing was not needed to establish this fact.

Defendant argues that "Blond hair in the van would also have supported appellant's theory that the victims in this case were killed there—even if the hair could not have been scientifically matched. Any blood in the van not identified as Murray's would similarly support appellant's defense. And under a 'best case' scenario, appellant would have been able to show that the murders with which he was charged occurred in Murray's van." However, a blonde hair in Murray's van, not matched to any victim, would not prove anything. In addition, even if blood, tissue or hair were matched to victims in this case, it might be circumstantial evidence that the victim had been in the van, but it would show little more.

More importantly, the entire premise was based on sheer speculation. The record contains no evidence whatsoever, not even of motive or opportunity, connecting Murray to these murders. There was no evidence that Murray frequented with prostitutes or was acquainted with any victim. There was no evidence that Murray had access to the guns until one time after the murders had been committed. Murray did not drive the Buick or Datsun. There was no evidence of Murray's whereabouts at any of the relevant times. Defendant admitted that he, not Murray, made the Brigges, Gottesman and second Cohen calls. Although defendant had the services of two investigators, he produced no evidence that Murray's murder was relevant. Defendant also failed to show that the evidence sought to be discovered might produce or lead to relevant evidence sufficient to raise a reasonable doubt as to defendant's guilt.[16]

---

[16]Defendant also claims the trial court erroneously instructed that "No person *may be convicted* of a criminal offense unless there *is* some proof of each element of the crime independent of any admission made by him outside of this trial. [¶] . . . [¶] You are instructed that as a matter of law, each element of the crime of the murder of Jack Murray (187 Penal Code) and the crime of lewd acts with a child under the age of fourteen (288 Penal Code) have not been proven. Therefore, you may not consider any admission that may have been made *by the defendant* concerning these crimes." (Italics added.)

The instruction was, however, for defendant's *benefit*. Bundy was not charged with the Murray murder in this proceeding and could not be convicted of it at defendant's trial. The instruction correctly directed the jury that it could not convict *defendant* of either the Murray

### E. Voice Identification

Defendant claims the trial court improperly permitted Mindy Cohen and Laurie Brigges to testify about out-of-court proceedings in which they identified his voice. He contends: (1) Cohen's voice identification was obtained by inherently suggestive procedures; (2) the trial court improperly excluded relevant expert testimony; and (3) he was not afforded a hearing on the alleged suggestiveness of Brigges's identification.

#### 1. *Alleged Suggestiveness of Cohen's Identification*

Cohen testified at an in camera hearing on the admissibility of her voice identification that in August 1980, Detective Broda met with her and played two portions of a tape for her. Before playing the tape, Detective Broda explained that Cohen was not obligated to identify any voice on the tape.

Broda played the first segment of tape, approximately two minutes long. Cohen heard only one voice, speaking about service in the Army. Cohen positively identified the voice as that of the caller. Cohen then heard a second two-minute segment of tape. She heard more than one voice on the second part of the recording. She remembered that something was being said about a pornographic movie involving a girl and a horse. Cohen again identified one of the voices (defendant's) as that of the caller.

Defendant contends that the voice identification procedure was impermissibly suggestive. Even assuming, without deciding, that voice identification procedures are judged by the same standards as visual identification, we find no error.

In resolving this question, the court first determines whether the identification procedure was unduly suggestive and unnecessary. If so, the court must determine whether the identification itself was nevertheless reliable, under the totality of the circumstances, taking into account such factors as the witness's opportunity to view (or hear) the person, the degree of the witness's attention, the accuracy of any prior description of the person (or voice), the level of certainty of the identification, and the time between the incident and the confrontation. (*People* v. *Gordon* (1990) 50 Cal.3d 1223, 1242 [270 Cal.Rptr. 451, 792 P.2d 251].)

Defendant contends that the procedure was unduly suggestive in three respects: first, the police used a tape of only defendant's voice; second,

---

murder or the molestation of Shannon O., or even consider any of his admissions concerning the crimes.

the police suggested to Cohen that the voice she would hear was that of a suspect; and third, the police chose to play a segment of tape dealing with bizarre sexual conduct, which would be likely to induce Cohen to identify the speaker's voice.[17]

Defendant draws a parallel to a one-person showup or one-photo lineup (see *Stovall* v. *Denno* (1967) 388 U.S. 293 [18 L.Ed.2d 1199, 87 S.Ct. 1967]; *People* v. *Nation* (1980) 26 Cal.3d 169 [161 Cal.Rptr. 299, 604 P.2d 1051]; *People* v. *Bisogni* (1971) 4 Cal.3d 582 [94 Cal.Rptr. 164, 483 P.2d 780]; *People* v. *Sandoval* (1977) 70 Cal.App.3d 73 [138 Cal.Rptr. 609, 99 A.L.R.3d 765]). A single-voice "lineup," like a one-person showup or corporeal lineup, may pose a danger of suggestiveness, but such lineups or showups are not necessarily or inherently unfair. (*People* v. *Bisogni, supra,* 4 Cal.3d 582, 587; *People* v. *Bauer* (1969) 1 Cal.3d 368, 374 [82 Cal.Rptr. 357, 461 P.2d 637, 37 A.L.R.3d 1398]; see *Stovall* v. *Denno, supra,* 388 U.S. 293, 302 [18 L.Ed.2d at p. 1206].) Rather, all the circumstances must be considered.

The first step of the analysis presents a close question. It is not clear that the single-voice lineup was necessary. Defendant was in custody on other charges at the time. As defendant argues, the procedure was suggestive in some respects. However, even assuming that the procedure was unduly suggestive and unnecessary, the identification was nevertheless reliable under the totality of the circumstances.

We have once before considered the propriety of a single-voice identification. In *People* v. *Osuna* (1969) 70 Cal.2d 759 [76 Cal.Rptr. 462, 452 P.2d 678], the witness had been held at gunpoint by hooded robbers for over two hours. At trial, the witness identified the defendant as one of the robbers. The witness had previously identified the defendant at the district attorney's office. The witness first stood outside the door and listened to the defendant talking to the district attorney for 10 or 15 minutes. Then he went into the office and confronted the defendant. We held that the defendant was not denied due process by this procedure. "It might have been preferable to have [the witness] hear several persons speak, but in view of the length of time he was able to hear the robbers talk during the crime, it was not unreasonable to have him confront a single suspect. (Cf. *People* v. *Caruso* (1968) 68 Cal.2d

---

[17]Defendant further argues that the trial court failed to employ the proper standard for determining admissibility of the identification evidence, because it found that the factors of reliability went only to the weight and not the admissibility of the evidence. The court apparently did not apply the two-pronged test. It simply found that "there was no lineup. There was no need for any lineup. So this does not rise to any constitutional level at all." However, our independent review of the record convinces us that the evidence was properly admitted. Any error in this regard was harmless.

183, 188-189 [65 Cal.Rptr. 336, 436 P.2d 336]; *Simmons* v. *United States* (1968) 390 U.S. 377, 385 [19 L.Ed.2d 1247, 1253-1254, 88 S.Ct. 967].) Moreover, there is nothing in the record to show that the district attorney in any way suggested the response [the witness] should make." (*Id.* at p. 765.)

Here, similarly, Cohen had a good opportunity to hear the caller's voice during the telephone calls. The first call was approximately 30 minutes in length. The second call lasted for about two minutes. The police specifically instructed Cohen that she need not make any identification. The calls were highly unusual, and Cohen paid close attention. Cohen's identification was positive and unshaken. The time between the first call and the second call was approximately one month. The time between the second call and the identification procedure was approximately three weeks. Accordingly, as in *Osuna*, "[w]e conclude the procedure was not so suggestive as to give rise to a substantial likelihood of misidentification." (*People* v. *Osuna, supra,* 70 Cal.2d at p. 765.)

### 2. *Expert Testimony on Factors of Reliability*

At the in camera hearing, defendant sought to present the testimony of an expert witness in support of his challenge to the admissibility of the voice identification. The witness would not be available until the next day. The court found no need to delay the proceedings to wait for the expert to be available, and ruled on the merits of the issue without hearing the expert testimony. It stated that defendant could "bring your expert in on defense."

Defendant contends that the trial court's refusal to give him time to present the expert testimony was error. Part of his contention was not raised below. Defendant's offer of proof was limited to the question of how the ability to correctly identify a voice diminishes over time, and possibly to the difference in perceptions between media (telephone, tape recorder, or live voice). Other claims were not raised below and are not cognizable on appeal.

As with eyewitness identification, some factors pertaining to voice identification might not be widely known or may be counterintuitive. We need not decide whether expert testimony may be proper as to these factors. (Cf. *People* v. *McDonald* (1984) 37 Cal.3d 351, 367-368 [208 Cal.Rptr. 236, 690 P.2d 709, 46 A.L.R.4th 1011].) However, it is a matter of common experience that the ability to remember a perceptive experience diminishes over time. It is also generally known that voices may sound slightly different through different media. Expert opinion on these matters was not required to determine the admissibility of the voice identification under the totality of the circumstances. Especially given the fact that the witness was not available on the day of the hearing, the trial court did not abuse its discretion.

### 3. *Hearing on Brigges's Identification*

The day after the hearing on the Cohen identification, defendant requested a second hearing on the admissibility of the voice identification by Laurie Brigges. The court stated it believed it had ruled on both motions the day before. Defendant said that the Brigges matter was "not different than the Cohen lineup," but he had a quarrel with the way the Cohen issue was presented. The court found defendant merely wanted to "rehash" the previous order, and denied the request for a new hearing. Defendant contends this was error.

Evidence presented to the jury showed that sometime in August 1980, after defendant's arrest, Detectives Broda and Garcia played a portion of defendant's interrogation tape for Brigges. Before the tape was played, Detective Garcia told her that she was about to hear a voice on the tape, but that she was not obligated to identify any voice. Detective Garcia did not tell Brigges that he "had a suspect," or whose voice would be on the tape. He testified he played approximately five minutes of tape. Brigges herself remembered listening to 12 to 15 minutes of tape. Three police officers and defendant spoke. Brigges identified defendant's voice. Brigges testified that she deliberately did not listen to the contents of the tape. Detective Garcia did not recall what portion was played.

Defendant now argues that he was entitled to a new hearing on this identification. He argues that the "totality of the circumstances" surrounding the Brigges identification were different from those surrounding the Cohen identification. However, he never suggested this to the trial court. In any event, our review of the record convinces us that the procedure by which Brigges identified defendant's voice was not impermissibly suggestive. Brigges heard a recording with several voices. She did not perceive that some voices were asking questions and one voice was answering. She had a substantial opportunity to listen to defendant's voice during the telephone call, which lasted four minutes. As with Cohen, the police did not suggest that any identification be made. Brigges' identification from the tape was perhaps less certain than Cohen's, but Brigges specifically identified defendant's voice at trial from hearing his cross-examination. The identification was thus admissible, and any error in not holding a separate hearing harmless.[18]

---

[18]Defendant himself admitted in a letter to Lamphier that was admitted into evidence as part of the prosecution case-in-chief that he made the call to Brigges. (He also later testified that he made the call to Brigges and the second telephone call—in which the caller referred to the first call—to Cohen.) There was thus no possibility of misidentification.

## F. Right to Testify

██ As noted earlier, defendant's in propria persona privileges were terminated on December 6, 1982. The standby attorneys were reinstated as attorneys of record. Upon counsel's request, the court ordered sheriff's deputies to seize the case materials in defendant's cell and turn them over to trial counsel. Defendant now complains that his "personal legal tactical notes" were among the papers seized, and that the deprivation of those notes, coupled with counsel's refusal to return them or review them with him, deprived him of the right to testify fully in his own behalf. The argument hinges on his claim that "[d]uring direct and cross-examination, [he] frequently expressed difficulty . . . answering various questions without reference to his notes." In particular, he complains that, without his notes, he was unable to account for his movements on two critical dates, June 11 and June 21, 1980.

The contention is not supported by the record. In many of the instances about which defendant complains, he did not indicate an inability to testify without his notes. Rather, he stated that he might be able to answer if he reviewed work logs, telephone records, checks, receipts, letters, police reports or other documents. Indeed, on redirect examination, defense counsel did attempt to help defendant refresh his recollection with the very kinds of evidence he said he would need.

Defendant was on the stand for approximately five and one-half days. Counsel took special care that defendant be allowed to explain many of the letters and documents he had written—and about which the prosecutor had cross-examined him at length. In the middle of the redirect examination, defendant refused to testify further. That was his own decision. Defendant was not deprived of his right to testify.

## G. Waiver of Conflict With Defense Counsel

██ Defendant next contends he did not validly waive a conflict of interest with his attorney, Watson, who had formerly been employed as a deputy district attorney. He argues that Watson was bound by a duty of loyalty to her "former client, the prosecutor's office," and that that duty conflicted with her duty to defendant. He also contends that Watson "may have been privy to confidential information concerning the practices, policies and attitudes of the prosecutor's office, such as the charging of multiple special circumstances, the selection of capital juries, and the extent to which accomplices are accommodated in exchange for their testimony." He claims that the information could not be conveyed to cocounsel or used without

breaching a duty to the former "client," but that to ignore her knowledge would breach a duty to defendant.

These matters do not appear to constitute confidential information within the attorney-client privilege. More fundamentally, defendant expressly waived any potential conflict. When Watson was appointed, the trial court advised defendant that she had been employed as a deputy district attorney when the charges against defendant were investigated and filed, and she had remained so employed until two months before her appointment. Attorney Keith asked defendant, "bearing in mind what His Honor just stated for the record and what you already know, do you consent to have Miss Watson represent you in this matter along with myself?" Defendant answered, "Yes, I do."

Defendant claims the waiver was invalid because the trial court did not explain more fully all the "dangers and consequences" of representation by Watson. Even assuming defendant is correct that Watson would not be permitted to share information regarding the district attorney's internal practices with him, he does not explain why this is a "danger" or a "consequence" which would require the appointment of a different attorney. Under defendant's hypothesis, no attorney would be able to offer him that information. All former deputy district attorneys, like Watson, would be bound not to reveal the information. No attorney who was not a former member of the district attorney's office would be privy to such information. The unavailability of the information does not of itself constitute a conflict of interest.

Defendant does not allege the existence of any other conflict. There is no suggestion that Watson had received any information about defendant's case while employed as a deputy district attorney. Defendant never expressed any actual conflict with Watson. He regularly proclaimed her competence (in contrast to Keith's alleged incompetence). ·

A waiver need not be in any particular form, nor is it rendered inadequate simply because all conceivable ramifications are not explained. (See *Maxwell* v. *Superior Court* (1982) 30 Cal.3d 606, 622 [180 Cal.Rptr. 177, 639 P.2d 248, 18 A.L.R.4th 333].) Defendant was advised of the basic problem. The deputy district attorney trying the case specifically indicated he was not aware of any matters relating to defendant's case of which Watson had knowledge. We find the waiver adequate under the circumstances.

### H. Search Warrant for Lamphier Residence

In September 1982, a warrant was issued for a search of Joey Lamphier's apartment for evidence of a plan between defendant and Veronica Compton

to offer false testimony at defendant's or Compton's trials. Defendant contends the affidavit supporting the warrant, based largely on information supplied by Compton's former cellmate in Washington State, did not establish probable cause for the search.

 The crimes here were committed in 1980, before the effective date of Proposition 8. That initiative, therefore, does not apply to this case. (*People* v. *Smith* (1983) 34 Cal.3d 251, 262 [193 Cal.Rptr. 692, 667 P.2d 149].)[19] (If it did, defendant's contention would fail at the outset. He would lack standing to challenge the search of Lamphier's residence. (*In re Lance W.* (1985) 37 Cal.3d 873 [210 Cal.Rptr. 631, 694 P.2d 744].)

 We therefore "apply the California rule that an untested noncitizen informant's claims must be independently corroborated . . . ." (*People* v. *Gonzalez* (1990) 51 Cal.3d 1179, 1206, fn. 3 [275 Cal.Rptr. 729, 800 P.2d 1159].) The corroboration need not, however, be in any particular form. "[T]he authorities need only confirm the untested informant's *reliability* 'in essential respects'; they need not establish *every element* of probable cause by independent means. [Citations.]" (*Id.* at p. 1207, fn. 3, italics in original.) In addition, " '[i]t is . . . possible for an informant's bare conclusion to be buttressed by secondary information, which itself does not amount to probable cause but which fortifies the first, and for the two in combination to provide sufficient cause for the issuance of a search warrant.' " (*People* v. *Levine* (1984) 152 Cal.App.3d 1058, 1065 [199 Cal.Rptr. 756].)

 Applying the foregoing principles to the facts here, we conclude the warrant affidavit was sufficient. The primary allegations were supplied by a noncitizen informant, Compton's former cellmate in Washington. This informant provided Washington authorities with specific, detailed information that Compton and defendant were conspiring for Compton to testify falsely on defendant's behalf at his trial on the instant murders.

Washington prison officials searched Veronica Compton's cell and seized materials which corroborated the informant's statements in many respects. Compton possessed a photograph album containing pictures of nude and decapitated bodies. The photographs appeared to be coroner's and police photographs relating to the charges against defendant, which had been delivered to the defense pursuant to court-ordered discovery. A number of letters in defendant's handwriting were also seized from Compton's cell.

---

. [19]The Attorney General argues that, *Smith* notwithstanding, the provisions of Proposition 8 should apply to a search conducted *after* its passage. (The evidence in *Smith* was obtained before its passage.) We need not decide the point, for the search warrant was valid in any event.

Two of defendant's letters expressly referred to the photographs as case photographs pertinent to the charges against him. All this was similar to the informant's description.

The affiant, based on her experience as an investigator, further believed that certain statements in the letters made coded reference to a plan to give false testimony, either in defendant's case or in Compton's. The references, although by no means a clear statement of such a plan, could reasonably be read together to support the informant's allegation that such a plan existed. Some letters referred to a "screenplay" or "show" which required a "totally polished" preparation. Other letters sought information from Compton about Bundy. Defendant made frequent comments about the secrecy of his correspondence with Compton—he kept her letters "under LOCK and KEY," not at the jail, and he even kept knowledge of them from his legal advisers, as well as his friends. Defendant emphasized that secret mail should be sent to his post office box. He also indicated that a "lady" he knew (i.e., Joey Lamphier) would aid them by (1) delivering mail from the post office box to investigators, who would give it to defendant unopened and unread, and by (2) reading over the phone to defendant correspondence that Compton marked "Joe read."

Based upon this evidence, and postal records showing that Joey Lamphier was a cotenant of the post office box, the affiant had reason to believe that communications from both defendant and Compton, outlining a plan to present false evidence at the trial of either or both, were stored at Joey Lamphier's apartment. All this information, in combination, provided sufficient cause for the issuance of a search warrant. (*People v. Levine, supra,* 152 Cal.App.3d 1058, 1065.) There was no error.

## I. WARRANTLESS SEARCH OF DEFENDANT'S WALLET

■ Defendant next contends the telephone list seized from his wallet should have been suppressed because it was neither a proper booking search nor a search incident to an arrest. We find it was a valid booking search, and hence need not decide whether it was also a valid search incident to an arrest.

Defendant was taken into custody around noon on August 11, 1980. He was transported to the Van Nuys station and placed in a holding cell to await the arrival of officers from the downtown robbery-homicide division. Defendant was placed in the holding cell around 1:30 or 2:00 p.m. His wallet, belt and other personal effects were placed in a manila envelope. The envelope remained on Detective Pida's desk. Nothing was examined at that time.

The robbery-homicide detectives arrived and formally arrested defendant around 6 p.m. Detective Orozco took possession of the manila envelope containing defendant's belongings, but he did not open it at that time. Detectives Orozco and Stallcup then transported defendant to Parker Center. At Parker Center, the robbery-homicide detectives interviewed defendant. The interview began the same day at 7:15 p.m. and concluded at 10:45 p.m. Detective Stallcup booked defendant after the interrogation. At that point, Detective Orozco inspected the wallet and its contents. Plainly visible upon opening the wallet was a card listing several female names and telephone numbers. The name "Cindy" and a telephone number appeared on the card. During his interrogation, defendant had stated that he knew Cynthia Chandler and had her telephone number in his wallet.

. Defendant claims the search and seizure of the wallet exceeded the scope of a proper booking search because Detective Orozco read the telephone list in defendant's wallet. He argues that the reading of the documents in his wallet was not properly related to any inventory purpose and that the search was therefore invalid.

In *People* v. *Hovey* (1988) 44 Cal.3d 543, 570-571 [244 Cal.Rptr. 121, 749 P.2d 776], we rejected a similar contention. There, the defendant was arrested and booked into jail. The booking officers inventoried the contents of the defendant's wallet, including an incriminating receipt. We held not only that it was permissible to inventory the contents of the wallet (*Illinois* v. *Lafayette* (1983) 462 U.S. 640, 643-648 [77 L.Ed.2d 65, 69-73, 103 S.Ct. 2605]), but that it was also necessary to read the papers in the wallet in order to properly identify and inventory them. Here, the opening of defendant's wallet and the reading of papers within it likewise did not exceed the scope of a proper booking search.

## J. TRIAL COURT'S ALLEGED BIAS

Defendant next contends that the trial court was biased against him and committed various acts of misconduct.

### 1. *Involvement in Presentation of Evidence*

Defendant contends the court manifested bias in the presentation of evidence, possibly leading the jury to believe the court was expressing an opinion on the merits. The question for us to decide is whether the judge "officiously and unnecessarily usurp[ed] the duties of the prosecutor . . . and in so doing create[d] the impression that he [was] allying himself with the prosecution . . . ." (*People* v. *Campbell* (1958) 162 Cal.App.2d 776, 787

[329 P.2d 82]; see also *People* v. *Mahoney* (1927) 201 Cal. 618 [258 P. 607].) As we explain, the answer is no; the court was acting "within the scope of its duty in refusing to allow [the improper questions] to be answered, even though no objection [was] made." (*People* v. *White* (1954) 43 Cal.2d 740, 747 [278 P.2d 9].) The other purported acts of bias also fell within the bounds of proper comment and control of the proceedings and were nonprejudicial.

Defendant cites four instances in which the trial court allegedly interjected sua sponte hearsay objections to nonhearsay. In the first instance, defendant sought to elicit from Detective Helvin whether Dr. Choi, the medical examiner, had told Helvin the cause of Exxie Wilson's death. This was clearly hearsay and the sua sponte objection was proper. The second matter was also clearly hearsay: defendant asked a witness to state whether he was told the results of scientific testing that was performed by someone else and not personally observed by the witness, and which the witness was not personally qualified to interpret. In the third instance, defendant asked Donielle Patton for the names of other women who had told Patton that they may have had conversations with defendant. The court sustained its own hearsay objection. The names of the women alone were not hearsay, but since Patton had no personal knowledge of any of the conversations, they were irrelevant. In the fourth instance, defendant's questions clearly called for Officer Jacques to testify about the content of Bundy's statement to police.

Defendant cites 22 instances in which he claims the trial court's sua sponte relevancy objections were not proper. We have reviewed each of the trial court's objections. In each instance the objection was well taken.

Defendant asked Detective Broda whether "being involved in the production of film involving a woman and a horse having sex . . . would . . . be . . . incriminating?" He also asked Broda how much of his interrogation tape was "nonincriminating." Both these questions were properly objected to as vague as to what constituted "involvement," "incrimination," or "nonincrimination." Defendant's question to a former police department laboratory assistant whether he was "asked to check for certain specific dates to testify about" was also vague and ambiguous as asked.

The court objected to several of defendant's questions as calling for a conclusion from the witness. Defendant asked Mindy Cohen if her caller had used "official sounding terminology." Defendant asked Frances Huys why defendant was carrying bullets on the trip to Northern California. Defendant asked Carlos Ramos, a fellow worker, what he meant by his former testimony that "the next day" another coworker had told Ramos that police

would be searching the plant for the guns. Defendant asked Joey Lamphier whether he had admitted his guilt in a particular letter to her. The questions clearly called for conclusions, e.g., as to "official" police terminology, what was in defendant's mind, what was in the witness's mind at another time, or a personal interpretation of a letter written by defendant. The rulings were proper.

Defendant complains about several other allegedly improper sua sponte objections. Again, we have reviewed the record and find no improper rulings. For example, the percentage of business calls Laurie Brigges received on her telephone line was properly excluded as irrelevant. Defendant's cross-examination of Carlos Ramos about a statement he made to the district attorney concerning guns he saw in defendant's possession was properly curtailed as argumentative. Whether Detective Pida recalled testifying that he left his office for no more than 10 minutes on the day defendant was held for questioning was not proper impeachment and was marginally relevant at best.

Defendant further contends that the trial court's repeated intervention in the defense case compared to far fewer objections in the prosecution's case demonstrates bias. We disagree. As noted above, the court's sua sponte objections were justified. Additionally, the court's intervention is largely explained by the fact that defendant was representing himself. The prosecutor, an experienced attorney, was deliberately following a strategy of not objecting to defendant's questions, and undoubtedly asked fewer objectionable questions than did defendant.[20]

The cases on which defendant relies are not apposite. The court did not summarily rest the defendant's case without permitting him to assemble his witnesses (*People* v. *Blackburn* (1982) 139 Cal.App.3d 761, 764 [189 Cal.Rptr. 50]), or excessively inject itself in the examination of witnesses (*Offutt* v. *United States* (1954) 348 U.S. 11, 16 [99 L.Ed. 11, 17, 75 S.Ct. 11]; *United States* v. *Sheldon* (5th Cir. 1976) 544 F.2d 213, 216-219; *People* v. *Robinson* (1960) 179 Cal.App.2d 624, 632 [4 Cal.Rptr. 50]).

Defendant next complains that the trial court improperly criticized him for asking questions and then objecting to the answers. He alludes to only one instance in which this occurred. The trial court's admonition—"You can't ask for hearsay and then when you don't like the answer object"—was brief and mild, and appropriately advised defendant to focus his questions properly.

---

[20]We note that the court objected sua sponte to the *prosecutor's* penalty phase argument about the danger defendant might pose in the future if he were ever released.

Defendant further contends the trial court gave the jury the impression that it disbelieved defendant's testimony when it objected to several of defendant's answers as nonresponsive, struck one and characterized several others as "wisecracks" or "smart-alecky" answers. We have reviewed each of the instances in question and conclude that the court's objections or admonitions were appropriate.

Defendant also argues that the trial court showed bias during his cross-examination of Detective Stallcup. Defendant had prepared his own transcript of the police interview and attempted to use it during cross-examination. Defendant contends the trial court unfairly restricted him from calling his transcript "the transcript," while permitting the prosecutor to refer to the unauthenticated police transcript during direct examination. There was no error. The prosecutor merely used the police transcript, which was not admitted into evidence, as a basis for direct examination of Detective Stallcup on his observations and recollections of the interrogation of defendant. To have permitted defendant to refer in front of the jury to a different, also unauthenticated, transcript risked undue confusion and was properly disallowed under Evidence Code section 352. Defendant was fully allowed to cross-examine Detective Stallcup regarding any alleged errors in either the police transcript or Stallcup's recollection.

Defendant further contends that the trial judge twice required him to place irrelevant prejudicial information before the jury. In neither instance could the matter possibly have been prejudicial.

Defendant next complains that the trial court improperly restricted his ability to move freely about the courtroom without similarly restricting the prosecuting attorney. When defendant represented himself, the trial court permitted him to conduct questioning from the counsel table or the podium, but did not allow him to approach witnesses himself. It required him to use one of his investigators to take materials to the witness. The court was not required to impose a similar restriction on the prosecutor. As the court noted, the prosecutor was an officer of the court and subject to the rules of professional responsibility for his conduct. Defendant was under no such constraints. In addition, defendant's unilateral choice to represent himself did not dictate the scope of the prosecutor's rights in the conduct of the People's case.

Defendant cites as further evidence of bias that the court ordered his investigator not to go near him with unloaded firearm exhibits, thereby allegedly communicating to the jury it believed defendant to be dangerous. In fact, the court merely ordered the bailiff to handle the weapons. It never

told the defense investigator not to go near defendant with the weapons. This was a proper exercise of discretion for purposes of security and control of the proceedings.

## 2. *Rulings Allegedly Based on Facts Outside the Record*

When this case was first assigned to Judge Torres for trial, he informed defendant that he had ruled on a motion to dismiss the charges in Bundy's case, and that he had read the preliminary hearing transcript in that case which contained a transcript of the tape recording of Bundy's police interview. Judge Torres stated that this would not affect his ability to be fair and impartial in defendant's case. Defendant orally objected to trial before Judge Torres. The court informed defendant that he could move to have the judge disqualified, but neither defendant nor his attorney ever filed a challenge either for cause or peremptorily. Defendant now contends that this exposure to Bundy's case led the court to prejudge and to make biased rulings on four occasions.

On the first occasion, defendant, not the court, sought to rely on matters outside the record. Defendant urged the court, based on Bundy's extrajudicial statements to police (none of which had been offered in evidence) to declare Bundy an uncharged coconspirator so that defendant could elicit hearsay statements allegedly made by Bundy. The court properly indicated that there was no evidence in the record to support such a ruling.

The second disputed ruling came during defendant's motion for production of evidence involving Murray's van. The prosecutor disagreed with defendant's unsupported assertions that the requested items were relevant to the charges against defendant. The court denied the motion, stating that Murray's van "was not used on any murder other than the Jack Murray murder which is Miss Bundy." Defendant asserts that this statement must have been based on the court's exposure to evidence outside the record. On the contrary, defendant himself mentioned numerous times that Bundy had killed and decapitated Murray in the van. Moreover, there was no evidence whatsoever linking any of the charged offenses to the items defendant sought. There is no indication of bias.

Third, later in the same hearing, the court denied production of evidence related to the murder of Jane Doe 28, ruling the evidence to be irrelevant. Although the court referred to the "995," it properly based its ruling on the undisputed fact that defendant was not charged at the guilt phase with that murder; evidence relating to it was not relevant.

The fourth occasion occurred after the court had revoked defendant's self-representation. At one point, the court stated that there was "not a

scintilla of evidence" to show that the victims herein, or anyone aside from Murray, was killed in Murray's van. The basis for this remark is unclear, but the colloquy involved no evidentiary or discovery rulings; defendant points to none. We find no impropriety.

### 3. *Alleged Interference With Defendant's Self-representation*

 Defendant next complains that the trial court improperly hampered his efforts at self-representation on several occasions. The record does not support the claim. Defendant has shown neither error nor prejudice.

Defendant first claims that the trial court should have ordered the prosecutor to provide him a list of witnesses whom the prosecutor intended to call 48 hours in advance of the witnesses' testimony. Before trial, the prosecution provided the defense with a list of all prosecution witnesses. In addition, the court ordered the prosecution to inform the defense each day of the witnesses the prosecution intended to call that day. That was sufficient.

In another instance, defendant complained that he had not been afforded the access to the law library to which he was entitled under the Los Angeles County "Pro Per Memorandum." Defendant conceded, however, that he had only missed a minor part of his law library time. He did not seek any court order or intervention, and he does not claim any other wrongful deprivation of law library access.

Defendant next complains that the court refused to order standby counsel to deliver to him their copies of the daily transcripts when he was granted self-representation. Although the court did not initially make any order in regard to transcripts, it later ordered the standby attorneys to transfer to defendant all transcripts in their possession that defendant did not already have, so that he would have a complete set.

Defendant next contends that the court refused to permit him to call his attorneys as witnesses to prove that they deliberately withheld material from him. The claim is not supported by the record. At that point, defendant was accusing the deputy district attorney of withholding information both from defendant and his attorneys. Upon examination, the allegation proved to be unfounded.

Defendant also complains that the court refused to order that he be returned to the jail each day by 6 p.m. Defendant complained that he had been returned to the jail one evening at 7:10 p.m. The court ordered the sheriff "to do everything possible to get the defendant back to the County

Jail each and every evening, to the best of their ability." This order was adequate to assure that defendant was returned to the jail reasonably promptly each day. Defendant points to no delay in returning him to the jail which prevented him from preparing for the next day of trial.

Defendant cites another instance in which he was placed in a holding cell in violation of a federal court order and his tape recorder confiscated. However, after a hearing, defendant was restored to his proper cell and his tape recorder was returned to him.

Defendant further contends the trial court continually threatened to revoke his in propria persona status. One occasion came in response to a frivolous motion to recuse the prosecutor. On another occasion, defendant attempted to exclude his own hearsay admissions by declaring himself available as a prosecution witness, apparently on the theory that admissibility was dependent on the availability of the declarant. Similar admonitions followed other flares of temper, outbursts of sarcastic comment before the jury, or threats to delay the proceedings with requests for continuances if the court did not afford him the discovery he wanted.

 The right of self-representation is not a license to abuse the court, nor to obstruct the proceedings. The court's admonitions that defendant's self-representation status could be revoked if he abused it were reasonable under the circumstances.

 Finally, defendant contends the court unfairly burdened his right of self-representation by instructing standby counsel not to consult with defendant. The record does not substantiate the contention. Defendant had made it clear he despised, would not cooperate with, and did not desire any communication with, his former attorneys. The court was not required to appoint advisory counsel to assist defendant. (See *People* v. *Crandell, supra,* 46 Cal.3d 833, 864.) Rather, the court appointed Keith and Watson as standby counsel *for the benefit of the court* in case it became necessary for counsel to step in and complete the trial. (See *Faretta* v. *California, supra,* 422 U.S. 806, 834-835, fn. 46 [45 L.Ed.2d at p. 581].) Defendant has not demonstrated that his self-representation was burdened by any inability to communicate with counsel whom he repeatedly rejected.

K. POSTHYPNOTIC TESTIMONY OF CHARLENE A.

 Defendant contends that Charlene A.'s identification of defendant as her assailant should have been excluded, and that the attempted murder and mayhem counts must be reversed. We agree.

 In *People* v. *Shirley* (1982) 31 Cal.3d 18, 66-67 [181 Cal.Rptr. 243, 723 P.2d 1354], we held that "the testimony of a witness who has undergone hypnosis for the purpose of restoring his memory of the events in issue is inadmissible as to all matters relating to those events, from the time of the hypnotic session forward." (See also *People* v. *Miller* (1990) 50 Cal.3d 954, 982 [269 Cal.Rptr. 492, 790 P.2d 1289]; *People* v. *Hayes* (1989) 49 Cal.3d 1260, 1268-1269 [265 Cal.Rptr. 132, 783 P.2d 719].) This rule applies retroactively to this case. (*People* v. *Guerra* (1984) 37 Cal.3d 385, 390 [208 Cal.Rptr. 162, 690 P.2d 635].) A pretrial hearing was held in this case on defendant's objection to the evidence after *Shirley* was decided but before we held it retroactive in *Guerra*. The court found that the witness had been hypnotized, but ruled that *Shirley* should not be applied retroactively.

Charlene was assaulted on April 27, 1980. She gave a description of the car and assailant. Lieutenant William Gaida, an officer trained in hypnosis, conducted a hypnosis session with Charlene on May 22, 1980. He did not ask her about the specific events of the offense, but concentrated on the description of the assailant. Gaida recorded Charlene's description before the hypnosis began. Under hypnosis, she gave a similar but slightly different description of the assailant and his clothing, and said she believed his name was "Don" or "Ron."

On July 30, 1980, Charlene viewed a photographic lineup which did not include defendant's photograph. She tentatively selected one photograph as the possible assailant. Several days later, on August 5, 1980, Charlene viewed a live lineup. She told officers the suspect was not present. When officers urged her to pick someone who looked similar to the attacker, she indicated the same person as in the photograph she tentatively identified. In April 1982, nearly two years after the crime, Charlene identified defendant from a photographic lineup. She also identified him in court and described her assailant.

Much of Charlene's testimony was properly admitted. Her testimony about the events of the crime, a subject not discussed in the hypnotic session, and her descriptions that *predate* the hypnotic session, were admissible. (*People* v. *Hayes*, *supra*, 49 Cal.3d 1260, 1272-1273.) Some of the evidence of posthypnotic events was elicited by the *defense*. However, Charlene's photographic-lineup and in-court identifications of defendant—which post-date the hypnotic session—were inadmissible under the foregoing authority. This was the only direct identification of defendant at trial. As this was by far the strongest evidence connecting defendant with the crimes against Charlene, it is reasonably probable that this testimony affected the verdicts.

We therefore must reverse the attempted murder and mayhem counts. (*People* v. *Hayes, supra,* 49 Cal.3d at p. 1270.)[21]

### III. PENALTY PHASE FACTS

#### A. EVIDENCE IN AGGRAVATION

The prosecutor presented in aggravation evidence of two other murders in which defendant was involved, and other acts and threats of violence by defendant.

#### 1. *Murder of Jane Doe 28*

The skeletal remains of Jane Doe 28, a woman approximately 17 to 23 years of age, were found near a creek bed in the Saugus-Newhall area in early March 1981. Various bone fragments were found: part of a femur bone, some ribs, vertebrae, a lower jaw bone and a skull. There was a bullet hole in the skull behind the right ear. The coroner's examination showed that all the bones belonged to one individual. She had sustained a fatal bullet wound about two inches from the right ear. No bullet was found, but the size of the entry wound and the wound pattern were similar to the wounds inflicted on Exxie Wilson, Karen Jones and Jane Doe 18.

Among the documents seized in the search of Joey Lamphier's apartment was one in defendant's handwriting, which the prosecutor contended described how defendant and Bundy had murdered a young blonde prostitute called "Cathy" and disposed of her body near Saugus. During the guilt phase, the defense had played for the jury the entire tape of Bundy's interview with the police in which she described how she and defendant had killed "Cathy."

#### 2. *Murder of Jane Doe 99*

On August 28, 1980, the mummified remains of Jane Doe 99 were found 30 feet down an embankment in a remote area near Malibu known as Tuna Canyon. The victim was wearing a black tank top and skirt, both wrapped around her waist. Sheriff's deputies also found a clump of blonde hair below where the body was found. It appeared to belong to the victim, who also had blonde hair.

The coroner's examination showed that Jane Doe 99 was approximately 20 years old, 5 feet, 3 inches tall, with blonde hair. The victim had been

---

[21]Because of this holding, we need not consider other contentions that relate solely to these counts.

killed by a gunshot wound to the left forehead. Ballistics examination of bullet fragments taken from the skull revealed that they came from a .25-caliber ACP bullet jacket. The characteristics of these bullet fragments matched generally the characteristics of the bullet found in the skull of Jane Doe 28. There were too few fragments to make a positive ballistics identification.

Bundy testified that some time in July 1980, possibly shortly before July 26, she and defendant had driven on the Pacific Coast Highway to Oxnard. Along the route, defendant pointed out a mountainous region near Malibu and told Bundy he had "dropped a package" in that area. A "package" was defendant's term for a dead body. At the Verdugo apartment on another occasion, defendant mentioned that a "package" had been dumped in Tuna Canyon. Defendant apparently had sex with the victim and disposed of the body.

### 3. *Other Evidence*

The prosecution presented numerous other instances of defendant's acts or threats of violence, including the physical abuse of Bundy's 10-year-old son, and several assaults against former coworkers as well as against fellow prisoners.

### B. EVIDENCE IN MITIGATION

### 1. *Character and Background*

Over defendant's personal objection, the defense presented testimony by family members.

Defendant's mother testified about defendant's childhood. The family moved often because of the father's work assignments as a career naval officer. Defendant did not go to college, but enlisted in the Air Force. He was honorably discharged. Defendant then moved to Southern California where he married Sue Clark in 1972. They were divorced around 1976. When defendant's upholstery business failed, he took and passed an examination to become a steam engineer working for the department of water and power. According to defendant's mother, defendant had no behavior problems at school and his grades were good. She never noticed any mental or behavioral peculiarities about defendant. She did not believe her son could have committed the murders of which he stood convicted. The mother loved defendant and did not want him to die in the gas chamber.

Defendant's father remembered that he had been "competitive" with his brother Walter, though no more so than would be normal in any other family.

After a year's schooling in Switzerland, defendant attended Culver Military Academy. He was sent to Culver, not because of any behavioral problems, but because of his father's personal interest in the school. Defendant's father never noted anything unusual about defendant's behavior or attitudes while he was growing up.

The defense also presented expert psychiatric evidence. Dr. Gloria Keyes, a forensic psychiatrist, testified that defendant had an antisocial personality disorder. Other diagnoses included psychosexual disorders, shared paranoia, and possibly an atypical psychosis. Dr. Keyes explained that a psychopathic personality is acquired, not inherited. Although the diagnosis is not usually made until the person is at least 15 years old, it can develop at a very early age. It is characterized by extreme narcissism, impulsivity, delinquent behavior, grandiosity, and an inability to relate to other people. In defendant's case, for example, he portrayed himself in many letters as invincible, at the same time disparaging others and blaming them for his problems. The disorder is further characterized by low self esteem for which extreme grandiosity is a compensating mechanism, and by self-destructive behavior. Defendant's efforts in representing himself (e.g., behaving obnoxiously and presenting himself in a negative light) indicated self-destructiveness.

Dr. Keyes believed that defendant's psychosexual disorder was paraphilia, including fetishism, pedophilia, and the acting out of fantasies. Wearing women's underwear is a classic example of fetishism. Defendant engaged in pedophilic activity with Shannon O. There were also indications that defendant had engaged in necrophilia. Defendant denied any interest in necrophilia and got upset with Dr. Keyes when she broached the topic. In the opinion of some psychiatrists, necrophilia is a "blatant psychosis."

At one point, Dr. Keyes diagnosed defendant as having an "atypical" psychosis. She later explained that defendant was only "possibly psychotic" and that whatever "psychosis" he may have had did not require hospitalization for treatment. Defendant was neither schizophrenic nor delusional in the sense of being out of touch with reality.

Dr. Keyes believed there was a causal relationship between the murders and defendant's mental disorders. Defendant was sane, however. His personality disorders did not prevent him from understanding what he was doing; he intended to commit the killings, and he knew that killing was wrong. Defendant was in touch with reality and what delusions he had did not affect his perception of reality. Defendant has an above-average intelligence with an IQ of 118.

Dr. Donald Lunde, a professor of psychiatry at Stanford University, examined defendant and reviewed Dr. Keyes's report and supporting documents. He diagnosed defendant's disorder as "antisocial personality and

paraphilia, that is a variety of sexual deviations." In addition, he found defendant suffered from "sexual sadism."

### 2. Defendant's Testimony

Against the advice of counsel, defendant testified in his own behalf at the penalty phase.

Defendant reviewed his upbringing, relationship with his family, educational background and employment history. He explained his differences with two former coworkers whom he had allegedly assaulted and who testified for the prosecution at the penalty phase. He denied committing the murders, and claimed to have passed a lie detector test which indicated he was not the killer.

Defendant explained the circumstances of the death of Jane Doe 28, who had given her name as "Cathy." One day, near the end of July 1980, while defendant and Bundy were out driving the Buick station wagon, defendant stopped at the market to buy some cigarettes. When defendant returned, Bundy had arranged for a blonde prostitute, Cathy, to have sex with defendant. They parked the car behind an empty gas station and defendant got into the back seat with Cathy so that Bundy could watch while Cathy orally copulated him. Defendant suddenly looked up and saw Bundy pointing a gun at him. Bundy fired the gun. The bullet went through Cathy's head and struck defendant in the stomach, without penetrating either defendant's shirt or his skin.

Defendant was afraid that Bundy might shoot him. Then Bundy impressed upon him that police would be more likely to believe that defendant, not Bundy, had actually killed Cathy. Bundy climbed into the back seat and ordered defendant to "keep driving." Bundy removed Cathy's clothes and sexually fondled her for a while. Eventually, they turned down a dirt road in the Saugus area and stopped where the road led to a water hole. There they dragged Cathy's body out of the car. Defendant did not report Bundy because he felt that the police department was incompetent, and that Bundy would successfully accuse him of the murder. Defendant denied that he washed Cathy's blood out of the Buick on June 21, 1980; he claimed that she was not killed until after the murders of Karen Jones and Exxie Wilson on June 23, 1980.

Defendant disclaimed knowledge of the murder of Jane Doe 99, contending he was 385 miles away at his brother's wedding.

Defendant also stated that, if he were a juror on the case and were convinced of his guilt of the murders, he would himself vote for the death

penalty. Defendant, however, insinuated that Bundy would not be given the death penalty in exchange for her testimony against him, and complained that he was a victim of indigency because the trial court denied him the assistance of counsel or a law clerk while he had represented himself.

## IV. Penalty Phase Issues

### A. Denial of Challenges for Cause to Prospective Jurors

Defendant contends the trial court improperly denied defense challenges for cause to six prospective jurors because it applied the then applicable rule of *Witherspoon* v. *Illinois* (1968) 391 U.S. 510 [20 L.Ed.2d 776, 88 S.Ct. 1770], and granted a challenge for cause only if it was "unmistakably clear" that the prospective juror would either automatically impose or automatically decline to impose the death penalty. He argues that the standard of *Wainwright* v. *Witt* (1985) 469 U.S. 412 [83 L.Ed.2d 841, 105 S.Ct. 844], a case decided after the trial, should be applied, and that the defense challenges for cause to the six jurors should have been sustained under that standard. Under *Witt*, a juror may be excused for cause if his or her views on capital punishment would " 'prevent or substantially impair the performance of [his or her] duties as [a juror] in accordance with [the] instructions and . . . oath.' " (*Id.* at p. 424 [83 L.Ed.2d at pp. 851-852]; see *People* v. *Cooper* (1991) 53 Cal.3d 771, 809 [281 Cal.Rptr. 90, 809 P.2d 865].)

Our review of the record discloses no error. We need not consider the matter in detail, however, for defendant has failed to show prejudice even assuming the court erred as to all six challenged jurors. None actually sat on defendant's jury. One eventually *was* excused for cause for an unrelated reason, one was never called into the jury box during the general voir dire, and the other four were excused peremptorily by the defense. Furthermore, when the jury was accepted and sworn, the defense had exercised only 18 of 30 peremptory challenges.[22] Defendant did not express dissatisfaction with the jury as selected. Any erroneous inclusion of prospective jurors was therefore harmless. (*Ross* v. *Oklahoma* (1988) 487 U.S. 81, 87-89 [101 L.Ed.2d 80, 89-90, 108 S.Ct. 2273]; *People* v. *Edwards* (1991) 54 Cal.3d 787, 830-831 [1 Cal.Rptr.2d 696, 819 P.2d 436].) Contrary to defendant's argument, no reason appears why this well-settled rule should not apply here. (See also *People* v. *Kelly* (1990) 51 Cal.3d 931, 960-961 [275 Cal.Rptr. 160, 800 P.2d 516].)

---

[22]By agreement of the parties, the trial court used a modified procedure for jury selection. Instead of 26 peremptory challenges for selection of the 12 jurors and 4 peremptory challenges for selection of 4 alternates, each side was allotted a total of 30 peremptory challenges. A panel of 16 jurors was selected. From among these, the trial court drew the names of 4 jurors, who were designated as alternates.

## B. UNCHARGED MISCONDUCT BY DEFENDANT

Defendant contends that the jury erroneously considered various uncharged acts of misconduct, and that the court committed various instructional errors related to these uncharged acts.

### 1. *Admissibility of Uncharged Misconduct*

 Defendant lists 32 instances of what he calls "uncharged misconduct" that he claims was impermissibly admitted against him. They range from the murder of Jane Doe 99 to evidence that he "was once fired from a job for insubordination." He claims that much of this evidence violated the rule of *People* v. *Boyd* (1985) 38 Cal.3d 762, 774 [215 Cal.Rptr. 1, 700 P.2d 782] that aggravating evidence is limited to evidence that comes within one of the specific factors listed in section 190.3.

Much of this evidence was presented at the *guilt* phase for various reasons, some by the defense.[23] The district attorney never suggested this evidence be considered as aggravating evidence, and the defense did not object on this basis. Some of the evidence at the penalty phase was presented by the defense, again without an objection to the jury considering it as aggravating evidence. Other penalty phase evidence was admitted without an objection. Defendant may not object to any of this evidence on appeal. (*People* v. *Clark* (1990) 50 Cal.3d 583, 624-625 [268 Cal.Rptr. 399, 789 P.2d 127]; *People* v. *Ghent, supra,* 43 Cal.3d 739, 766.)

On the merits, we find no error. The *Boyd* rule does not apply to evidence presented at the guilt phase or by the defense. Rather, "It stands for the proposition that the 1978 law prevents the prosecution from introducing, in its case-in-chief, aggravating evidence not contained in the various factors listed in section 190.3." (*People* v. *Guzman* (1988) 45 Cal.3d 915, 963 [248 Cal.Rptr. 467, 755 P.2d 917].) The only acts of misconduct other than the charged guilt phase crimes that the district attorney relied on in his penalty phase argument were the murders of Jane Does 28 and 99 and defendant's physical abuse of Bundy's child. These were properly considered as criminal activity involving force or violence. (§ 190.3, factor (b).) As to the rest, "the prosecution made no effort to capitalize on the testimony." (*People* v. *Guzman, supra,* 45 Cal.3d 915, 963.)

 Defendant also contends there was insufficient evidence to support a jury finding that he murdered Jane Doe 99. The trial court should not

---

[23]We have previously considered defendant's guilt phase contentions regarding some of this evidence.

"permit the penalty jury to consider an uncharged crime as an aggravating factor unless a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (*People* v. *Boyd, supra,* 38 Cal.3d 762, 778, internal quotation marks omitted.) Under this test, the evidence of the murder of Jane Doe 99 was properly admitted.

Jane Doe 99 was a blonde woman approximately 20 years old. She was killed by a .25-caliber bullet to the head. Bullet fragments from the skull shared the same general characteristics as the bullet found in the skull of Jane Doe 18, though no positive identification could be made. Bundy testified that defendant once pointed to the area where the remains of the victim were found, and told her he had "dropped a package," i.e., a body, at that location; he admitted having sex with the girl before killing her. Defendant later mentioned the killing again, referring to the same area. Evidence of the fact and the manner of the victim's death, coupled with defendant's admissions, was sufficient for a reasonable trier of fact to conclude beyond a reasonable doubt that defendant committed the murder of Jane Doe 99.

### 2. *Alleged Instructional Errors Regarding the Other Acts of Misconduct*

Defendant contends the court erred in not instructing the jury it could consider evidence of other crimes only if they were proved beyond a reasonable doubt. (*People* v. *Robertson* (1982) 33 Cal.3d 21, 53-55 [188 Cal.Rptr. 77, 655 P.2d 279].) The court did so instruct as to the murders of Jane Does 28 and 99. The only other crime that the prosecution cited at the penalty phase was the abuse of Bundy's son. Any error in not giving the reasonable doubt instruction regarding that abuse (and any other alleged crimes) was harmless. These other crimes were utterly insignificant compared to the many and egregious crimes the jury properly considered. (*People* v. *Brown* (1988) 46 Cal.3d 432, 446-449 [250 Cal.Rptr. 604, 758 P.2d 1135].)

Defendant also contends that the trial court was required sua sponte to instruct that the testimony of Bundy, an alleged accomplice, had to be corroborated. However, she was not an accomplice to the crimes about which she testified at the penalty phase, and the instruction was not needed. There was evidence she was an accomplice to the murder of Jane Doe 28, but she testified about that murder only as a *defense* witness at the guilt phase. Since she was a defense witness, the corroboration instruction was not required at least absent a defense request. (*People* v. *DeSantis* (1992) 2 Cal.4th 1198, 1247 [9 Cal.Rptr.2d 628, 831 P.2d 1210]; *People* v. *Fowler* (1987) 196 Cal.App.3d 79, 87[241 Cal.Rptr. 571]; *People* v. *Miller* (1960)

185 Cal.App.2d 59, 82 [8 Cal.Rptr. 91].) In addition, her testimony about the Jane Doe 28 murder was corroborated by other evidence, including defendant's own writings.

■ Defendant next contends the court erred in not instructing on the presumption of innocence, the burden of proof on the prosecution, and the corpus delicti rule as to the other crimes. However, such instructions were given at the guilt phase. At the penalty phase, the jury was expressly told to consider the murders of Jane Does 28 and 99 only if it found defendant committed them beyond a reasonable doubt. There was no suggestion the pertinent guilt phase instructions did not also apply at the penalty phase. Under the circumstances, a reasonable jury would correctly assume these instructions continued to apply, and there was no sua sponte duty to repeat them. (*People* v. *Pinholster* (1992) 1 Cal.4th 865, 973 [4 Cal.Rptr.2d 765, 824 P.2d 571]; *People* v. *Brown, supra,* 46 Cal.3d 432, 460; *People* v. *Thompson* (1988) 45 Cal.3d 86, 128 [246 Cal.Rptr. 245, 753 P.2d 37].)

Defendant finally contends the court should have instructed the jury it could consider any factor in aggravation only if it unanimously agreed that such factor existed. We have repeatedly rejected the contention. (*People* v. *Gordon* (1990) 50 Cal.3d 1223, 1273 [270 Cal.Rptr. 451, 792 P.2d 251].)

## C. Deceased Coroner's Report

■ Dr. Carpenter of the coroner's office conducted the autopsy of Jane Doe 99 and prepared a report of his findings. He died before the penalty phase. Dr. Choi, who had performed much of the medical examination in relation to this case, including the autopsy of Jane Doe 28, was permitted over defense objection to testify about the report and findings of Dr. Carpenter. The report itself was not placed into evidence. Defendant contends the report was inadmissible hearsay and violated his right of confrontation. The claim lacks merit.

In *People* v. *Wardlow* (1981) 118 Cal.App.3d 375 [173 Cal.Rptr. 500], a deputy coroner testified concerning an autopsy report prepared by another deputy coroner, who had since left the employ of the coroner's office. Because an autopsy report is a public record (*People* v. *Williams* (1959) 174 Cal.App.2d 364, 390 [345 P.2d 47]), and the trial court had inquired into both the report and the expertise required of deputy coroners so as to establish the trustworthiness of the report, the deputy coroner's testimony was found to have been properly admitted. (*People* v. *Wardlow, supra,* 118 Cal.App.3d 375, 388.) Dr. Choi's testimony was similarly proper here.

Evidence Code section 1280 provides: "Evidence of a writing made as a record of an act, condition, or event is not made inadmissible by the hearsay

rule when offered to prove the act, condition, or event if: [¶] (a) The writing was made by and within the scope of duty of a public employee; [¶] (b) The writing was made at or near the time of the act, condition, or event; and [¶] (c) The sources of information and method and time of preparation were such as to indicate its trustworthiness."

These requirements were met in this case. Dr. Carpenter had already testified as an expert at the guilt phase—he performed the autopsies of Gina Marano and Cynthia Chandler. Dr. Choi testified that Dr. Carpenter performed the autopsy of Jane Doe 99, that Dr. Choi was personally familiar with the manner of preparation of autopsy reports in the medical examiner's office, that it was Dr. Carpenter's duty at the time of the examination to make a report of the Jane Doe 99 autopsy, that the report was made at or near the time of the autopsy examination, and that the report so prepared was an official record of the coroner/medical examiner's office. This was sufficient to establish the report as an official record and to permit Dr. Choi's testimony.

Also lacking merit is defendant's further contention that Dr. Choi's testimony violated his constitutional right to confront witnesses. The contents of Dr. Carpenter's report were admitted under a "firmly rooted" exception to the hearsay rule that carries sufficient indicia of reliability to satisfy the requirements of the confrontation clause. (*White* v. *Illinois* (1992) __ U.S. __ [116 L.Ed.2d 848, 859, 112 S.Ct. 736, 742, fn. 8, 743]; *Bourjaily* v. *United States* (1987) 483 U.S. 171, 182-184 [97 L.Ed.2d 144, 156-158, 107 S.Ct. 2775].) The state was not required, as defendant suggests, to exhume the remains and perform a new autopsy after Dr. Carpenter's death.

D. ADMISSION OF PSYCHIATRIC TESTIMONY

Defense counsel called and examined Dr. Keyes to present mitigating evidence of defendant's mental condition. During direct examination, defendant personally objected on the basis that he had not waived the "doctor-client" privilege. He later threatened that there would be a "law suit" if the witness testified, and later yet interjected a "hearsay" objection to part of her testimony. The court overruled the objections. Counsel also called Dr. Lunde as a defense witness. Prior to his testimony, counsel stated that defendant asked him to object to the testimony because he had not waived the "psychiatrist-patient privilege." The court noted the objection for the record, but stated that "you are the attorney. If you call him, the court is going to allow it. [¶] You're the one that has to determine what's in the best interest of Mr. Clark."

Defendant contends the court erred in admitting this evidence over his personal objection. He claims there was a violation of both the psychotherapist-patient privilege and the attorney-client privilege. He argues the

error was prejudicial because the jury learned damaging information about him. We note first that defendant only objected on the basis of the psychotherapist-patient privilege, not the attorney-client privilege. The latter claim was therefore waived. (Evid. Code § 353, subd. (a); *People* v. *Green, supra*, 27 Cal.3d 2, fn. 8.)

In *People* v. *Deere* (1985) 41 Cal.3d 353 [222 Cal.Rptr. 13, 710 P.2d 925] (*Deere I*), we held that defense counsel was obligated to present evidence in mitigation despite defendant's personal desire that such evidence not be presented. Under this ruling, it would seemingly have been error for counsel *not* to have presented the evidence. Subsequent decisions have "largely undermined" that holding. (*People* v. *Deere, supra*, 53 Cal.3d 705, 716 [*Deere II*].) Defense counsel no longer need to present mitigating evidence if that is defendant's desire. (*Id.* at pp. 716-717; *People* v. *Bloom, supra*, 48 Cal.3d 1194, 1228.) This case was tried before any of these decisions. Defense counsel's actions, and the court ruling, would have been vindicated under *Deere I*, for if the court or attorney had *yielded* to defendant's objection, and not admitted the evidence, there would undoubtedly have been a claim of error under that decision. We need not decide whether, in light of the more recent cases, there was error in admitting the evidence over defendant's personal objection, for any error in presenting the mitigating evidence was harmless.

Although some of the information elicited from the psychiatrists reflected negatively on defendant, the testimony as a whole was mitigating, as counsel obviously believed in choosing to present it. The testimony portrayed defendant as a "sick" individual, suffering from recognized, severe psychological disorders, who could not control his conduct as a result of the disorders. Dr. Keyes testified that defendant's psychological illnesses were a causative factor in the murders. The testimony provided much of the basis on which defense counsel argued that defendant should be treated rather than executed. Defendant claims that the jury would have been able to infer mental illness from the circumstances of the crimes without the benefit of (and without the allegedly detrimental information provided by) the expert testimony. We find, however, that on balance, the evidence benefitted defendant. It is not reasonably possible that any error in admitting the psychiatric testimony affected the penalty verdict. (*People* v. *Brown, supra*, 46 Cal.3d 432, 448.)

## E. ALLEGED PROSECUTORIAL MISCONDUCT; FUTURE DANGEROUSNESS

During closing argument the prosecutor argued that defendant represented a "continuing danger" because he might attack prison guards or other

inmates who angered him or because he might escape. The trial court interrupted and twice instructed the jury not to speculate about defendant's future conduct but to assume that those responsible for defendant's custody would fulfill their duties in that regard.

 Defendant contends the remarks violated the prohibition against expert testimony regarding future dangerousness. (*People* v. *Murtishaw* (1981) 29 Cal.3d 733, 773 [175 Cal.Rptr. 738, 631 P.2d 446].) They did not. "*Murtishaw* was concerned with limiting *expert* predictions of dangerousness, not prosecutorial argument on that topic." (*People* v. *Hendricks* (1988) 44 Cal.3d 635, 649 [244 Cal.Rptr. 181, 749 P.2d 836], italics in original; see also *People* v. *Fierro* (1991) 1 Cal.4th 173, 249 [3 Cal.Rptr.2d 426, 821 P.2d 1302].)

Defendant argues that the prosecutor's remarks were based on the testimony of Dr. Keyes that defendant's acting out of fantasies by killing was an "escape valve" for him. On the contrary, the prosecutor did not solicit expert forecasts of future dangerousness, but rather argued generally about defendant's behavior and personality. Dr. Keyes did not make any predictions of future dangerousness. She merely explained why she diagnosed defendant as only "possibly" psychotic, i.e., that defendant's defense mechanisms of acting-out prevented him from developing a full-blown psychosis. There was no error.

### F. AGGRAVATING AND MITIGATING EVIDENCE AND SENTENCING DISCRETION

Defendant contends the court's instructions and the prosecutor's arguments improperly restricted the scope of mitigating evidence the jury could consider, expanded the scope of aggravating evidence, and misled the jury as to its sentencing discretion.

#### 1. *Section 190.3, Factor (k)*

The trial court instructed the jury that "In determining which penalty is to be imposed on the defendant, you shall consider *all* of the evidence which has been received during any part of the trial of this case, except as you may be hereafter instructed. You shall consider, take into account, and be guided by the following factors, if applicable. . . ." (Italics added.) Among the specified factors was the catch-all factor (k) of section 190.3 (hereafter factor (k)): "Any other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime."

 Defendant contends the factor (k) instruction did not properly advise the jury that it could consider not only mitigating evidence which

related to the crime, but also mitigating evidence which related to defendant's character or record. We expressed concern in *People* v. *Easley* (1983) 34 Cal.3d 858, 878 [196 Cal.Rptr. 309, 671 P.2d 813] that the language of factor (k) was "potentially confusing" about the kind of evidence the jury could consider in mitigation. We recommended that a more expansive instruction be given in the future. (*Id.* at p. 878, fn. 10.) More recently, however, the United States Supreme Court has upheld this precise instruction as comporting with federal constitutional requirements. (*Boyde* v. *California* (1990) 494 U.S. 370, 377-382 [108 L.Ed.2d 316, 326-330, 110 S.Ct. 1190].)

As in *People* v. *Hovey*, *supra*, 44 Cal.3d 543, 582, the court here instructed the jury to consider "*all of the evidence* which has been received during any part of the trial of this case." (Italics in original.) In *Hovey*, we held, "Thus, the jury probably realized that it could consider the extensive testimony regarding defendant's character and background . . . ." (*Ibid.*) Defendant points out that this instruction was qualified by the phrase "except as you may be hereafter instructed." The court never, however, instructed the jury not to consider any of the defense mitigating evidence. It only instructed that the jury could not consider the *aggravating* evidence of the murders of Jane Doe 28 and Jane Doe 99 unless it found defendant guilty of those murders beyond a reasonable doubt. There was no instructional error.

 Defendant urges that the prosecutor's argument restricted the jury's consideration of mitigating evidence. He cites several instances in which the prosecutor appeared to argue that the jury should consider only matters which extenuate the circumstances of the offenses. We need not consider the matter in detail, for any error in the district attorney's argument was harmless. Defendant contends that error of this kind is reversible per se. We have rejected the contention. (*People* v. *Hamilton* (1988) 46 Cal.3d 123, 148-149 [249 Cal.Rptr. 320, 756 P.2d 1348]; see also *People* v. *Guzman*, *supra*, 45 Cal.3d 915, 957-958.) In these cases predating *Boyde* v. *California*, *supra*, 494 U.S. 370, we found any error harmless beyond a reasonable doubt. Assuming that standard applies even after *Boyde* v. *California*, *supra*, it is met here.

The evidence in aggravation was overwhelming. The court instructed the jury to consider *all* of the evidence. That evidence, demonstrating defendant's depravity, has been previously recounted and need not be repeated. Over a period of months, defendant brutally murdered six victims (eight if the jury found that he also murdered Jane Does 28 and 99) who did him no harm, and were of no threat to him. The only apparent reason for taking these lives was defendant's own personal sexual gratification. Defendant's

mitigating evidence of his character, background and mental condition was minuscule in comparison. Defense counsel were allowed to, and did, stress all mitigating evidence that there was. The penalty question was not close, as the relative brevity of the jury deliberations indicates. Any error in the prosecution argument was harmless.

### 2. "Extreme" Mental or Emotional Disturbance

Defendant next contends that the instructions in the language of section 190.3, factor (d), may have misled the jury to believe it could not consider evidence of a psychiatric condition which did not amount to an *extreme* mental or emotional disturbance in mitigation of the offenses. We have repeatedly rejected the contention, pointing out that the catchall factor (k), referring to "Any other circumstance which extenuates the gravity of the crime," allows consideration of nonextreme mental or emotional conditions. (*People* v. *Gonzalez, supra*, 51 Cal.3d 1179, 1227; *People* v. *Ghent, supra*, 43 Cal.3d 739, 776.)

Defendant also reiterates his contention that the district attorney's argument misled the jury regarding the scope of factor (k). We have already found any such error harmless. The jury heard all the evidence. Given the nature of the crimes, we are confident beyond a reasonable doubt that, even assuming the jury erroneously believed it could not consider nonextreme mental or emotional disturbance, such misconception did not contribute to the verdict. If the jury found any such disturbance not to be extreme, it would surely not have based a life verdict on such nonextreme disturbance.

### 3. Sympathy and Mercy

Defendant complains that the jury was not expressly instructed that it could consider sympathy and mercy for the defendant. There is, however, no duty to so instruct. (*California* v. *Brown* (1987) 479 U.S. 538 [93 L.Ed.2d 934, 107 S.Ct. 837]; *People* v. *Williams, supra*, 44 Cal.3d 883, 955; *People* v. *Allen* (1986) 42 Cal.3d 1222, 1276, fn. 36 [232 Cal.Rptr. 849, 729 P.2d 115].) Indeed, we have found no error in giving an express instruction "against '*mere* sentiment, conjecture, sympathy, passion, prejudice, public opinion, or public feeling,'" an instruction that was not given in this case. (*People* v. *Gonzalez, supra*, 51 Cal.3d at p. 1225, italics in original.)

Defendant argues that the district attorney improperly argued the jury could not consider sympathy or mercy. In context, the argument was not misleading. In urging that the jury should not be induced to reject the death penalty by arguments that its imposition is a "purely discretionary" matter,

or that it should not act on the basis of mercy, sympathy or personal feelings of guilt, the prosecutor correctly advised the jury that they did not have " 'unbridled discretion in determining the fates of those charged with capital offenses.' . . . [¶] . . . Under the Constitution, the jury must 'ignore emotional responses that are not rooted in the aggravating and mitigating evidence introduced during the penalty phase.' (*California* v. *Brown, supra,* 479 U.S. at p. 542 [93 L.Ed.2d at p. 940].) The jury may not act on whim or unbridled discretion. A penalty determination based on jury consideration of mere personal choice would inject into the proceedings the very arbitrariness and uncertainty forbidden by the Constitution. (*Furman* [*v. Georgia* (1972)] 408 U.S. 238 [33 L.Ed.2d 346, 92 S.Ct. 2726].)" (*People* v. *Kimble* (1988) 44 Cal.3d 480, 507-508 [244 Cal.Rptr. 148, 749 P.2d 803].)

In *People* v. *Gonzalez, supra,* 51 Cal.3d at page 1226, the prosecutor argued that the jury "must not 'weigh' or 'consider' the presence of defendant's family members in court." We found the argument did not mislead the jury. The jury "could properly be cautioned against free-floating emotional responses that were extraneous to the statutory sentencing factors and the aggravating and mitigating *evidence.*" (*Ibid.,* italics in original.) There was similarly no error here.

### 4. *Brown Error*

Defendant next contends that the jury was misled to believe that imposition of the death sentence was mandatory, and was not based upon the jury's determination that death was ultimately the appropriate penalty. The jury was instructed that, "If you conclude that the aggravating circumstances outweigh the mitigating circumstances, you shall impose a sentence of death. However, if you determine that the mitigating circumstances outweigh the aggravating circumstances, you shall impose a sentence of confinement in the State Prison for life without possibility of parole."

In *People* v. *Brown* (1985) 40 Cal.3d 512 [220 Cal.Rptr. 637, 709 P.2d 440], we held that the language of section 190.3, and instructions such as those given here, did not unconstitutionally withdraw from the jury its discretion to select the appropriate penalty. However, we identified two related ways in which the instructions might potentially mislead the jury. First, the jury might be misled to believe it should merely "count" the aggravating and mitigating factors. Second, the instruction might be understood to allow or require the jury to return a death verdict without deciding that that penalty was *appropriate* under the facts and circumstances of the particular case. (See *People* v. *Hayes* (1990) 52 Cal.3d 577, 642 [276 Cal.Rptr. 874, 802 P.2d 376].) To determine whether the jury may have been

misled to defendant's prejudice in these regards, we have reviewed the entire record. (*Ibid.*)

In *Boyde* v. *California, supra,* 494 U.S. at pages 376-377 [108 L.Ed.2d at pages 326-327], the high court upheld the instructions given here against federal constitutional attack. Assuming we still need to review the entire record to determine whether the jury was misled (see *People* v. *Cooper, supra,* 53 Cal.3d 771, 845, fn. 15), we have done so, and "conclude that there exists 'no legitimate basis' [citation] for believing that the jury was misled regarding its sentencing responsibilities." (*People* v. *Ghent, supra,* 43 Cal.3d 739, 777.)

■■■■■ Defendant argues that the district attorney told the jury that it had no discretion, that the law required it to return a judgment of death if it found the aggravating circumstances outweighed the mitigating, and that the death penalty was therefore mandatory. Considering the remarks in context, together with the instructions, we do not find a "reasonable likelihood" the jury would understand it was to return a sentence of death without first deciding that that sentence was appropriate. (*People* v. *Clair* (1992) 2 Cal.4th 629, 663 [7 Cal.Rptr.2d 564, 828 P.2d 705].)

The jury was not misled into believing it should merely count the factors on both sides. It was advised by all counsel that the process was not mechanical or rote, and that it was not merely to count aggravating and mitigating circumstances, but that each juror was to assign whatever weight that juror felt was appropriate to the applicable aggravating and mitigating circumstances.[24]

The jurors were also not misled about their individual responsibility to determine whether death was the appropriate penalty in this case. The district attorney did speak in terms of "no discretion," and said the standard is an "objective" one—that if the aggravating factors outweighed the mitigating the jury was "required" to return a verdict of death. However, in context, the "objective" standard was to be applied only after the jury had *subjectively* assigned whatever weight it deemed appropriate to each of the factors. The prosecution argument as a whole was directed to an individual moral assessment of the punishment that was appropriate under all the

---

[24]The prosecutor did use a chart listing all the potential aggravating and mitigating factors, and assigned to each such circumstance that he suggested might exist a hypothetical value of one. The prosecutor made clear, however, as defense counsel did also, that the chart was for illustrative purposes only, that it did not purport to suggest what value the jurors should assign to any factors they found in aggravation or mitigation, that the process required was one of "weighing" not counting, and that the relative *numbers* of factors did not automatically mandate any particular result. (See *People* v. *Gonzalez, supra,* 51 Cal.3d at p. 1228.)

circumstances. Hence, the jury would have understood the prosecutor's comments to mean that death was in effect mandated by the law because it was mandated by the facts, and that it was mandated by the facts because it was the only appropriate punishment in defendant's case. It was not reasonably likely the jury would believe it was precluded from determining whether death was appropriate.

As we have explained in the past, the "weighing" and "appropriateness" functions are not separate and independent. Jurors who are told they may assign whatever value they deem appropriate to the factors necessarily understand that they have discretion to determine the appropriate penalty. The subjective assignment of weights is the very means by which the jury arrives at its qualitative and normative decision about the appropriate punishment in the particular case. (*People* v. *Gonzalez, supra,* 51 Cal.3d at p. 1230.)

The arguments of both defense counsel also stressed the moral quality of the decision the jury was called upon to make. Keith argued several reasons why death was "inappropriate in this case," including defendant's dignity as a human being, his intelligence, his past work performance as a productive member of society, and, not least, that he was victim of severe mental and psychosexual disorders for which he was not responsible. Keith emphasized the solemnity of the jury's responsibility. Attorney Watson reiterated the momentousness of the jury's decision, also stating that this decision required each individual juror to weigh, rather than count, the applicable factors. Like Keith, Watson focused the jury's attention on defendant's mental illnesses as mitigating factors.

Defendant also emphasizes the prosecutor's remarks that "the law" or the jurors' "duty" required them to return a verdict of death. The comments, in context, referred to the absence of discretion to disregard the law or to act on mere unbridled passion and prejudice. As we stated in *People* v. *Hendricks, supra,* 44 Cal.3d 635, 655, "we see no impropriety in a prosecutor urging that the jurors 'follow the law' and base their penalty decision on a weighing of the applicable factors, so long as it is understood that *inherent in the weighing process itself* is the determination of 'appropriateness' that . . . is so essential." (Italics in original.) The jury here so understood its responsibility. There was no error under *People* v. *Brown, supra,* 40 Cal.3d 512.

### 5. *Caldwell Error*

Defendant further contends that the prosecutor's argument improperly suggested that the responsibility for the penalty determination did not

rest with the jurors, but rather with society or "the law." He relies on *Caldwell* v. *Mississippi* (1985) 472 U.S. 320 [86 L.Ed.2d 231, 105 S.Ct. 2633] which held that it is constitutionally impermissible to permit the sentencer to believe the responsibility for determining the appropriate penalty lies elsewhere.

At the outset of his argument, the prosecutor stated, "In [imposing the death penalty], you do not act as individuals. You do not act as a member of a group of only 12 persons. But you act as the representative of all of the people of this state who, by statute and by constitutional amendment, have imposed upon every citizen called to jury service the solemn duty to impose the death penalty whenever the evidence shows a preponderance of aggravating factors." He later stated, "Again, ladies and gentlemen, you are not acting as individuals. You are acting as 12 persons. You are acting as the representatives of the sovereign People of the State of California [objection and ruling omitted] . . . who have imposed upon you the duty of weighing a limited number of clearly specified and defined factors and basing your verdict upon the results of that process."

These statements, as well as the prosecutor's exhortations that the jury should "follow the law," or perform its "duty" by returning a verdict of death, correctly admonished the jury that it represented the community, that its decision should be based on a weighing process, and that it should not be swayed by appeals to mere passion and prejudice ungrounded in the evidence. Although the prosecutor did refer to the jurors as representatives of the people of the state, the totality of his arguments correctly placed the responsibility for making the penalty determination with these 12 jurors. Unlike *Caldwell* v. *Mississippi, supra,* 472 U.S. at page 325 [86 L.Ed.2d at p. 237], the prosecutor here suggested neither that the jury's decision was not final, nor that its decision would be reviewable. In addition, as discussed above, the jury was required to make the ultimate decision whether death was appropriate. Then, and only then, was its duty mandated under the law. We perceive no error. (See *People* v. *Kaurish* (1990) 52 Cal.3d 648, 711-715 [276 Cal.Rptr. 788, 802 P.2d 278] [discussing a similar prosecution argument].)

6. *Multiple Multiple-murder Special Circumstances*

(79) Defendant correctly contends that it was error to charge and permit the jury to find duplicative multiple-murder special circumstances. (*People* v. *Rodriguez* (1986) 42 Cal.3d 730, 787-788 [230 Cal.Rptr. 667, 726 P.2d 113].) Consequently, all but one of the multiple-murder special-circumstance findings must be set aside. Nonetheless, "[w]e have repeatedly held that the

consideration of such excessive multiple-murder special-circumstance findings where, as here, the jury knows the number of murders on which they were based, is harmless error. (*People* v. *Kimble, supra,* 44 Cal.3d at p. 504; *People* v. *Allen, supra,* 42 Cal.3d at pp. 1281-1283.)" (*People* v. *Caro* (1988) 46 Cal.3d 1035, 1063 [251 Cal.Rptr. 757, 761 P.2d 680].)

### 7. *Dual Use of Aggravating Factors*

■ Defendant next contends that the murders were erroneously double-counted under section 190.3, factors (a) (circumstances of the crime) and (b) (other violent criminal conduct). The Attorney General correctly concedes that the prosecutor did improperly urge the jury to consider the underlying offenses as "other criminal activities" under factor (b). The error, however, was harmless.

In *People* v. *Kimble, supra,* 44 Cal.3d 480, 505-506, we found similar error harmless because: (1) the erroneous comment was brief; (2) the prosecutor emphasized that only the crimes for which the defendant was being tried were before it for consideration; and (3) the jury could have fully considered the facts in any event under factor (a) of section 190.3. Here, the prosecutor's comment was reasonably brief. He distinguished between the crimes for which defendant was tried and those additional crimes which were introduced at the penalty phase. He appeared to separate the aggravating effect of the underlying crimes from the special circumstances and the less serious offenses of which defendant had been convicted, all of which were in themselves proper matters for the jury to consider. Most importantly, the jury properly considered the *facts* of each of the many murders. "In view of the properly admitted aggravating factors presented to the jury . . . we find it inconceivable that the jury would have reached a different verdict in the absence of the improper argument; accordingly, there was no prejudice." (*People* v. *Kimble, supra,* 44 Cal. 3d 480, 506.) We reach the same conclusion here.

### 8. *Davenport Error*

■ Defendant next argues that the factors in aggravation were artificially inflated when the prosecutor argued that the absence of mitigation as to section 190.3, factors (e) [whether the victim was a participant or consented], (f) [whether defendant reasonably believed there was a moral justification for his conduct], (g) [whether defendant acted under duress or domination of another], and (j) [whether defendant was an accomplice or minor participant] was itself aggravating. He correctly argues that we found such argument improper in *People* v. *Davenport* (1985) 41 Cal.3d 247, 290 [221 Cal.Rptr. 794, 710 P.2d 861].

We note that, as in *People* v. *McDowell* (1988) 46 Cal.3d 551, 573 [250 Cal.Rptr. 530, 758 P.2d 1060], "[t]he present case was tried before *Davenport* was decided and accordingly, the trial court and prosecutor lacked the benefit of *Davenport*'s teachings." As in *McDowell*, the improper argument was harmless. "Despite the prosecutor's argument, the jury was well aware of the underlying *facts*, and was free to place whatever weight it wished upon these facts." (*Id.* at p. 574, italics in original.) Moreover, the jury was well aware that the "sentencing determination [w]as a weighing process, 'not just a matter of adding up these various categories' or 'a mere mechanical weighing of factors on each side of an imaginary scale' or 'a matter of counting.' " (*People* v. *Cox* (1991) 53 Cal.3d 618, 684 [280 Cal.Rptr. 692, 809 P.2d 351.) Under these circumstances, "a reasonable jury would not assign substantial aggravating weight to the absence of unusual extenuating factors." (*People* v. *Gonzalez, supra,* 51 Cal.3d at p. 1234.)

### 9. *Deletion of "Inapplicable" Factors*

Defendant contends that the trial court should have deleted from the instructions reference to any "inapplicable" statutory factors. We have repeatedly rejected the argument, and continue to do so. (*People* v. *Cox, supra,* 53 Cal.3d 618, 674; *People* v. *Gallego, supra,* 52 Cal.3d 115, 198; *People* v. *Whitt* (1990) 51 Cal.3d 620, 653 [274 Cal.Rptr. 252, 798 P.2d 849].)

### 10. *Mental or Emotional Disturbance as Aggravation*

 Defendant next argues that the instructions did not clearly inform the jury that his mental disturbance, if any, should be considered as a mitigating factor and may not be considered as an aggravating factor. He relies upon *Zant* v. *Stephens* (1983) 462 U.S. 862 [77 L.Ed.2d 235, 103 S.Ct. 2733] for the proposition that it is constitutionally impermissible to label as aggravating those circumstances "that actually should militate in favor of a lesser penalty, such as . . . the defendant's mental illness." (*Id.* at p. 885 [77 L.Ed.2d at p. 255].) He contends that the prosecutor's argument, leaving it to the jury to decide whether defendant's mental condition was mitigating or aggravating, improperly allowed the jury to consider defendant's mental illnesses as a circumstance in aggravation.

In *People* v. *Poggi* (1988) 45 Cal.3d 306 [246 Cal.Rptr. 886, 753 P.2d 1082], we rejected the argument that section 190.3, factor (d), was unconstitutional on its face because it improperly allowed the jury to consider emotional disturbance as a factor in aggravation. We there stated, "[I]t seems plain that the provision does not authorize the jury to consider the presence of extreme mental or emotional disturbance in aggravation. [citation.])" (At p. 344.)

Here, the defense psychiatrists presented the only evidence going to any possible mental or emotional disturbance. It was clearly offered in mitigation. The only substantive argument the prosecutor made with respect to the defense psychiatric evidence was that it essentially did not amount to evidence establishing a mental or emotional disturbance; while both doctors were able to place descriptive labels on defendant's conduct, they both concluded he was sane, intelligent, and that his disorders did not prevent him from understanding what he was doing when he committed the murders. Although the prosecutor initially suggested that this factor could be considered aggravating as well as mitigating, he later argued that in this case, it was neither. We find no error.

### 11. *Age as an Aggravating Factor*

Defendant next contends the trial court should have deleted age as a factor for use in the determination of the penalty. The prosecutor argued that the "defendant was 32 years old when he went on this killing spree, though he behaved then, and he continues to behave now, like an eight-year-old. [¶] He's well beyond the age of accountability for his acts and this is another factor in aggravation."

Chronological age, as such, is neither aggravating nor mitigating, but age-related inferences relevant to the choice of penalty may be argued by either side in a given case. (See *People* v. *Visciotti* (1992) 2 Cal.4th 1, 76-77 [5 Cal.Rptr.2d 495, 825 P.2d 388]; *People* v. *Edwards, supra,* 54 Cal.3d at p. 844.) One such permissible inference is that the defendant is "old enough to know better." (*People* v. *Caro, supra,* 46 Cal.3d 1035, 1062, fn. 13: see also *People* v. *Bonin* (1988) 46 Cal.3d 659, 704-705 & fn. 6 [250 Cal.Rptr. 687, 758 P.2d 1217].) The prosecutor's remark here was similarly permissible.

### G. "REASONABLE DOUBT" INSTRUCTIONS AS TO CERTAIN FINDINGS

Defendant contends the jury was required to find that the aggravating circumstances outweighed the mitigating circumstances beyond a reasonable doubt, and that they must be convinced beyond a reasonable doubt that death was the appropriate penalty. We have rejected the identical contention in numerous cases. (See e.g., *People* v. *Thompson, supra,* 45 Cal.3d 86, 143; *People* v. *Miranda* (1987) 44 Cal.3d 57, 107 [241 Cal.Rptr. 594, 744 P.2d 1127]; *People* v. *Rodriguez, supra,* 42 Cal.3d 730, 777-778.) We see no reason to reconsider our rulings here.

### H. CUMULATIVE EFFECT OF THE ERRORS

We have reversed the convictions for the crimes committed against Charlene A., and have found certain errors and presumed errors at the

penalty phase. Although the crimes against Charlene A. were serious, they pale in comparison to the *six* murders of which the jury convicted defendant and the two more proven at the penalty phase. The same is true of the penalty phase errors. The six guilt phase and two penalty phase murders were fairly and properly proven against defendant. Except for the crimes against Charlene A., the "jury properly considered all of the *evidence*. It was well aware of the circumstances under which the murders were committed." (*People* v. *Kelly* (1992) 1 Cal.4th 495, 551 [3 Cal.Rptr.2d 677, 822 P.2d 385].) As discussed previously, the jury properly understood the weighing process. The overwhelmingly aggravating nature of these murders renders any of the errors insignificant, and thereby harmless.

Our review of the record convinces us that it is not reasonably possible that the errors, singly or in combination, affected the penalty verdict. We are persuaded that defendant received a fair and untainted trial. The Constitution requires no more. (*People* v. *Kelly*, *supra*, 1 Cal.4th at p. 551.)

I. AUTOMATIC MOTION TO MODIFY THE PENALTY

 Defendant next contends that the trial court, in ruling upon his automatic motion for modification of the penalty under section 190.4, subdivision (e), committed three errors.

First, defendant claims the trial court improperly treated the absence of certain mitigating factors as aggravating. (See *People* v. *Davenport, supra,* 41 Cal.3d 247, 290.) Defendant has misconstrued the court's ruling. The court reviewed each of the statutory factors, and referred to the absence of specific factors, but it did not suggest that that absence was itself aggravating. The court did find "in aggravation that the defendant was neither under the influence of any drug nor intoxicated" at the time of the murders, but the comment was merely part of the larger, and proper, finding in aggravation that the murders were "committed solely for the defendant's perverted sexual gratification."

Second, defendant claims the trial court improperly relied on nonstatutory aggravating factors. (See *People* v. *Boyd, supra,* 38 Cal.3d 762.) In discussing section 190.3, factor (d)—whether defendant was under the influence of any extreme mental or emotional disturbance—the court stated that defendant was not under any such influence, but rather that defendant "has an antisocial personality . . . that he is selfish, has no regard for others, no social conscience, has an explosive personality and has an extreme violence potential." The comments were proper. Defendant's selfish motivation is evident from his utter disregard for others to the extent of taking lives for

nothing more than his own immediate sexual gratification. His selfishness, explosiveness and violence are all part of the circumstances of the crimes, a proper criterion under section 190.3, factor (a).

Third, defendant claims the court impermissibly disregarded defendant's mitigating evidence. He asserts that the court overlooked section 190.3, factor (c) (lack of prior convictions), and improperly found no mitigation under factor (k), when in fact defendant had honorably served in and been discharged from the military service, and had once received a commendation from the police for his part in reporting a robbery in progress. Because, he asserts, there is something redeeming in every human being, the court's failure to find anything in mitigation requires reconsideration of the motion.

There was no error. The trial court independently assessed the weight of the evidence and stated its reasons for denying the motion with sufficient particularity " 'to assure thoughtful and effective appellate review.' " (*People v. Rodriguez, supra*, 42 Cal.3d 730, 794.) It stated that it had reviewed *all* the evidence presented at the guilt and penalty phases and had considered all the factors in mitigation and aggravation under section 190.3. Its failure to find any factors in mitigation was plainly a relative statement that it found nothing persuasive in the urged mitigating factors. (See *People v. Pinholster, supra*, 1 Cal.4th 865, 971.)

The court did specifically refer to the crimes committed against Charlene A. Since we have reversed those convictions, the reference was error. The error, however, was harmless. Given the number and nature of these murders, and the extensive aggravating factors, it is not reasonably possible the reference to those crimes affected the modification decision. (*People v. Benson* (1990) 52 Cal.3d 754, 812 [276 Cal.Rptr. 827, 802 P.2d 330].)

## J. CONSTITUTIONALITY OF DEATH PENALTY LAW

Finally, defendant contends the 1978 death penalty statute is unconstitutional on grounds we have repeatedly rejected. (See *People v. Sully* (1991) 53 Cal.3d 1195, 1250-1251 [283 Cal.Rptr. 144, 812 P.2d 163]; *People v. Douglas* (1990) 50 Cal.3d 468, 541 [268 Cal.Rptr. 126, 788 P.2d 640]; *People v. Howard* (1988) 44 Cal.3d 375, 443-444 [243 Cal.Rptr. 842, 749 P.2d 279]; *People v. Rodriguez, supra*, 42 Cal.3d 730, 777-778.)

## K. BRIEFS IN PROPRIA PERSONA

In addition to the briefing of counsel, defendant has filed briefs and other documents in propria persona.[25] In *People* v. *Mattson* (1959) 51 Cal.2d 777 [336 P.2d 937], we confronted a similar situation. As we there observed, "although defendant has been diligently represented by court-appointed counsel, he has persisted in presenting documents in propria persona which reflect his misconceptions of and refusal to accept established rules of law." (*Id.* at pp. 797-798.) We held: "The general rule that a defendant who is represented by an attorney of record will not be personally recognized by the court in the conduct of his case applies to the filing of *pro se* documents on appeal. Because of the undesirability of fruitlessly adding to the burdens of this court the time-consuming task of reading *pro se* documents which are not properly before us, and, if they be read, of consequently enlarging this opinion by a recountal and discussion of the contentions made in propria persona, such documents filed in this appeal by defendant should be stricken." (*Id.* at p. 798, citations omitted.)

We now reiterate this rule. ▆▆ Motions and briefs of parties represented by counsel must be filed by such counsel. (See also *In re Cathey* (1961) 55 Cal.2d 679, 684-685 [12 Cal.Rptr. 762, 361 P.2d 426] [where we accepted pro se documents filed before the appointment of counsel and "briefs subsequently prepared by [defendant] personally but filed on his behalf by his counsel."].) Developments since *Mattson* (*supra*, 51 Cal.2d 777) was decided necessitate one exception to this rule. We will accept and consider pro se motions regarding representation, including requests for new counsel. (Cf. *People* v. *Marsden*, *supra*, 2 Cal.3d 118.) Such motions must be clearly labeled as such, and must be limited to matters concerning representation. We will not consider extraneous matters even in such documents unless submitted by counsel. Any pro se documents by represented parties not clearly coming within this exception will be returned unfiled.

Out of caution, we have read defendant's pro se briefs in this case, and the issues and arguments raised therein, and find no basis on which to reverse either the guilt or penalty verdicts or the judgment of death. (See *People* v. *Sully*, *supra*, 53 Cal.3d at p. 1251.) We have considered defendant's pro se motions and other documents, however designated or labeled, not previously acted upon. All lack merit, and are hereby denied.

---

[25]As an example, defendant filed a lengthy "motion" demanding various actions by this court; the motion revolved exclusively around a minor typographical error that appeared in the advance sheets of an opinion of this court in 1989. The error was corrected in the bound volume, and never had any relevance to this case. At different times, defendant has moved to recuse former Justice Broussard (and other members of this court) because of alleged bias, and has "demand[ed]" that Justice Broussard not retire until this case is decided.

## V. Disposition

The attempted murder and mayhem convictions are reversed. All but one of the multiple-murder special-circumstance findings are set aside. In all other respects, the judgment is affirmed.

Lucas, C. J., Panelli, J., Baxter, J., and George, J., concurred.

MOSK, J.—I dissent. Justice was not served by the trial court proceedings.

This case illustrates the futility of self-representation in a death penalty case. It was unfortunate that *Faretta* v. *California* (1975) 422 U.S. 806 [45 L.Ed.2d 562, 95 S.Ct. 2525]—a noncapital case—in recognizing a general right of self-representation did not distinguish between mere traffic infractions and the heightened requirement of cases in which the issue is life or death. In the latter, both the state and the defendant have the responsibility of presenting all available evidence, for and against the death penalty or life without possibility of parole. Defendant may not frustrate that duty by silence as in this case, by gamesmanship as in *People* v. *Bloom* (1989) 48 Cal.3d 1194, 1234 [259 Cal.Rptr. 669, 774 P.2d 698] (dis. opn. of Mosk, J.), or by prohibiting counsel to present evidence as in *People* v. *Deere* (1985) 41 Cal.3d 353, 361 [222 Cal.Rptr. 13, 710 P.2d 925].

I must repeat the admonition given to trial courts and counsel in *Deere*: when the people of California are being asked to take a human life, every aspect of the case must be presented to and considered by the jury in a genuine adversary proceeding. Self-representation by a marginally equipped defendant seldom serves that end. If there is the slightest doubt of the knowledge and abilities of the defendant to effectively duel with the skilled prosecutor, the trial court should deny self-representation at the very outset. Such a doubt—which certainly arose here—precludes the threshold determination required by *Faretta*, viz., that the defendant has "voluntarily and intelligently elect[ed] to" proceed without counsel. (422 U.S. at p. 807 [45 L.Ed.2d at p. 566].)

Since the trial court did not deny self-representation in this case, I would reverse the judgment.

KENNARD, J., Dissenting.—This death penalty trial was a judge's nightmare: an extremely complex multiple-murder case in which an obstreperous, manipulative defendant insisted on exercising his constitutional right to represent himself. Obviously frustrated with defendant's course of conduct, the trial court, confronted with defendant's decision to stand mute, incorrectly deemed that decision to be a waiver of defendant's right to represent himself, and appointed counsel to represent him.

Much as I sympathize with the trial court's desire to terminate defendant's pro se status under the circumstances of this case, defendant had a right to remain silent in the face of the prosecution's allegations. By preventing him from doing so, the court violated defendant's constitutional right to act as his own attorney and to present his case in his own way. I cannot accept the majority's conclusion that by being silent defendant obstructed the proceedings against him, thus warranting revocation of his right to self-representation. I therefore dissent.

BACKGROUND

On October 13, 1982, the trial court granted defendant's request, made in the midst of trial, to represent himself. (See *Faretta* v. *California* (1975) 422 U.S. 806 [45 L.Ed.2d 562, 95 S.Ct. 2525].) Defendant conducted his own defense until November 1, 1982. On that day, outside the presence of the jury, the court denied defendant's motion to recuse the prosecutor. When trial recommenced and the court told defendant that it was his turn to cross-examine the prosecution's witness, defendant replied: "Your Honor, the defense stands mute throughout the rest of the trial." Defendant gave no reason for his decision.

The court immediately declared a recess and, outside the jury's presence, announced its conclusion that defendant had renounced his right to act as his own attorney. Defendant responded that he had a right to stand mute and that he wished to continue to represent himself. The trial court replied: "If you open your mouth again without my permission, I'll have it gagged. . . . I find that you've renounced your pro per privileges. You do not wish to proceed to represent yourself. [¶] Mr. Keith and Ms. Watson, who have been standby counsel, will now resume." Before the trial continued, defendant asked the court why it had terminated his right to represent himself. The court responded: "On the grounds that you decided to stand mute . . . ."

That afternoon, Attorneys Keith and Watson, who had been observing the trial in the courtroom, represented defendant over his objection. Attorney Keith conducted cross-examination on defendant's behalf. The next morning, defendant informed the trial court that if it would restore his right to represent himself, he would abide by the court's ruling and would actively defend himself. The court then permitted defendant to resume his self-representation. Defendant conducted his own defense until December 6, 1982, when, based on the trial court's finding that defendant had engaged in disruptive behavior, the court terminated defendant's right to act as his own attorney and reappointed counsel to represent him.

DISCUSSION

The Sixth Amendment to the federal Constitution guarantees to defendants in criminal prosecutions not only the right to representation by an attorney, but also the right to conduct the defense in person without counsel. (*Faretta* v. *California, supra,* 422 U.S. 806.) A defendant who elects self-representation, rather than representation by counsel, may conduct the defense in whatever manner the defendant deems appropriate, so long as the defendant does not "use the courtroom for deliberate disruption." (*Id.* at p. 834, fn. 46 [45 L.Ed.2d at p. 581]; see *McKaskle* v. *Wiggins* (1984) 465 U.S. 168, 177-178 [79 L.Ed.2d 122, 132-133, 104 S.Ct. 944].) A self-represented defendant may even conduct the defense by standing mute, as this court has recognized on several occasions.

In *People* v. *Teron* (1979) 23 Cal.3d 103 [151 Cal.Rptr. 633, 588 P.2d 773], a self-represented defendant asked no questions of the prosecution's witnesses, presented no evidence on his own behalf, and made no opening or closing statement. On appeal, the defendant contended that the trial court should have stepped in and terminated self-representation once it became clear that the defendant would make no effort to obtain a favorable verdict. We rejected the contention, saying that the defendant "bears no duty to present a defense." (*Id.* at p. 115.)

We reaffirmed this conclusion in *People* v. *McKenzie* (1983) 34 Cal.3d 616 [194 Cal.Rptr. 462, 668 P.2d 769], contrasting a self-represented defendant's right to stand mute with a defense attorney's duty to provide effective assistance. In *McKenzie,* the defendant was represented by an attorney who refused to participate in the trial, beyond appearing in court, after the trial court had denied certain defense motions. Defense counsel made no opening or closing statements, asked no questions of jurors on voir dire, cross-examined no prosecution witnesses, and raised no objections to the prosecution's evidence. We held that the attorney's conduct had deprived the defendant of his right to the effective assistance of counsel. But we carefully distinguished the situation of a self-represented defendant: "The choice of self-representation preserves for the defendant the option of conducting his defense by nonparticipation. A competent defendant has a right to choose 'simply not to oppose the prosecution's case.' . . . *If the defendant chooses to defend himself by not participating in the trial, he, unlike his attorney, is free to do so,* but once this choice is made he cannot thereafter claim ineffective assistance of counsel as a basis for reversal on appeal." (*Id.* at pp. 628-629, citations omitted, italics added.)

Recently, in *People* v. *Bloom* (1989) 48 Cal.3d 1194 [259 Cal.Rptr. 669, 774 P.2d 698], we again emphasized that a self-represented defendant should

be free to conduct the defense in any manner that does not disrupt the trial. In *Bloom*, a death penalty case, the defendant contended on appeal that the trial court had abused its discretion when it permitted him to act as his own attorney at the penalty phase for the announced purpose of asking the jury to return a death verdict. Rejecting the contention, we explained that although a defendant may conduct a defense ultimately to the defendant's detriment, the defendant's choice " 'must be honored out of "that respect for the individual which is the lifeblood of the law." ' " (*Id.* at p. 1221, citations omitted.)

A self-represented defendant's right to stand mute at trial has been recognized not only by this court, but by federal appellate courts as well. The Sixth Circuit has put it this way: "[J]ust as it is the accused's right to plead guilty or *nolo contendere* to the charges against him, it is equally an accused's personal constitutional right to face the charges alone, either by standing mute and forcing the state to its proofs or by attempting to defend himself." (*U.S.* v. *McDowell* (6th Cir. 1987) 814 F.2d 245, 250; see also *U.S.* v. *Clark* (7th Cir. 1991) 943 F.2d 775, 782; *Savage* v. *Estelle* (9th Cir. 1990) 924 F.2d 1459, 1464, fn. 10.)

Without directly denying that self-represented defendants have a right to stand mute, the majority asserts that in this case the trial court properly terminated defendant's right to conduct his own defense because he had engaged in " 'serious and obstructionist misconduct' " that " 'abuse[d] the dignity of the courtroom.' " (Maj. opn., *ante*, p. 115, quoting *Faretta* v. *California*, *supra*, 422 U.S. at pp. 834-835, fn. 46 [45 L.Ed.2d at p. 581].) But in what respect is mere silence obstructive? And how does such silence abuse the court's dignity? These are questions that the majority does not, and cannot, answer.

I fail to see how in this case defendant's nonparticipation in his defense could be deemed an affront to the dignity of the trial court. It would appear that rather than obstructing the trial proceedings, the defendant's conduct in standing mute (had it been permitted by the trial court) would have expedited them. Obviously, trial time is shortened considerably when the defense does not cross-examine prosecution witnesses and calls no defense witnesses.

The majority attempts to justify the trial court's termination of defendant's right of self-representation on several grounds. None is persuasive, as discussed below.

The majority asserts that termination of the right of self-representation was permissible here because, viewed in context, the act of standing mute

was "part of a deliberate course of conduct designed to cause as much disruption as possible." (Maj. opn., *ante*, p. 116.) I find this analysis unpersuasive in two respects. First, I question whether defendant's behavior during the discussion preceding his decision not to participate in the trial was deliberately disruptive. Although defendant's motion to recuse the prosecutor was clearly meritless, the record suggests that defendant believed it to be proper, and that he attempted to argue it in an orderly fashion. More important, however, the trial court did not terminate defendant's right of self-representation for engaging in a pattern of disruptive behavior; rather, as the court repeatedly explained, its ruling was based on defendant's decision to stand mute.

The majority characterizes defendant's nonparticipation as "an attempt to either inject error into the case, or to pressure the court into reconsidering its earlier rulings . . . ." (Maj. opn., *ante*, p. 115.) But so long as defendant was not disrupting the proceedings, he was entitled to remain silent regardless of his motives. Moreover, it is difficult to conceive how the act of standing mute, which carries with it no coercive power, could have injected error into the record or pressured the trial court into reversing its rulings. Defendant may have believed that if he remained silent while representing himself, any ensuing conviction would be reversed for incompetence of counsel, and that to avert such a reversal the trial court would be compelled to change its rulings. If this was defendant's belief, he was mistaken, because a self-represented defendant may not argue his or her own incompetence as a ground for reversal on appeal. (*Faretta* v. *California, supra*, 422 U.S. at p. 835, fn. 46 [45 L.Ed.2d at p. 581]; *People* v. *McKenzie, supra*, 34 Cal.3d at pp. 628-629.)

The majority apparently would permit a self-represented defendant to stand mute only if that decision is based on a "sincere desire to withhold a defense." (Maj. opn., *ante*, pp. 114-115.) But a trial court may not condition the right of self-representation on a judicial evaluation of the sincerity of the defendant's desires. Generally, a self-represented defendant's knowing and intelligent decision not to participate in the trial should not be considered as a waiver of the right of self-representation. As we said in *People* v. *Bloom, supra*, 48 Cal.3d at page 1222, "both court and counsel are obligated to respect a competent defendant's considered and voluntary decisions on matters of fundamental importance affecting trial of the action . . . ." The decision by a defendant who has chosen self-representation and has decided to remain silent in the face of the prosecution's case is one of "fundamental importance," and must therefore be respected by the trial court. Although the court may warn the defendant that such a decision is unwise, it must permit the decision to stand.

When the trial court in this case denied defendant the right to stand mute while acting as his own attorney, it violated defendant's right to conduct his own defense, as guaranteed by the Sixth Amendment to the federal Constitution and enunciated by the United States Supreme Court in *Faretta* v. *California, supra,* 422 U.S. 806. "In determining whether a defendant's *Faretta* rights have been respected, the primary focus must be on whether the defendant had a fair chance to present his case in his own way." (*McKaskle* v. *Wiggins, supra,* 465 U.S. at p. 177 [79 L.Ed.2d at p. 132].) Here, the trial court's ruling that defendant could not represent himself if he elected to remain silent deprived defendant of a "fair chance to present his case in his own way," and thus violated defendant's constitutional right to act as his own attorney.

The majority asserts that the dissent "cites [no cases] compelling a court to acquiesce in a defendant's request to stand mute under circumstances even remotely similar to those of this case." (Maj. opn., *ante,* p. 116.) The converse is also true: the majority cites no cases upholding a trial court's decision to terminate a defendant's right of self-representation "under circumstances even remotely similar to those of this case." This dearth of precedent suggests, if anything, that most trial courts do not view a self-represented defendant's act of standing mute as a waiver of the defendant's *Faretta* rights, and have allowed defendants to continue representing themselves in circumstances such as these.[1]

The trial court's erroneous ruling was not corrected when, the morning after it had appointed counsel to represent defendant, the court reinstated defendant's right to represent himself after defendant promised to actively participate in the trial. The court never rescinded its ruling that defendant could not stand mute, and defendant knew that if he again elected to do so, the court would regard this act as a basis to revoke his right to represent himself. Defendant's right of self-representation was therefore impaired not only for the afternoon on which he was represented by counsel, but for the remainder of the trial.

Because, in contrast to the majority, I am of the view that the trial court erred when it terminated defendant's right of self-representation because he chose to stand mute, the remaining question is whether the error requires reversal of the judgment. A review of the applicable decisions of the United States Supreme Court leads me to conclude that reversal is compelled.

---

[1]The majority also remarks that other than *Faretta* itself, this dissent cites no cases finding a violation of a defendant's right to self-representation. (Maj. opn., *ante,* p. 116.) The point of this remark eludes me. Does the majority doubt that such cases exist? Is the majority suggesting that the right of self-representation cannot be violated?

When a trial court denies a defendant the constitutionally guaranteed right to act as his or her own attorney, the conviction must be reversed irrespective of whether the denial influenced the outcome of the trial. The United States Supreme Court has expressly said so: "Since the right of self-representation is a right that when exercised usually increases the likelihood of a trial outcome unfavorable to the defendant, its denial is not amenable to 'harmless error' analysis. The right is either respected or denied; its deprivation cannot be harmless." (*McKaskle* v. *Wiggins, supra,* 465 U.S. at p. 177, fn. 8 [79 L.Ed.2d at p. 133]; see also *People* v. *Joseph* (1983) 34 Cal.3d 936, 946 [196 Cal.Rptr. 339, 671 P.2d 843].)

Here, in ruling that defendant, who had chosen to represent himself, could not stand mute at trial, the trial court deprived defendant of his constitutional right to conduct his defense "in his own way." (*McKaskle* v. *Wiggins, supra,* 465 U.S. at p. 177 [79 L.Ed.2d at p. 132].) Under the high court's decision in *McKaskle,* the denial of that right requires reversal of the judgment against defendant.

Appellant's petition for a rehearing was denied September 23, 1992. Mosk, J., and Kennard, J., were of the opinion that the petition should be granted.